## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MIKE HARRIS and JEFF DUNSTAN, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:11-5807 |
| v. | ) ) | Hon. James F. Holderman |
| COMSCORE, INC., a Delaware corporation, | ) ) ) | Magistrate Judge Kim |
| Defendant. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
## SUPPLEMENTAL MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

II.   STATEMENT OF FACTS.................................................................................3

    A.    comScore: A Major Player in the Internet Behavior Data-Tracking
          Industry....................................................................................................3

    B.    comScore's Tracking Software, OSSProxy ...........................................3

    C.    comScore Distributes OSSProxy Using Third Party "Bundlers."

          1.    Step 1: the user selects "download" on the Bundler's website to
                 get the screensaver, photo editor, or other desired program.................5

          2.    Step 2: the user runs the installation program .......................................6

          3.    Step 3: the user is presented with a dialog box containing the
                 Bundler's complete license agreement ....................................................6

          4.    Step 4: the user is presented with dialog box terms that state
                 RelevantKnowledge is included with the software "In order to
                 provide this free download" and—except for Subclass
                 members—provides a hyperlink to a uniform ULA............................7

          5.    Step 5: following the user's clicking of "Accept" or "Deny" on
                 the RelevantKnowledge dialog box, the desired program is
                 installed ....................................................................................................8

          9.    Step 6: the free software can be launched and used ............................6

    D.    The Terms of the ULA: TRMG Inc., or Another Sponsor Uniformly
          Promises, *inter alia*, to "make commercially viable efforts to
          automatically filter confidential personally identifiable information"
          While Concealing the True Scope of Data that OSSProxy will Actually
          Monitor and Collect ..............................................................................10

    E.    OSSProxy's Inner Workings—what comScore's Software Actually
          Does ........................................................................................................12

          1.    OSSProxy's methods to access, intercept, and transmit
                 consumer data .......................................................................................12

          2.    OSSProxy identifies, "fuzzifies," and transmits—rather than
                 automatically filters—sensitive data ....................................................14

3.      comScore retains sensitive data that it admits to collecting "inadvertently." ...................................................................15

F.      **Named Plaintiffs Dunstan and Harris Had OSSProxy Installed on their Computers** ...........................................................16

G.      **The Claims at Issue Under the SCA, ECPA, CFAA, and for Unjust Enrichment** ...............................................................17

III.    **ARGUMENT** ..........................................................................18

A.      **The Proposed Class and Subclass Are Ascertainable** ...................18

B.      **The Class and Subclass Satisfy the Four Requirements of Rules 23(a)** .........20

1.      **Numerosity is satisfied as millions of individuals had OSSProxy installed onto their computers** ...............................20

2.      **Resolution of this case will answer—in one stroke—common questions of law and fact that principally ask: (1) did comScore obtain consent from users to track their information, and (2) if so, did comScore exceed the scope of that authority** ..........................22

        a.      *Issue One: Can comScore enforce the ULA?* ...................22

                i.      *Is comScore party to the ULA and, if not, does it have any third-party rights under it?* ...............22

                ii.     *Does the process for downloading and installing OSSProxy, which does not lend itself to securing knowing consent, render the ULA unenforceable* ............23

        b.      *Issue Two: Assuming comScore can enforce the ULA, does OSSProxy's data collection violate its terms?* ...............24

        c.      *Plaintiffs' claims share "the same essential characteristics" with those of the Class and Subclass* ................25

3.      **The Class Representatives and their Counsel have no conflicts with and are committed to adequately representing the proposed Class** .........................................................25

C.      **The Class and Subclass Satisfy the Rigors of Rule 23(b)(3)** ...........27

1.      **Common issues regarding comScore's ability to enforce the ULA and whether OSSProxy exceeds the ULA's terms predominate over any supposedly relevant individual questions** ........28

2.      **The class action is a superior method for adjudicating the**

**controversy** ................................................................................................29

**IV.**     **CONCLUSION** ...............................................................................................30

## TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..............................................18, 28

*Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011) ...........................29

*Runyan v. McCrary*, 427 U.S. 160 (1976) .......................................................................29

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ...........................................18, 21

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Analect LLC v. Fifth Third Bancorp*, 380 F. App'x 54 (2d Cir. 2010)...........................22

*Carlson v. Gen. Motors Corp.*, 883 F.2d 287 (4th Cir. 1989) .......................................23

*Carte Blanche (Sing.) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24 (2d Cir. 1993) ...................22

*Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010) .....................................29

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................29

*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006)................................18

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) ........................................29

*Mazza v. Am. Honda Motor Co. Inc.*, 666 F.3d 581 (9th Cir. 2012) ............................29

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) ................................................29

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992).....................................................21

*Spano v. The Boeing Co.*, 633 F.3d 574 (7th Cir. 2011)................................................21

*Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742 (7th Cir. 2008) .............................29

*United Steel v. ConocoPhillips Co.*, 593 F.3d 802 (9th Cir. 2010) ...............................29

**UNITED STATES DISTRICT COURT CASES:**

*Beckless v. Heckler*, 622 F.Supp. 715 (N.D. Ill. 1985).................................................26

*Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408 (N.D. Ill. 2012) ...................22, 24

*Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387 (N.D. Ill. 2006) ...................................................26

*Fletcher v. ZLB Behring LLC*, 245 F.R.D. 328 (N.D. Ill. 2006)....................................................28

*Foreman v. PRA III, LLC*, 2007 WL 704478 (N.D. Ill. Mar. 5, 2007)...........................................18

*Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394 (N.D. Ill. 1987)................................................26

*Haroco, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 121 F.R.D. 664 (N.D. Ill. 1988) ...........22

*Heartland Commc'ns., Inc. v. Sprint Corp.*, 161 F.R.D 111 (D. Kan. 1995) ................................22

*Hinman v. M & M Rental Ctr., Inc.*, 545 F.Supp.2d 802 (N.D. Ill. 2008).....................................18

*Hylaszek v. Aetna Life Ins. Co.*, 1998 WL 381064 (N.D. Ill. July 1, 1998) .................................28

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 290 F.R.D. 323 (S.D.N.Y. 2002)..............18

*Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683 (N.D. Ga. 1983).......................................22

*Matthews v. United Retail, Inc.*, 248 F.R.D. 210 (N.D. Ill. 2008)...........................................26, 27

*Maxwell v. Arrow Fin. Servs., LLC.*, 2004 WL 719278 (N.D. Ill. Mar. 31, 2004).......................28

*Menagerie Prods. v. Citysearch*, 2009 WL 3770668 (C.D. Cal. Nov. 9, 2009)...........................22

*Montgomery v. Corinthian Colleges, Inc.*, 2011 WL 1118942 (N.D. Ill. Mar. 25, 2011)............23

*Pope v. Harvard Banchares, Inc.*, 240 F.R.D. 383 (N.D. Ill. 2006)..............................................20

*Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424 (N.D. Ill. 2003)..............................25

*Ramirez v. Palisades Collection LLC*, 250 F.R.D. 366 (N.D. Ill. 2008) .......................................18

*Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648 (N.D. Ill. 2006) ..............................................20

*Tatz v. Nanophase Tech. Corp.*, 2003 WL 21372471 (N.D. Ill. June 13, 2003) ..........................28

*Wolph v. Acer Am. Corp.*, 272 F.R.D. 477 (N.D. Cal. 2011) .......................................................18

*Ziemack v. Centel Corp.*, 163 F.R.D. 530 (N.D. Ill. 1995)...........................................................28

**STATE COURT CASES:**

*In re Rehab. of Centaur Ins. Co.*, 158 Ill. 2d 166, 632 N.E.2d 1015 (1994) ...............................22

*Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1 (2006)..............................................................23

**STATUTES AND FEDERAL RULES:**

18 U.S.C. § 1030.....................................................................................................................#

18 U.S.C. § 2701.................................................................................................................#, 9

18 U.S.C. § 2510....................................................................................................................#

Fed. R. Civ. P. 23 ...........................................................................................................*passim*

**MISCELLANEOUS:**

2 Conte & Newberg, Newberg on Class Actions § 4:24 (4th ed. 2002).......................................28

5 James Wm. Moore et al., Moore's Federal Practice (3d ed. 2001)...........................................19

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
    Federal Practice and Procedure § 1759 (2d ed. 2006) .....................................................18

15 W. Jaeger, *Williston on Contracts* § 1763A (1972)...............................................................23

18 Am. Jur. 2d *Corporations* § 45 (1985) ................................................................................22

18 C.J.S. *Corporations* § 12 (1990).........................................................................................22

Manual for Complex Litigation, § 21.222 (4th ed. 2004)............................................................18

Restatement (Second) of Contracts § 208 comment d (1981) .....................................................23

Restatement of Contracts § 19(b) (1932)....................................................................................23

I.    **INTRODUCTION**[1]

Defendant comScore Inc. ("comScore") touts itself as a global leader in a booming new

industry that provides statistics and trends on consumers' Internet behavior. Claiming to capture

over one trillion interactions each month (or almost 40% of the monthly page views of the entire

Internet), comScore collects, measures, and analyzes computer user data to offer its clients—

many of the world's largest corporations—actionable and "real-time predictive analytics . . .

measuring consumers' behavior and attitudes...and analyzing the implications." To gather its

"vast mountain of data,"[2] comScore relies in part on "panelists"[3]—consumers who've had

comScore's tracking software, OSSProxy[4] ("OSSProxy" or the "Program"), installed on their

computers. Once operational, OSSProxy begins monitoring virtually every online movement of

the panelists, capturing such intimate details as the websites viewed, items purchased, each piece

of information entered on a webpage—such as credit card numbers, addresses, telephone

numbers, bank account numbers, and full names—and even targets data revealing the websites

visited, movies watched, and music listened to by a user on his or her *smart phone*. Upon

acquisition, the data is sent back to comScore's servers, where it ultimately feeds into the

---

[1]    All referenced exhibits in this document are attached to the Declaration of Jay Edelson ("Edelson Decl.") filed contemporaneously with this Supplemental Motion.

[2]    *See About the comScore Data Mine*, comScore Data Mine, http://www.comscoredatamine.com/about-comscore-data-mine/ (last visited Jan. 15, 2013).

[3]    comScore refers to the owners of the computers from which it takes and sells information as "panelists" to give the outward impression that they are willing participants in comScore's data collection practices. As most consumers don't understand that they've even installed OSSProxy, the terms "computer user," "user" or "household" are more accurate. Plaintiffs use the term "panelist" at times in this brief merely for convenience.

[4]    OSSProxy is comScore's internal name for its tracking software, as designed to operate on Windows compatible computers. (Dep. Tr. of comScore R. 30(b)(6) Designee, Michael Brown ("Brown Tr.") at 120:3–121:18, Ex. A.) For convenience, Plaintiffs use "OSSProxy" to also include "MacMeter," the "Mac software [] designed to collect the same types of data [] collected by the Windows software." (Brown Tr. 120:3–121:18; Defendant comScore, Inc.'s First Supplemental Responses to Plaintiff Harris' First Set of Interrogatories. ("comScore Interrogs.") No. 17, Ex. B.)

company's reports.

The problem—and what triggered this lawsuit—is that panelists never agree to having such a wide array of their data collected, which means that comScore is engaged in the ongoing violation of millions of individuals' privacy rights. In the end, while the technical details of this case may appear complex, comScore's liability is fairly straightforward: as will be proven at trial, comScore collects and sells user information without consent (or perhaps more accurately, in a manner plainly exceeding any user consent).[5] Thus, establishing comScore's liability under the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701, *et seq.*, Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510, *et seq.*, and Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030, *et seq.*, and for unjust enrichment, turns on two simple questions: (1) did comScore obtain *any* consent from consumers to access, intercept, and ultimately collect information from their computers through OSSProxy, and (2) assuming Class members provided some level of consent, did comScore exceed the scope of that consent by collecting information beyond what was permitted?

At this stage of the proceedings, however, the issue is the maintenance of a class and subclass pursuant to Federal Rule 23. Certification here is textbook. Under that analysis, the relevant questions are even plainer: (1) do the same (or substantively similar) terms govern consumers' subjection to OSSProxy and were such terms presented to consumers in a uniform manner, and (2) was comScore's tracking software uniformly designed to attempt to capture and transmit data from panelists' computers? The answer to both questions, as even comScore itself

---

[5]     Consistent with the allegations in their Complaint, and Plaintiff Harris' experience, comScore provided *no* hyperlink to the end user license agreement ("ULA") to Subclass members and, accordingly, none were given an opportunity to review *any* ULA terms before "agreeing" to download and install comScore's tracking software. (*See* Dkt. 1-1.) That fact additionally supports Plaintiffs' arguments, explained below, that the ULA terms were effectively hidden within the download and installation process and thus Subclass members did not knowingly assent to any terms supposedly governing the installation and use of the software. *See infra*, § II.B.2.a.ii; (*see also*, Dkt. 31 at 3.)

has admitted, is yes. As explained below, discovery has revealed that comScore designed OSSProxy in such a manner that it is uniformly downloaded and installed onto consumers' computers, so that consumers are supposedly presented with (and, by comScore's account, assent to) identical contract terms and so that their personal computer habits are subjected to the same type of invasive tracking. The only relevant exception to comScore's uniform conduct is that, with respect to a specific subset of panelists (like Plaintiff Mike Harris) who had the Macintosh version of OSSProxy installed on their computers, comScore failed to provide a hyperlink to the full end user license agreement. That slight distinction, however, is easily dealt with by the creation of a subclass.

As such, Plaintiffs seek certification of the following Class and Subclass:

> **Class:** All individuals who have had, at any time since 2005, downloaded and installed comScore's tracking software onto their computers via one of comScore's third party bundling partners.
>
> **Subclass:** All Class members not presented with a functional hyperlink to an end user license agreement ("ULA") before installing comScore's software onto their computers.[6]

Looking forward, this litigation is able to resolve for the entire Class and Subclass—in a single stroke—whether comScore obtained any authority from panelists to collect and sell their data, and if so, whether it exceeded the scope of such authorization. Regardless of how the fact finder ultimately decides, the answer to these questions will be the same for everyone in the Class and Subclass, making this case readily amenable to class-wide adjudication.

Accordingly, and as explained further below, the Court should certify this case as a class action under Rule 23(b)(3) for statutory damages under the SCA, ECPA, and CFAA, and for

---

[6]     As mentioned above, the only issue facing Subclass members separate and apart from the issues relevant to the Class as a whole deals with comScore's failure, for a specific subset of Macintosh panelists, to provide any functioning hyperlink to the full ULA before such panelists downloaded and installed the software (whereas comScore insists the hyperlink worked for the rest of the Class members).

disgorgement of the monies comScore continues to unjustly retain.

## II.     STATEMENT OF FACTS

### A.     comScore: A Major Player in the Internet Behavior Data-Tracking Industry.

With so many companies wanting to know what makes their customers tick, especially

when it comes to online purchases and behavior, it was inevitable that a data analytics industry

would emerge to meet that demand. Enter comScore, an early entrant and leader in the field.

comScore claims that it measures online consumer trends by collecting and analyzing data about

individual users' Internet behavior. (Answer to First Am. Compl. ("Am. Answer"), Dkt. 140 at

2.) comScore sells this information to its clients, who, in some cases, resell the information. (Ex.

B, No. 11.) comScore also combines its proprietary data with its clients' internal data to produce

highly detailed reports about the clients' customers. (Brown Tr. at 140:12–25.)

### B.     comScore's Tracking Software, OSSProxy.

To gather its data, comScore relies heavily on tracking software that it has developed,

which it internally refers to as "OSSProxy." (*Id.* at 9:5–15.) OSSProxy performs the same way

on every computer. (*Id.* at 91:8–92:8; Expert Witness Report of Don Waldhalm ("Waldhalm

Rpt.") at 2, Ex. C.) comScore designed OSSProxy so that once it's downloaded and installed,

the software continuously collects and sends data back to comScore's servers. (Waldhalm Rpt. at

3–6.) The information collected includes, *inter alia*, the names of every file on a user's computer,

everything a user enters into a web browser, and the content of PDF files. (*Id.*) Absent

immaterial variations, comScore's OSSProxy has been in operation in its present form—

collecting and transmitting data back to comScore from millions of computer users—since

2005.[7] And, though programmed for compatibility with separate operating systems, OSSProxy

---

[7]     OSSProxy has been monitoring and collecting panelist data since 2002. (Brown Tr. at 62:22–24.)
In 2005, however, comScore "upgraded the functionality of [OSSProxy] to no longer require [the use of]

functions the same whether installed on a Mac or a PC.[8]

### C.    comScore Distributes OSSProxy Using Third Party "Bundlers."

With limited exceptions, comScore doesn't distribute OSSProxy directly. Rather, comScore disseminates OSSProxy through dozens of third-party bundling partners. (Expert Witness Report of Colin O'Malley ("O'Malley Rpt.") at 6, Ex. D.) These "Bundlers" offer a range of free digital products, including but in no way limited to, software that allows users to copy CDs, convert video files, edit photographs, and install custom screensavers. (*See* Exhibit A to Defendant comScore, Inc.'s First Supplemental Responses to Plaintiffs Harris' First Set of Interrogatories, Ex. E.)

When an Internet user browses to a Bundler's website and selects a free program, they go through several steps for downloading and installing the desired software.[9] Paving the way for certification, comScore has, through its own expert witness, explained that these steps— including the "process and disclosures" regarding (1) the contractual terms for the program they want and (2) the contract that comScore claims allows it to siphon off their information—are "materially identical across all partner bundles." (O'Malley Rpt. at 6; Dep. Tr. of Colin

---

proxy servers" to track panelists. (*Id.* at 194:8–195:16.) As such, while comScore did in fact re-route panelist Internet traffic *through* comScore's proxy servers before collecting data from 2002-2005, OSSProxy in its current form preforms its collection operations on panelists' computers, and then transmits "information of interest . . . to comScore's servers." (*Id.* at 195:3–16.)

[8]    comScore internally referred to the Macintosh version of OSSProxy as "MacMeter" but, apart from the coding differences required by the PC versus Macintosh operating systems, both OSSProxy and MacMeter were designed to capture the same information from panelists. (*Id.* at 121:2–18, 122:25–123:21.)

[9]    The bundler websites seldom mention comScore or OSSProxy. For example, the Bundler website examined by comScore's expert Colin O'Malley—www.mp3-cutter-splitter.com—offers a free download of an .mp3 cutter that is bundled with OSSProxy's installer. (*See* O'Malley Rpt. at 6–8.) The website, however, provides no indication that the user will be prompted to install OSSProxy (Edelson Decl. at ¶ 4; *see also* O'Malley Tr. at 125:10–19 ("I'd be surprised to see [a reference to comScore's software]" on the MP3 Cutter website.).)

O'Malley ("O'Malley Tr.") at 123:5–124:4, Ex. F.) The most relevant steps[10] of this uniform

"process and [these uniform] disclosures" are as follows:

1. **Step 1: the user selects "download" on the Bundler's website to get the screensaver, photo editor, or other desired program.**

*First,* the user visits a Bundler's website, locates the desired software that they want (*e.g.*,

MP3 Cut), and selects "download." (O'Malley Rpt. at 6.)

2. **Step 2: the user runs the installation program.**

*Second,* after the software has been downloaded onto the computer, it must be installed.

Upon clicking the downloaded file the user initiates the installation process, and, as Figure 1

shows, is presented with a "Set-up Wizard." (O'Malley Rpt. at 8.)



(Fig. 1)

The "small piece of software used to verify" the user's "acceptance of our partner's

disclosures"—displayed above in Fig. 1—is comScore's "RKVerify" software—even though it

is not identified as such. (O'Malley Rpt. at 7–8.) RKVerify is comScore's "WatchDog" program,

which ensures that users are presented with materially identical dialog box terms, as discussed

---

[10]     The screenshots that follow below—for MP3 Cut 5.5.1 ("MP3 Cut")—come from the same Bundler examined by Mr. O'Malley in the context of his expert report. (*See* O'Malley Rpt. at 6–11.) Two points should be noted. First, the name of the program offered by the Bundler has changed since O'Malley composed his report (*i.e.*, from "MP3 Cutter" to "MP3 Cut"). (Edelson Decl. at ¶ 2.) Second, the complete installation process for MP3 Cut involves additional screens—including the presentation of more downloadable software offers to users after Step 5. (*See* MP3 Cut Screenflow, Figs. 1–13, Ex. G; Edelson Decl. at ¶¶ 2–4.)

below in Step 4.[11] (*Id.* at 7.)

> **3.    Step 3: the user is presented with a dialog box containing the Bundler's complete license agreement.**

*Third,* upon clicking next, the user is presented with the Bundler's license agreement. (O'Malley Rpt. at 9; MP3 Cut Screenflow at Fig. 2.)

> **4.    Step 4: the user is presented with dialog box terms that state RelevantKnowledge is included with the software "In order to provide this free download" and—except for Subclass members—provides a hyperlink to a uniform ULA.**

*Fourth,* and still prior to the desired software's (*e.g.,* MP3 Cut) actual installation, users are presented with an abbreviated statement relating to "RelevantKnowledge," or another one of comScore's "brands" of OSSProxy.[12] (O'Malley Rpt. at 9–10.) In the case of MP3 Cut, as shown below in Figure 2, users are told the software is being "provided by TMRG, Inc, a comScore, Inc., company."[13] The dialogue box says that TMRG may use the data collected through its software to create market reports and may combine it with data from "consumer data brokers." It continues that the information taken includes "internet usage information, basic demographic information, certain hardware, software, computer configuration and application usage information about the computer." TMRG promises to make "commercially viable efforts to automatically filter confidential personally identifiable information and to purge our databases of such information about our panelists" when inadvertently collected. A link to a "Privacy

---

[11]    While almost every Bundler uses "RKVerify," comScore has indicated that two of its bundling partners that "have a long and known, established history with comScore" do not but are "still . . . monitored." (Brown Tr. at 97:2–98:10.)

[12]    comScore distributes OSSProxy using several brand names, including RelevantKnowledge, PremierOpinion, PermissionResearch, OpinionSquare and MarketScore. (Am. Answer at ¶ 34.) Though the brands feature cosmetic differences, they are all OSSProxy. (Brown Tr. at 91:16–92:4.)

[13]    As explained below in Section II(D) *infra,* TMRG, Inc. is one of several comScore "Sponsors," which—according to these dialog box terms and the linked-to ULAs—provide, maintain, and collect data through a branded version of OSSProxy.

Statement and User License Agreement" is provided.[14] Panelists are told the branded version of

OSSProxy is needed "[i]n order to provide this free download" but are not told whether they can

proceed with the installation of the free software (*e.g.*, MP3 Cut) if they click "Decline."



(Fig. 2)

5.      **Step 5: following the user's clicking of "Accept" or "Deny" on the RelevantKnowledge dialogue box, the desired program is installed.**

*Fifth,* after clicking "Accept" or "Deny," users are finally able to install the free software

program. Figures 3 and 4 below show the user that the MP3 Cut program is being installed.

 

(Fig. 3)                                        (Fig. 4)

---

[14]      Again, for Subclass members *no* hyperlink to the ULA was provided and, accordingly, Subclass members were given no opportunity to review *any* ULA terms before "agreeing" to download and install comScore's software. (*See supra*, n.5; Dkt 1-1.)

Here, it is worth noting that even when the user allows the installation of RelevantKnowledge, only the location of files created by the bundled software's installation is shown. (*See* Figure 3). No similar information is provided for RelevantKnowledge, even though it's installed as a separate program and must be independently removed should the user wish to delete it. (Expert Witness Report of Roberto Tamassia ("Tamassia Rpt.") at 4, Ex. H.)

      **6.**     **Step 6: the free software can be launched and used.**

Following these steps, the user is able to launch and access the free software. With MP3 Cut, users are presented with the option of finishing the installation and launching the program directly, as shown in Figure 5. No prompt is provided to start RelevantKnowledge, which automatically launches and starts the process of collecting data stored on a user's hard drive.



(Fig. 5)

Again, comScore's own retained expert admitted that the process for downloading and installing OSS Proxy is "materially identical across all partner bundles." (O'Malley Rpt. at 6.) Likewise, comScore's Chief Technology Officer opined that the functionality of OSSProxy and the terms that govern its operations are the same across all partner bundles. (Brown Tr. at 90:13–17; 126:8–127:12.) Such admissions illustrate the uniform nature of comScore's conduct and

resultant uniform harm to Plaintiffs, the Class and Subclass.

> **D.** **The Terms of the ULA: TRMG Inc. or Another Sponsor Uniformly Promises, *inter alia*, to "make commercially viable efforts to automatically filter confidential personally identifiable information" While Concealing the True Scope of Data that OSSProxy will Actually Monitor and Collect.**

According to comScore, a single document—the ULA linked to in Figure 2 above—

governs its monitoring and collection of information from panelists through OSSProxy. (*Id.* at

127:10–12; 134:6–18.) Most relevant for present purposes, the ULA is essentially identical

irrespective of the Bundling Partner and provides uniform representations regarding the design

and function of the tracking software. (*Id.* at 126:8–127:12.)

As for its terms, the ULA makes clear that it's an agreement between the consumer, on

the one hand, and a "sponsor" on the other. (*See* RelevantKnowledge ULA at 6, Ex. 1) ("This

Agreement constitutes the entire agreement between sponsor and you with respect to the subject

matter contained in the Agreement."); *see also* Brown Tr. at 127:10–12.) For example, the

RelevantKnowledge ULA provides that "[t]he program sponsor is TMRG, Inc., a Delaware,

U.S.A. corporation," and welcomes consumers to direct "questions about the [ULA]" to

TMRG's "Privacy Office." (RelevantKnowledge ULA at 6–7.)

Similar to the ULA's naming comScore's other Sponsors—such as, but not limited to,

VoiceFive, Inc. (Am. Answer, ¶ 34)—the ULA for the RelevantKnowledge brand also makes

clear that, "[t]his agreement shall not create any rights or remedies in any parties other than the

parties to the agreement and no person shall assert any rights as a third party beneficiary under

this agreement." (RelevantKnowledge ULA at 6; *see also* Brown Tr. at 128:16–129:6 (stating

that the ULA is an agreement "between the [users] and the brand they signed up for").)

comScore isn't mentioned at all in the section of the ULA styled "PRIVACY POLICY, USER

LICENSE AGREEMENT, AND PATENT NOTICE." Rather, in the RelevantKnowledge

ULA,[15] comScore only appears in the introductory paragraph, which states, "The information you contribute is used by comScore, Inc., a globally-recognized market research authority on Internet and general economic trends, whose data are routinely cited by major media outlets . . . ." (RelevantKnowledge ULA at 1.)

Irrespective of comScore's tenuous relationship with the ULA, the document contains several uniform promises regarding the functionality of the software (*i.e.*, OSSProxy) being installed on the user's machine, along with express promises pertaining to the treatment of potentially confidential personal information that is accessed and collected. (Brown Tr. at 127:10–12.) Most relevant to this lawsuit, the ULA represents:

- That the Program will collect categories of information from panelists, including "[b]asic demographic information," "[c]omputer hardware, software, and other configuration information," and "Internet usage information";

- That the Program "may report on devices connected to your computer and your network, such as the type of printer or router you may be using";

- That the Program "monitors all of the internet behavior that occurs" during both normal and secure sessions and may collect information regarding "cookies" that exist;

- That the Sponsor will "make commercially viable efforts to automatically filter confidential personally identifiable information such as UserID, password, credit card numbers, and account numbers from the data being provided"; and

- That the Sponsor may "[i]nadvertently . . . collect such [confidential personally identifiable information such as UserID, password, credit card numbers, and account numbers] about our panelists; and when this happens, we make commercially viable efforts to purge our database of such information."

(*See* RelevantKnowledge ULA at 2.) By the ULA's terms, each promise and representation about OSSProxy's operation comes from the program's Sponsor. Yet it's *comScore*, rather than any "comScore company," that receives every piece of data collected by OSSProxy and it's

---

[15]     It bears noting that in most—if not all—of the VoiceFive, Inc. ULAs and dialog box terms presented to users, comScore does not appear *at all* in either document. (*See, e.g.*, PremierOpinion ULA, Ex. J; Appendix C to Tamassia Rpt. (PremierOpinion dialog box terms presented by Cyzeal and Traffix).)

*comScore*, rather than any "comScore company," that deploys, installs, configures, validates, and otherwise maintains all installations of OSSProxy. (Brown Tr. 74:9–76:25; 77:2–79:10.)

### E. OSSProxy's Inner Workings—what comScore's Software Actually Does.

As discussed, OSSProxy has a uniform design regardless of the brand name used. (Brown Tr. at 90:13–17; 91:16–92:8.) Through that common design, and once installed on a consumer's computer, OSSProxy uniformly attempts to access, intercept, and transmit the same types of consumer data back to comScore's servers. (Waldhalm Rpt. at 2–6.)

### 1. OSSProxy's methods to access, intercept, and transmit consumer data.

Numerous modules[16] within OSSProxy control its access, interception, and transmission of information collected from files located on a user's hard drive or while the user browses the Internet.[17] For example, the aptly named "SystemHawk" module directs OSSProxy to sweep a panelist's hard drive (the first sweep occurs immediately after the software's installation, and periodically thereafter) and assemble information about files, folders, and other installed software, and then deliver that information to comScore's servers. (Waldhalm Rpt. at 5–6; Dep. Tr. of Randy McCaskill ("McCaskill Tr.") at 27:21–28:2, Ex. K.) A different module constantly monitors for "POST" data—*i.e.*, information typed into an input form by a panelist on a website.[18] (Waldhalm Rpt. at 3–5.) Another module captures the contents of PDF files viewed by a panelist, and yet another captures iPod playlists (notwithstanding the ULA's promise to merely

---

[16]     For purposes of this brief, the term "modules" refers to programmatic methods or compilations of methods within OSSProxy's codebase that were designed by comScore to accomplish specific tasks.

[17]     The report of Plaintiffs' retained class certification expert, Don Waldhalm, describes in greater detail the various categories of information that comScore designed OSSProxy to attempt to capture from a user's hard drive as well as during web browsing sessions. (*See* Waldhalm Rpt. at 3–6.)

[18]     A hearing on the merits will also reveal that, contrary to comScore's representations that its software will only capture data entered online by a user after its installation, OSSProxy collects information such as the last 25 websites viewed prior to its installation. (Waldhalm Rpt. at 6; Brown Tr. at 226:9–227:4.)

record the type of connected device (*e.g.*, that a printer is attached)). (*Id.*; McCaskill Tr. at 78:10–18.)

Each module relies upon "rules files" sent to the panelist's computer, which contain guidelines formulated by comScore that direct OSSProxy to target and collect certain data from hard drive files and to intercept certain information while each panelist browses the Internet.[19] (Brown Tr. 188:24–189:21; Dep. Tr. of Yvonne Bigbee ("Bigbee Tr.") at 72:12–73:13, Ex. L; OSSProxy Rule Files Documentation, Ex. M.)

### 2. OSSProxy identifies, "fuzzifies," and transmits—rather than automatically filters—sensitive data.

As explained above, the ULA promises to "make commercially viable efforts to automatically filter confidential personally identifiable information such as UserID, password, credit card numbers, and account numbers from the data being provided." Rather than filter such information, however, comScore engages in "fuzzification," which refers to comScore's proprietary method of identifying and then obfuscating certain user-inputted sensitive information captured by OSSProxy prior to transmission of the information to comScore's servers. (Tamassia Rpt. at 5; Bigbee Tr. at 40:20–41:3.) The fuzzification procedure involves sorting through the backend code of every webpage viewed by a panelist and examining "field names" associated with "input fields" (*i.e.*, the space on a webpage where a person enters information).[20] (Waldhalm Rpt. at 3–4.) When OSSProxy recognizes a field name that comScore

---

[19] As described in more detail Section II.E.3, *infra*, comScore employees continuously update these rules files. Afterwards, comScore's server sends a mass message to the OSSProxy software running on every panelist computer indicating that new rules are available for download. OSSProxy then downloads the new rules files to the panelists' computers. This deployment method ensures that every panelist's version of OSSProxy follows the same set of directives.

[20] In this context, an input field is an input box where an Internet user might enter a name, address, credit card number, or password. The field name is the backend label applied to that input box.

has previously associated with sensitive data (*e.g.*, a field name labeled "password"),[21] it

identifies the information entered into the input field as potentially sensitive and then, by

referencing the rules files discussed *supra*, it obscures some or all of that information before

transmitting the obscured data to comScore's servers.[22] (Brown Tr. at 147:7–148:2 (fuzzified

data is sent to comScore's servers); Bigbee Tr. at 56:20–57:2 (same).)

While its worth pointing out that comScore's Chief Technology Officer and Rule

30(b)(6) designee, Mike Brown, opined that "[in his] opinion, filtering and fuzzifying are two

different things," (Brown Tr. at 218:15–219:16) whether this fuzzification represents a

"commercially viable effort to automatically filter confidential information" is a key merits

question. The fact that the answer is the same for every Class member makes the case

appropriate for class-wide determination.

### 3. comScore retains sensitive data that it admits to collecting "inadvertently."

Fuzzification relies at least in part on comScore constructing its rules files to assist

OSSProxy in automatically identifying field names associated with input forms where users enter

sensitive information. (Tamassia Rpt. at 5; Bigbee Tr. at 68:8–12.) But because there is no

standardized naming convention for field names, this is an imperfect process that results in

OSSProxy's "inadvertent" capturing of sensitive information. (Dep. Tr. of Michiko Avantika

Chand ("Chand Tr.") at 41:2–11, Ex. N.)

---

[21] Similarly, a fuzzifier can also identify conspicuous patterns of data. For example, if the fuzzifier detects a string of digits in the familiar social security number format (XXX-XX-XXXX), or of the 15 or 16 digit length associated with credit card numbers, the value is obscured. (Bigbee Tr. at 65:17–66:3.)

[22] OSSProxy uses two methods to "fuzzify" *identified* sensitive data before transmitting such data to comScore. First, comScore has identified certain information that should be "hashed," such as last names and email addresses. (Bigbee Tr. at 59:4–60:13.) The resulting "hashed" value is a fixed-size, but unique, string of data. (*Id.*; *see* Waldhalm Rpt. 4.) Second, comScore has identified other information, such as credit card numbers, that should be "zeroed"—which involves replacing a defined number of values (*e.g.*, the last several digits of a credit card number) with null values (either zeroes or "X's"), and then transmitting the remaining data to comScore. (Bigbee Tr. at 59:4–60:13.)

comScore recognizes this limitation and maintains a team of employees that comb one page at a time through the World Wide Web and identifies instances where OSSProxy fails to identify (and obfuscate) sensitive information before transmitting it to comScore's servers. (Tamassia Rpt. 5.) When detection lapses are discovered, these employees update OSSProxy's rules files such that after panelists receive the updated rules files, OSSProxy (ideally) begins to obfuscate the sensitive data intercepted through previously un-flagged input forms. (Bigbee Tr. at 67:18–68:12.) These employees' task is a tremendous undertaking by any measure given the immense scope of content available on the Internet. comScore's internal documentation suggests OSSProxy frequently captures sensitive information from panelists for long periods of time, often years, before being discovered. (*See, e.g.*, McCaskill Tr. at 78:19–79:15.) The privacy concerns associated with this practice are compounded by the fact that, with limited exceptions,[23] OSSProxy defaults to collecting *all* data inputted by panelists. (Chand Tr. at 28:14–29:3; Waldhalm Rpt. at 3–5.) This amounts to a shoot first and aim later approach to data collection.

Nevertheless, comScore also claims[24] that for an added layer of data sanitization, it subjects "inadvertently" captured sensitive information to "manual obfuscation." (Tamassia Rpt. at 5.) Similar to the issues identified above, whether comScore's "manual obfuscation" satisfies the ULA's promise to "make commercially viable efforts to purge" inadvertently collected sensitive information is another key merits issue.[25] At this point, that comScore took the same

---

[23] For example, comScore has indicated that OSSProxy does not collect any information from ".edu" webpages. (Bigbee Tr. at 44:4–16.)

[24] Of course, the consumer-facing documents (*i.e.*, the ULAs and dialog box terms) promise that the program sponsor—rather than comScore—takes steps to "purge" inadvertently collected confidential information. (RelevantKnowledge ULA at 2, 6–7.)

[25] It bears noting that comScore's own expert didn't think comScore's treatment of inadvertently collected confidential data satisfied the ULA's promise to purge the data.[25] (Dep. Tr. of Roberto Tamassia, Ph.D. ("Tamassia Tr.") at 65:19–66:6, Ex. O (explaining that "the term purged[] does not accurately describe [the manual obfuscation] process").)

steps with respect to everyone's inadvertently captured data—nothing suggests it manually

obfuscated some customers' data but refused to do so for others—supports certification.

**F.    Named Plaintiffs Dunstan and Harris Had OSSProxy Installed on Their Computers.**

Consistent with their allegations, both Plaintiffs had OSSProxy downloaded and installed

onto their computers after seeking out and downloading a free piece of software that was

(unbeknownst to either of them) bundled with OSSProxy. (Plaintiff Jeff Dunstan's Responses to

Defendant comScore, Inc.'s First Set of Interrogatories ("Dunstan Interrogs.") No.1, Ex. P;

Plaintiff Mike Harris's Responses to Defendant comScore, Inc.'s First Set of Interrogatories

("Harris Interrogs.") No. 1, Ex. Q.) As such, each Plaintiff would have been presented with

comScore's standard dialog box terms (even though neither specifically remembers reading or

assenting to those terms) before accepting OSSProxy. (Dunstan Interrogs. No. 2; Harris Interrogs.

No. 2.)

Although discovery has revealed that Dunstan's dialog box likely contained a hyperlink

to the full ULA, it's still far from clear that the link provides conspicuous notice of its existence,

and in any event, the dialog box viewed by Harris—presented during the installation of the

screensaver application he downloaded that was bundled with the Macintosh version of

OSSProxy—had no such hyperlink. (Decl. of John O'Toole at ¶ 6 ("O'Toole Decl.") (Dkt. 14).)

Apart from this lone difference, which makes Harris a member of the proposed Subclass, the

named representatives' claims are identical with respect to each other and every other member of

the Class (and, in the case of Plaintiff Harris, the Subclass).

**G.    The Claims at Issue Under the SCA, ECPA, CFAA, and for Unjust Enrichment.**

Plaintiffs allege four counts in the Second Amended Complaint, under the SCA, ECPA,

CFAA, and for unjust enrichment. The critical question for each claim asks whether comScore

exceeded any consent it had to take the data it took.

*Count I: Violations of the SCA.* Plaintiffs claim that comScore violated the SCA (1) by designing its software to access (or attempt to access) certain "stored communications" on panelists' computers while (2) intentionally exceeding the scope of panelists' consent (if any) to permit such access. (Dkt. 136 at ¶¶ 81–89.)

*Count II: Violations of the ECPA.* Plaintiffs claim that comScore violated the ECPA (1) by designing its software to intercept (or attempt to intercept) certain "electronic communications" from panelists' computers (2) without consent to do so. (*Id.* at ¶¶ 90–98.)

*Count III: Violations of the CFAA.* Plaintiffs claim that comScore violated the CFAA (1) by designing OSSProxy to access, scan, and monitor panelists' computers, (2) without consent to do so, (3) while causing at least $5,000 in aggregated real economic damages. (*Id.* at ¶¶ 99–110.)

*Count IV: Unjust Enrichment.* Plaintiffs claim that comScore profited from the information unlawfully collected from panelists, and that, under principles of equity and good conscience, such profits should be disgorged.

As explained below, each claim raises common issues of law and fact that predominate over any individual issues. Coupled with the remaining requirements of Rule 23, this Court should readily certify the Class and Subclass.

## III. ARGUMENT

This Court should certify the proposed Class and Subclass. Rule 23(a) requires that (1) the proposed class is so numerous that joinder of all individual class members is impracticable (numerosity), (2) that there are common questions of law and fact amongst class members (commonality), (3) that the proposed representative's claims are typical of those of the class (typicality), and, (4) that both the named representative and his or her counsel will adequately

represent the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

Additionally, Rule 23(b)(3) requires that common questions of law or fact predominate on the Plaintiffs' claims for damages, and that maintaining the suit as a class action is superior to other methods of adjudication. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Though class certification "focuses on whether or not an overriding question of law or fact common to the entire class exists," 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1759 (2d ed. 2006), a plaintiff must nevertheless affirmatively demonstrate compliance with the Rule. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, at 2551 (2011).

### A.      The Proposed Class and Subclass Are Ascertainable.

"As a threshold matter, and apart from the explicit requirements of the class certification rule, the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011). A class definition is "sufficiently defined . . . if the class members can be ascertained based on objective criteria." *Ramirez v. Palisades Collection LLC*, 250 F.R.D. 366, 369 (N.D. Ill. 2008) (citing *Foreman v. PRA III, LLC*, No. 05-cv-3372, 2007 WL 704478, at *5 (N.D. Ill. Mar. 5, 2007). Such criteria may "reference . . . [a defendant's] conduct." *Hinman v. M & M Rental Ctr., Inc.*, 545 F.Supp.2d 802, 806 (N.D. Ill. 2008).

Additionally, the class members only "must be ascertainable 'at some point in the case,' but not necessarily prior to class certification." *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 45 (2d Cir. 2006) (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 290 F.R.D. 323, 337 (S.D.N.Y. 2002)). The goal of this first inquiry is not to identify individual class members, but rather to ensure that, looking forward, "individual class members . . . receive the best notice

practicable and have an opportunity to opt out." Manual for Complex Litigation, § 21.222, at 270

(4th ed. 2004); *see also* 5 James Wm. Moore et al., Moore's Federal Practice, ¶ 23.21[1] (3d ed.

2001) ("The identity of class members must be ascertainable by reference to objective criteria.").

Identifying Class members here is straightforward and turns on one objective fact: if an

individual has had a bundled version of OSSProxy (or its Mac equivalent) installed on his or her

computer at any time since 2005, he or she is a member of the Class. Class membership thus

turns on whether OSSProxy was or wasn't installed on a user's computer. To the extent that

some Class members may be unaware that the software was installed,[26] comScore's witnesses,

including its own expert, have identified several ways that an individual can objectively verify

that, in fact, the bundled version of OSSProxy is running on his or her particular computer. (*See*

Tamassia Tr. at 45:18–46:20 (describing ways that a user can determine it's running); Brown Tr.

at 90:18–92:8 (each brand of OSSProxy is cosmetically distinct).)[27]

Likewise, membership in the Subclass hinges on objective criteria: if a functional

hyperlink to the ULA was not presented *before* the download and installation of a bundled

version of OSSProxy on a panelist's computer, he or she is a member of the Subclass. By

comScore's own account, there is a "small group" of Subclass members, all of whom

downloaded the Macintosh version of OSSProxy from a specific comScore bundling partner

during the first half of 2010. (*See* O'Toole Decl. at ¶ 6.) Because Subclass membership turns on

this single and objective fact, it—like the Class—is ascertainable.

---

[26]     Dunstan, for example, was not aware that OSSProxy was running on his computer until he started
experiencing computer problems. (Dunstan Interrogs. No. 6; Dep. Tr. of Jeff Dunstan ("Dunstan Tr.") at
37:4–38:5, Ex. R.)

[27]     Plaintiffs additionally note that comScore has contact information for many, if not most, of the
Class. (*See* Brown Tr. at 160:7–161:7 (email addresses and contact info).) If the Court grants certification,
this information will help facilitate notice to the Class—along with providing an additional objective
measure of Class membership.

**B.    The Class and Subclass Satisfy the Four Requirements of Rule 23(a).**

As shown below, the Class and Subclass are sufficiently numerous, face common legal

and factual issues, feature claims that are typical of the named plaintiffs, and are adequately

represented by both the Plaintiffs and their counsel. Accordingly, the Class and Subclass are

readily certifiable here.

> **1.    Numerosity is satisfied as millions of individuals had OSSProxy installed onto their computers.**

Numerosity is met when "the class is so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1). There is no specific number required to satisfy this

requirement, nor are the plaintiffs required to state the exact number of potential class members.

*Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D. Ill. 2006). Generally, where the

membership of the proposed class is at least 40, joinder is impracticable and the numerosity

requirement is met. *Pope v. Harvard Banchares, Inc.*, 240 F.R.D. 383, 387 (N.D. Ill. 2006).

Numerosity is easily met. comScore has provided ample evidence that shows the "total

number of machines . . . actively reporting data" at the end of each year has ranged between

██████████████████████. (*See* comScore Interrogs. at No. 7.) Likewise, additional

evidence shows that, ████████████████████████████████████████████

█████████████████████████ with a portion of those installations (all of which,

according to comScore, occurred in 2010) comprising the Subclass.[28] (*Id.*; O'Toole Decl. at ¶ 6.)

Accordingly, the Class and Subclass are sufficiently numerous.

> **2.    Resolution of this case will answer—in one stroke—common questions of law and fact that principally ask: (1) did comScore obtain consent from users to track their information, and (2) if so, did**

---

[28]    A recent set of figures provided in connection with the deposition of comScore's expert witness, Mr. Colin O'Malley, shows that over a recent three month period comScore's software was installed *at least* 1,023,093 times. (O'Malley Tr. at 90:8–23.)

**comScore exceed the scope of that authority.**

As the Supreme Court explained in *Dukes*, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551. Commonality is present where a "common nucleus of operative fact" exists, even if as to one question of law or fact, and is often found where "defendants have engaged in standardized conduct toward members of the proposed class." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "'Rule 23(a)(2) does not demand that every member of the class have an identical claim,' and some degree of factual variation will not defeat commonality provided that common questions yielding common answers can be identified." *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 413 (N.D. Ill. 2012) (quoting *Spano v. The Boeing Co.*, 633 F.3d 574, 585 (7th Cir. 2011)).

Here, Plaintiffs' claims stem from a common factual core, namely, comScore's uniform data tracking practices, standardized installation process, and form ULA. These common facts give rise to common legal issues that will, in turn, determine comScore's liability with respect to each Class and Subclass member.

        a.    *Issue One: Can comScore enforce the ULA?*

                i.    *Is comScore party to the ULA and, if not, does it have any third-party rights under it?*

The first issue is whether or not comScore can enforce the ULA. More specifically, this issue asks whether comScore is even a party to the ULA, and if it isn't, whether it has any rights under the agreement as a third-party. The answers to these questions are undoubtedly the same for each and every Class and Subclass member.

As explained *supra*, Section II.D, users are presented with identical ULA terms. The

ULA plainly states that the agreement is between the Sponsor and the user, and that no third-party has any rights under the contract. (*See, e.g.*, RelevantKnowledge ULA at 6.) comScore can't enforce the ULA merely because it usually identifies TRMG, Inc., or other Sponsors, as "comScore companies" in the installation process dialogue boxes. The Sponsors are held out as separately incorporated entities. (*See, e.g., id.* at 6–7 ("The program sponsor is TMRG, Inc., a Delaware U.S.A. corporation.").) That comScore may own them doesn't provide it with contract rights. *See In re Rehab. of Centaur Ins. Co.*, 158 Ill. 2d 166, 173–74 (1994) ("Generally, the corporate veil is never pierced for the benefit of the corporation or its stockholder . . . reverse piercing (where the parent company asserts that the subsidiary is not really a separate entity) is not favored . . . .") (citing 18 Am. Jur. 2d *Corporations* § 45, at 846 (1985); 18 C.J.S. *Corporations* § 12, at 282 (1990)); *Analect LLC v. Fifth Third Bancorp*, 380 F. App'x 54, 56 (2d Cir. 2010) ("[A] parent corporation and its subsidiary are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both.") (citing *Carte Blanche (Sing.) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993)).

Thus, whether comScore has any ability to enforce the ULA hinges on an interpretation of the agreement—a "classic" common issue. *See Haroco, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 121 F.R.D. 664, 669 (N.D. Ill. 1988) (form contracts tend "to present the classic case for treatment as a class action."); *see also Menagerie Prods. v. Citysearch*, No. CV 08-4263, 2009 WL 3770668, at *10 (C.D. Cal. Nov. 9, 2009) ("When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such.") (quoting *Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 691 (N.D. Ga. 1983)); *Heartland Commc'ns., Inc. v. Sprint Corp.*, 161 F.R.D 111 (D. Kan. 1995) (certifying class seeking recovery of underpaid

commissions based upon uniform erroneous interpretation of contract). If it didn't, it violated the SCA, ECPA, CFAA, and it unjustly enriched itself.

> ii. *Does the process for downloading and installing OSSProxy, which does not lend itself to securing knowing consent, render the ULA unenforceable?*

Apart from the ULA's terms, common issues regarding comScore's ability to enforce it arise from the installation process. That is because the installation process uniformly fails to obtain the panelists' assent to the ULA, and lack of assent would render the ULA unenforceable.

"[I]t is and always has been central to the very concept of a 'contract' that there be 'assent by the parties who form the contract to the terms thereof,' Restatement of Contracts § 19(b) (1932)." *Runyan v. McCrary*, 427 U.S. 160, 194 (1976). As a hearing on the merits will show, Class members do not assent to the ULA because its full terms are not displayed to them during the OSSProxy installation process. For the Subclass, the lack of assent is even clearer— no functional link to the ULA was even provided to them, which means the full terms could not have been displayed to them. Accordingly, in addition to questions surrounding comScore's ability as a non-party to enforce the ULA, infirmities in the installation process—common to all Class and Subclass members—cast doubt on whether the ULA binds any of them. *See Boundas*, 280 F.R.D. at 415 ("[M]aybe contracts were not formed; that is one of the common questions to be resolved on a classwide basis. But if contracts were formed, they were identical . . . .").

> b. *Issue Two: Assuming comScore can enforce the ULA, does OSSProxy's data collection violate its terms?*

The second common issue facing the Class and Subclass assumes for the sake of argument that the ULA constitutes an enforceable agreement between panelists and comScore— thereby giving comScore consent to track panelists' computer and Internet behavior—and asks whether OSSProxy exceeds that authority. As a result, the litigation will resolve the following

common questions:

- Does comScore "make commercially viable efforts to automatically *filter* confidential [PII]," by designing its software to merely "fuzzify" and "obscure" such PII (*see* Section II.E.2, *supra*.);

- Does comScore "make commercially viable efforts to purge [inadvertently collected PII from its] database," when, in reality, it takes no such steps (*see* Section II.E.3, *supra*.);

- Whether the ULA allowed comScore to access and/or intercept (or attempt to access and/or intercept):

  o Phone numbers, social security numbers, user names, passwords, bank account numbers, credit card numbers, and other demographic information;

  o The previous 25 websites accessed by a user *before* installation of comScore's software;

  o The names of every file located on the user's computer;

  o The content of iPod Playlists, or the web browsing history of smartphones; and

  o Portions of every PDF viewed by the user during web browsing sessions. (Waldhalm Rpt. 2–6.)

- Whether the ULA disclosed that comScore would sell the data collected and transmitted on/from Class members' computers, and whether comScore exceeded the scope of the ULA by selling such data. (*See* RelevantKnowledge ULA.)

In summary, because comScore presented Class members with substantively identical ULAs that purported to govern comScore's uniformly designed software, the answer to the question of whether comScore exceeded or complied with the ULA's terms is the same for everyone. As Judge Kim anticipated, this common evidence does in fact show that "the putative class members' consent, and the scope of consent, is subject to evaluation on a class-wide basis, and . . . comScore's adherence to the scope of consent is subject to analysis on a class-wide basis." (*See* Order Granting comScore's Motion to Bifurcate Discovery (Dkt. 88) at 9.)

          c.    *Plaintiffs' claims share "the same essential characteristics" with those of the Class and Subclass.*

In addition to sharing common legal and factual issues, the Class and Subclass meet Rule

23(a)'s requirement that the "claims or defenses of the representative parties are typical of the claims or defenses of the Class." Fed. R. Civ. P. 23(a)(3). Typicality is closely related to commonality and is satisfied if Plaintiffs' claims arise from "the same event or practice or course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 432 (N.D. Ill. 2003). Factual differences do not preclude a finding of typicality—rather, the named plaintiff's claims need only share "the same essential characteristics" as those of the class. *Id.*

Here, few, if any, factual issues distinguish any given Class member's claims from those of the named Plaintiffs. Dunstan and Harris (1) downloaded OSSProxy from a different bundling partner, (2) through different OSSProxy "brands," (3) that, according to comScore, was purportedly governed by a ULA naming different Sponsors as contracting parties, and each Plaintiff—like every other Class member—was subjected to the same "core" tracking software and presented with essentially identical ULA terms. (Brown Tr. at 90:13–92:8; 125:12–127:12.) Further, because the dialog box viewed by Harris did not contain a functioning hyperlink to a ULA, his claims are typical of the other Subclass members. (O'Toole Decl. at ¶ 6.)

Ultimately, if Dunstan and Harris are able to recover, the Class and Subclass can recover. And if their claims fail, so too do the claims of the Class and Subclass. Accordingly, Plaintiffs' claims arise out of the same facts and circumstances and are typical of those raised on behalf of the Class and Subclass they seek to represent.

### 3. The Class Representatives and their Counsel have no conflicts with and are committed to adequately representing the proposed Class.

Finally, Rule 23(a) requires that the proposed class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy requires that "(1) the representative does not have conflicting or antagonistic interests compared with the class as a

whole, (2) the representative is sufficiently interested in the case outcome to ensure vigorous advocacy, and (3) class counsel is experienced, competent, qualified and able to conduct the litigation vigorously." *Matthews v. United Retail, Inc.*, 248 F.R.D. 210, 215 (N.D. Ill. 2008) (quoting *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 392–93 (N.D. Ill. 2006)). Further, "[w]here, as here, attorneys have been found to be adequate in the past, it is persuasive evidence that they will be adequate again." *Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987) (citing *Beckless v. Heckler*, 622 F.Supp. 715, 721 (N.D. Ill. 1985)).

In this case, neither Plaintiff has any interest antagonistic to his role as Class representative. Though comScore may cite tension stemming from Dunstan's potential claim for actual damages (resulting from the anti-virus program he purchased to remove comScore's software from his computer), (*see* Am. Compl. at ¶ 70), Dunstan has expressly stated that he has no intention of pursuing that claim. (Tr. Proceedings Before Hon. Young B. Kim, Mag. J. 20:21–25, Aug. 13, 2012, Ex. S.) And in any case, that some Class members may have a theoretical claim for actual damages does not detract from Dunstan's adequacy or certification of his claims. *See Matthews*, 248 F.R.D. at 215 (certifying class seeking statutory damages even after observing that some, but not all, class members may have claims for actual damages).

Further, both Plaintiffs have more than demonstrated their commitment to this case. Both have answered written discovery propounded by comScore, produced personal documents, and sat for videotaped depositions.[29] (Edelson Decl. at ¶ 10.) Further, the Plaintiffs have kept in close communication with their counsel, have been apprised of case developments, and continue to

---

[29] Dunstan, in particular, has drawn the ire of comScore's attorneys, yet has stood firm as a Class representative. To date, comScore's counsel have: (1) accused Dunstan of viewing several pornographic websites, which comScore's lawyers have tried to make public, (2) served—at his residence—Dunstan's wife with a subpoena to be deposed (without the courtesy of notifying his attorneys first), and (3) threatened to subpoena Dunstan's employer to obtain his work records for the day he downloaded comScore's software (rather than simply asking his attorneys for the information). (Edelson Decl. at ¶¶ 12–15.)

play an active role as Class representatives. (*Id.* at ¶ 11.) Accordingly, both Dunstan and Harris

have devoted significant time and energy to this case and have served (and will continue to

serve) admirably as named Plaintiffs. Thus, both Plaintiffs are adequate to represent the

proposed Class, and because comScore failed to provide him with a hyperlink to the full ULA

during the download and installation process of OSSProxy, Plaintiff Harris is adequate to

represent the proposed Subclass.

Finally, Plaintiffs' counsel are well-respected members of the legal community, have

regularly engaged in major complex litigation, and have had extensive experience in consumer

class actions involving issues of similar size, scope and complexity as this case. (*See* Firm

Resume of Edelson McGuire, LLC, Ex. T; Edelson Decl. at ¶¶ 16–17.) Proposed Class Counsel

have committed (and will continue to commit) significant resources to the successful prosecution

of this case. (Edelson Decl. at 18.) As such, proposed Class Counsel are more than adequate to

represent Plaintiffs, the Class and Subclass.

**C.      The Class and Subclass Satisfy the Rigors of Rule 23(b)(3).**

Once Rule 23(a) is satisfied, Rule 23(b)(3) requires that the common questions of law

and fact predominate over any questions affecting only individual members and that the class

action mechanism is superior to other available methods for fairly and efficiently adjudicating

the controversy. Fed. R. Civ. P 23(b)(3); *Fletcher v. ZLB Behring LLC*, 245 F.R.D. 328, 331-32

(N.D. Ill. 2006). The underlying purpose of Rule 23(b)(3)'s requirements is to assure that a class

action has "practical utility" in the suit. *Hylaszek v. Aetna Life Ins. Co.*, No. 94-C-5961, 1998

WL 381064, at *3 (N.D. Ill. July 1, 1998). A case such as this—where individual recoveries for

Plaintiffs and the members of the proposed Class and Subclass would be small and would likely

not be pursued but for the class action process—is the quintessential rationale for the "practical

utility" of the class action mechanism under federal law. *See Amchem*, 521 U.S. at 617. In other

words, the predominance and superiority requirements translate into the economy and efficiency that class certification must bring to the litigation. 2 Conte & Newberg, Newberg on Class Actions § 4:24 (4th ed. 2002).

Both inquiries are easily satisfied here.

### 1. Common issues regarding comScore's ability to enforce the ULA and whether OSSProxy exceeds the ULA's terms predominate over any supposedly relevant individual questions.

The focus of the predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," which is a "far more demanding" standard than the commonality requirement of Rule 23(a). *Amchem*, 521 U.S. at 623–24. To determine whether common questions predominate, courts look to "whether there is a 'common nucleus of operative facts.'" and, if so, whether such "common issues of fact and law . . . are likely to dominate [the] Court's attention." *Maxwell v. Arrow Fin. Servs., LLC.*, 03 C 1995, 2004 WL 719278 (N.D. Ill. Mar. 31, 2004) (quoting *Ziemack v. Centel Corp.*, 163 F.R.D. 530, 535 (N.D. Ill. 1995) and citing *Tatz v. Nanophase Tech. Corp.*, 2003 WL 21372471, at *9 (N.D. Ill. June 13, 2003)).

"When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Mazza v. Am. Honda Motor Co. Inc.*, 666 F.3d 581, 589 (9th Cir. 2012); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). Further, when the plaintiff advances a theory of liability in its certification motion, the court should determine whether common issues predominate under this theory without evaluating the theory itself. *United Steel v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010); *see also Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 588 (9th Cir. 2010) ("[I]t is the plaintiff's *theory* that matters at the class certification stage, not whether the theory will

ultimately succeed on the merits") (emphasis in original). The predominance test "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).

In this case, every material issue of fact and law stems from comScore's uniform conduct with respect to the Class and Subclass. Each turns on a common set of terms (*i.e.*, the dialog boxes and ULA presented to each and every Class member during the installation process) and the uniform functionality of OSSProxy. As a result, this lawsuit answers in one stroke whether comScore could enforce the ULA and, if so, whether it violated its terms. Again, it could either enforce the ULA against every Class member or against none of them, and comScore either complied with the ULA or the design of OSSProxy exceeded its terms with respect to everyone. comScore didn't alter the installation process so as to enhance its ability to enforce the ULA against some customers while keeping the process uniform with respect to others. Likewise, comScore didn't show special ULA terms to some Class members but not to others. Thus, whether comScore has the ability to enforce the ULA and whether OSSProxy collected data beyond what was consented to are common questions that predominate over any individual issues. Put simply, as the process and terms were the same for everyone, no individual matters imagined by comScore in its anticipated opposition can credibly trump the common issues that predominate.

### 2. The class action is a superior method for adjudicating the controversy.

Finally, Rule 23(b)(3) also requires a showing that "a class action is superior to the available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P 23(b). Courts routinely observe that "class certification is a 'sensible and legally permissible alternative to . . . individual suits each of which would cost orders of magnitude more to litigate than the

claims would be worth to the plaintiffs.'" *Pella Corp. v. Saltzman*, 606 F.3d 391, 393 (7th Cir.

2010) (quoting *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 748 (7th Cir. 2008); *see also*

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997).

Such is the case here. Plaintiffs principally seek recovery of $1,000 in statutory damages.

Absent a class action, litigation of individual claims for such a recovery is almost certainly cost

prohibitive. To that end, even comScore has recognized that, "[g]iven the meager amounts at

issue, failure to certify a class will either lead Plaintiffs to voluntarily withdraw this action or,

facilitate a quick and nominal settlement within the applicable statutory parameters." (Def.'s

Mem. in Support of Mot. to Bifurcate Disc., Dkt. 67 at 6–7.) That observation is the precise

reason why Class members here are best served pooling their resources into a single proceeding.

In short, a class action is far superior to individual (and redundant) litigation.

## IV.    CONCLUSION

OSSProxy is an intrusive tracking program that most, if not all, users don't even realize is

installed on their computers. Disregarding their privacy rights, comScore subjects Class and

Subclass members to an identical installation process that presents identical contract terms for

tracking software that performs the same functions on each of their computers. A hearing on the

merits will ultimately prove—in a single stroke for everyone—that comScore didn't have

authority to enforce the ULA, and that even if it did, it exceeded any authority the ULA purports

to provide it. That the Class and Subclass members' claims under the SCA, ECPA, CFAA, and

for unjust enrichment succeed or fail on these common issues makes this case particularly well-

suited for Rule 23 certification.

Dated: January 15, 2013

Respectfully submitted,

MIKE HARRIS AND JEFF DUNSTAN,
INDIVIDUALLY AND ON BEHALF OF A CLASS OF
SIMILARLY SITUATED INDIVIDUALS,

By: /s/ Rafey S. Balabanian
     One of Plaintiffs' Attorneys

Jay Edelson
Rafey S. Balabanian
Ari J. Scharg
Chandler Givens
Benjamin S. Thomassen
EDELSON MCGUIRE LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
jedelson@edelson.com
rbalabanian@edelson.com
ascharg@edelson.com
cgivens@edelson.com
bthomassen@edelson.com

## CERTIFICATE OF SERVICE

I, Rafey S. Balabanian, an attorney, certify that on January 15, 2013, I served the above and foregoing ***Plaintiffs' Memorandum in Support of their Supplemental Motion for Class Certification***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, and further by causing true and accurate copies of such paper to be transmitted to all counsel of record via electronic mail, all on this 15th day of January 2013.

/s/ Rafey S. Balabanian