# The Declaration of Jay Edelson

# [FILED PARTIALLY UNDER SEAL]

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| MIKE HARRIS and JEFF DUNSTAN,<br>individually and on behalf of a class of similarly<br>situated individuals, | ) )<br>) )<br>) ) | |
| Plaintiffs, | ) )<br>) ) | Case No. 1:11-5807 |
| v. | ) )<br>) ) | Hon. James F. Holderman |
| COMSCORE, INC., a Delaware corporation, | ) )<br>) )<br>) ) | |
| Defendant. | ) )<br>) | |

## DECLARATION OF JAY EDELSON

I, Jay Edelson, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am an adult over the age of 18 and a resident of the State of Illinois.  I am licensed to practice law in the State of Illinois, the Managing Partner of the law firm Edelson McGuire LLC, and the lead attorney representing Plaintiffs Mike Harris and Jeff Dunstan ("Plaintiffs") in this matter. I am fully competent to make this Declaration, have personal knowledge of all matters set forth herein unless otherwise indicated, and could and would testify truthfully to such matters if called as a witness in this action. I make this Declaration in support of Plaintiffs' Supplemental Motion for Class Certification.

*The Installation Process for "MP3 Cut"*

2.      On January 15, 2013, as a part of my firm's investigation into this case, an attorney at my firm, Chandler Givens, obtained the installation file of the "MP3 Cut" program by browsing to the website http://www.mp3-cutter-splitter.com/mp3_cutter.html, clicking a button labeled "FREE DOWNLOAD," and downloading a file labeled "MP3Cut.zip." The Microsoft

Windows operating system was used for purposes of this exercise.

3.      Next, Mr. Givens "unzipped" the MP3Cut.zip file, then clicked on the installation application contained in the resultant folder and navigated through MP3 Cut's entire installation process. (Software included with Microsoft Windows was used to capture a series of "screenshots" showing the windows that appear during MP3 Cut's installation process, and those images (thirteen (13) total) were collated into a single document. A true and accurate copy of that document is attached hereto as Exhibit G.) A more precise explanation of MP3 Cut's installation process, as illustrated by Mr. Givens' procedure, follows below:

    a.      When presented with the first window, titled "Setup – MP3 Cut" (as were all subsequent windows), Mr. Givens clicked the "Next >" button, thus triggering the display of a second window, (Exhibit G at Fig. 1);

    b.      When presented with the second window, Mr. Givens selected the "I accept the agreement" radio button and clicked the "Next >" button, thus triggering the display of a third window, (*id.* at Fig. 2);

    c.      When presented with the third window, the "Destination Location" field was already populated with text reading "C:\Program Files\MP3 Cut," and Mr. Givens clicked the "Next >" button, thus triggering the display of a fourth window, (*id.* at Fig. 3);

    d.      When presented with the fourth window, an input box offering to create a label within the Windows Start Menu was already populated with the text "MP3 Cut," and Mr. Givens clicked the "Next >" button, thus triggering the display of a fifth window, (*id.* at Fig. 4);

    e.      When presented with the fifth window, a de-selected radio button offered

to place an icon for MP3 Cut on the desktop, and Mr. Givens clicked the "Next >" button, thus triggering the display of a sixth window, (*id.* at Fig. 5);

f.     When presented with the sixth window (also titled "Setup – MP3 Cut"), two de-selected radio buttons appeared, one labeled "Accept," the other labeled "Decline." Mr. Givens selected the "Accept" radio button, and clicked next, thus triggering the display of a seventh window. (*Id.* at Fig. 6.) Additionally, in a subsequent and duplicative exercise, Mr. Givens selected the "Decline" radio button and completed the steps listed below. (*Id.*) As it turned out, these remaining steps were identical regardless of whether "Accept" or "Decline" was selected (*i.e.*, identical windows were subsequently presented);

g.     When presented with the seventh window, Mr. Givens clicked the "Install" button, thus triggering the display of an eighth window, (*id.* at Fig. 7);

h.     The eighth window displayed an installation progress report, and no additional action was taken by Mr. Givens, (*id.* at Fig. 8);

i.     At some time during the display of the eighth window—the progress report—a separate window labeled "InstallManager Setup" was rendered on the screen (*i.e.*, an independent window appeared outside the still visible two dimensional window labeled "Setup – MP3 Cut"). (*Id.* at Fig. 9.) Mr. Givens closed the "InstallManager Setup" window by clicking the 'X' in the top right corner of the display box;

j.     At this point a tenth window was presented showing survey information to be completed by the user; Mr. Givens clicked the "Next >" button without inputting any information, (*id.* at Fig. 10);

k.     Two additional windows were then presented, soliciting the user to

complete a "short survey." Mr. Givens clicked the "No" button when prompted, and then a button labeled "Yes" when the confirmatory window was displayed, thus triggering the display of the thirteenth window, (*id.* at Figs. 11 and 12);

      l.      When presented with the thirteenth (and final) window, Mr. Givens clicked the "Finish" button, which launched the MP3 Cut program. (*Id.* at Fig. 13.)

      4.      Separately, another attorney at my firm, Benjamin Thomassen, examined every webpage accessible through the www.mp3-cutter-splitter.com website. After a thorough review, Mr. Thomassen was unable to locate any of the following terms on the www.mp3-cutter-splitter.com website: "comScore," "RelevantKnowledge," "Relevant Knowledge," "TMRG, Inc.," or "TMRG."

***How Archived Versions of comScore's Software's User License Agreements Were Obtained***

      5.      On January 14, 2013, Mr. Thomassen used the Internet Archive's "Wayback Machine" to access archived versions of the RelevantKnowledge (dated September 15, 2010) and PremierOpinion (dated May 5, 2010) User License Agreements ("ULAs"), true and accurate copies of which are attached hereto as Exhibits I and J, respectively.

      6.      As of January 14, 2013, the Internet Archive (available online at http://archive.org/about/) website states that it was founded in 1996 and "is a 501(c)(3) non-profit that was founded to build an Internet library. Its purposes include offering permanent access for researchers, historians, scholars, people with disabilities, and the general public to historical collections that exist in digital format."

      7.      Another webpage on the Internet Archive's website (available online at http://archive.org/web/web.php) states that its service allows users to "[b]rowse through over 240 billion web pages archived from 1996 to a few months ago. To start surfing the Wayback, type in

the web address of a site or page where you would like to start, and press enter. Then select from the archived dates available. The resulting pages point to other archived pages at as close a date as possible."

8.  To obtain archived versions of the RelevantKnowledge and PremierOpinion ULAs, Mr. Thomassen first navigated to http://archive.org/web/web.php. Then Mr. Thomassen inputted the respective website addresses for RelevantKnowledge and PremierOpinion's ULAs into the Wayback Machine field prompt (*i.e.*, http://relevantknowledge.com/RKPrivacy.aspx and http://www.premieropinion.com/privacy.aspx, respectively). Next, Mr. Thomassen clicked on the "Take Me Back" button and was presented with various dates reflecting the dates that the Internet Archive captured versions of the ULAs. Mr. Thomassen then selected the archived versions temporally closest to September 2010. For RelevantKnowledge, http://relevantknowledge.com/RKPrivacy.aspx, Mr. Thomassen selected the content captured on September 15, 2010, and for PremierOpinion, http://www.premieropinion.com/privacy.aspx, the content captured on May 5, 2010.

9.  To produce Exhibits I and J, Mr. Thomassen copied the website addresses for each of the archived ULAs (for RelevantKnowledge, http://web.archive.org/web/20100915065323/http://www.relevantknowledge.com/RKPrivacy.aspx?, and for PremierOpinion, http://web.archive.org/web/20100720210222/http://www.premieropinion.com/privacy.aspx). Next, he pasted these URLs into Adobe Acrobat Pro using a feature that converts a web page into a paginated PDF file.

***Plaintiffs' Roles as Class Representatives***

10. It is my opinion that both Plaintiffs have served as exemplary class

representatives in this action. During the course of this lawsuit both Plaintiffs have timely and fully answered comScore's written discovery requests. comScore's attorneys deposed each Plaintiff for several hours at their Chicago, Illinois offices. Both Plaintiffs were asked numerous probing questions regarding usage of their home computers (such as questions about the websites that they view), their experiences with comScore's software, their personal backgrounds, and other aspects of this lawsuit more generally.

11. Attorneys at my firm have regularly communicated with Messrs. Dunstan and Harris at all stages of litigation. Both Plaintiffs have reviewed and assisted with pleadings, interrogatory responses, and other discovery matters. Both have expressed interest in being kept apprised of developments in this case and maintained a strong interest in obtaining a favorable result on behalf of the Class.

12. Mr. Dunstan, in particular, has demonstrated his commitment to this lawsuit and the Class's interests even in the face of what I would consider some more aggressive discovery tactics on the part of comScore.

13. On August 23, 2012, my firm received a phone call from Mr. Dunstan, who explained that a process server impersonating a package delivery service had, earlier that day at their home in California, served his wife with a subpoena to appear at a deposition in connection with this lawsuit. That phone call was the first time that my firm was informed about the subpoena or comScore's desire to depose Mr. Dunstan's wife.

14. That same day, Mr. Dunstan again called our office and relayed that comScore had served his wife with a *second* subpoena—once again at their residence—related to the same deposition. As before, the phone call was the first my firm had heard about this second subpoena.

15. At the same time, comScore's lawyers e-mailed an attorney at my firm indicating

6

their intent to subpoena Mr. Dunstan's work records from Sears, where he works as a retail salesman.

16.     Despite all of this, Mr. Dunstan never wavered in his support for this class action or tried to avoid his duties as a putative class representative.

### Edelson McGuire, LLC's Significant Class Action Experience

17.     Edelson McGuire, LLC is well-suited to represent the proposed Class and Subclass. My firm regularly engages in major complex litigation on behalf of consumers and has extensive general experience in large and complex consumer class actions like the present case. (*See* Firm Resume of Edelson McGuire, LLC, a true and accurate copy of which is attached hereto as Exhibit T.)

18.     As explained in the attached Firm Resume, my firm's lawyers have been appointed as class counsel in numerous complex consumer class actions and have been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *In re Facebook Privacy Litig.*, No. C 10-02389, Dkt. 69 at 5 (N.D. Cal. Dec. 10, 2010) (order appointing Edelson McGuire as interim co-lead of privacy class action); *see also In re Netflix Privacy Litig.*, No. 5:11-cv-00379, Dkt. 59 at 5 (N.D. Cal. Aug. 12, 2011) (appointing Edelson McGuire sole lead counsel due, in part, to its "significant and particularly specialized expertise in electronic privacy litigation and class actions[.]").

19.     To date, my firm has committed substantial resources to the prosecution of this case, including motion practice, propounding and responding to discovery requests, conducting six depositions of comScore's employees and proposed expert witnesses, defending the Plaintiffs' depositions, reviewing thousands of lines of source code and related documents, and

interfacing with the Plaintiffs, opposing counsel and others. Looking forward, my firm is prepared to continue its representation of the Plaintiffs and the putative Class.

***Exhibits Referenced in the Supplemental Motion for Class Certification***

20. Attached hereto as Exhibit A is a true and accurate copy of excerpts from the Rule 30(b)(6) Deposition of comScore's Chief Technology Officer and Rule 30(b)(6) designee, Michael Brown.

21. Attached hereto as Exhibit B is a true and accurate copy of comScore's First Supplemental Responses to Plaintiff Harris's First Set of Interrogatories.

22. Attached hereto as Exhibit C is a true and accurate copy of the Rule 26(a)(2)(B) report of Plaintiffs' expert witness, Don Waldhalm.

23. Attached hereto as Exhibit D is a true and accurate copy of the Rule 26(a)(2)(B) report of comScore's expert witness, Colin O'Malley.

24. Attached hereto as Exhibit E is a true and accurate copy of Exhibit A to Defendant comScore, Inc.'s First Supplemental Responses to Plaintiff Harris's First Set of Interrogatories.

25. Attached hereto as Exhibit F is a true and accurate copy of excerpts from the Deposition of comScore's expert witness, Colin O'Malley.

26. Attached hereto as Exhibit G is a true and accurate copy of the installation screenshots of MP3 Cut, as described in Paragraphs 2 and 3, *supra*.

27. Attached hereto as Exhibit H is a true and accurate copy of the Rule 26(a)(2)(B) report of comScore's expert witness, Roberto Tamassia, Ph.D.

28. Attached hereto as Exhibit I is a true and accurate copy of the RelevantKnowledge ULA captured September 15, 2010, as described in paragraphs 5 through 9,

*supra.*

29.    Attached hereto as Exhibit J is a true and accurate copy of the PremierOpinion ULA captured July 20, 2010, as described in paragraphs 5 through 9, *supra.*

30.    Attached hereto as Exhibit K is a true and accurate copy of excerpts from the Deposition of comScore's Director of Software Engineering, Randall Lynn McCaskill.

31.    Attached hereto as Exhibit L is a true and accurate copy of excerpts from the Deposition of comScore's Senior Vice President of Technology, Yvonne Bigbee.



33.    Attached hereto as Exhibit N is a true and accurate copy of excerpts from the Deposition of comScore's Quality Assurance Manager, Michiko Avantika Chand.

34.    Attached hereto as Exhibit O is a true and accurate copy of excerpts from the Deposition of Roberto Tamassia, Ph.D.

35.    Attached hereto as Exhibit P is a true and accurate copy of Plaintiff Jeff Dunstan's Responses to Defendant comScore, Inc.'s First Set of Interrogatories.

36.    Attached hereto as Exhibit Q is a true and accurate copy of Plaintiff Mike Harris's Responses to Defendant comScore, Inc.'s First Set of Interrogatories.

37.    Attached hereto as Exhibit R is a true and accurate copy of excerpts from the Deposition of Plaintiff Jeffrey Dunstan.

38.    Attached hereto as Exhibit S is a true and accurate copy of the August 13, 2012

transcript of proceedings before the Hon. Young B. Kim, Magistrate Judge.

39.     Attached hereto as Exhibit T is a true and accurate copy of the firm resume of Edelson McGuire, LLC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of January, 2013 at Chicago, Illinois.


/s/ Jay Edelson