**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MIKE HARRIS and JEFF DUNSTAN, individually and on behalf of a class of similarly situated individuals, | Case No. 1:11-cv-5807 |
| Plaintiffs, | Hon. James F. Holderman |
| v. | Magistrate Judge Young B. Kim |
| COMSCORE, INC., a Delaware corporation, | |
| Defendant. | |

**PLAINTIFF JEFF DUNSTAN'S MOTION TO COMPEL COMSCORE, INC.
TO RESPOND TO PLAINTIFF'S WRITTEN DISCOVERY**

Plaintiff Jeff Dunstan ("Dunstan"), by and through his undersigned counsel, respectfully moves this Court pursuant to Federal Rule of Civil Procedure 37, Local Rule 37.2, and the Court's September 17th Minute Entry for an Order compelling Defendant comScore, Inc. ("comScore") to produce all information within its possession or control that is relevant and responsive to Dunstan's outstanding Interrogatories and Document Requests and to otherwise supplement its document production so as to comply with Federal Rule of Civil Procedure 34. In support of this motion, Dunstan states as follows:

**INTRODUCTION**

On April 2, 2013, the Court certified a nationwide Class and Subclass of individuals who allege that Defendant comScore "improperly obtained and used personal information from [their] computers after they downloaded and installed comScore's [tracking software, OSSProxy.]" (Dkt. 186 at 1, 19–20.) Following certification, the Court ordered the Parties to proceed with merits discovery. (Dkts. 210, 211.) Accordingly, on July 31st Plaintiffs propounded their first merits-based interrogatories and requests for production. comScore provided written responses

1

one month later, but forwent producing any documents and instead promised to "produce copies of located, responsive, relevant, non-privileged documents to the extent that such documents exist and are in comScore's custody or control that have not already been produced by comScore." On September 17th, Plaintiffs received a hard drive containing well over 1.5 million pages of unindexed documents supposedly responsive to Plaintiffs' requests.

Presently, Plaintiffs are in the process of reviewing the documents produced by comScore, and currently seek additional time in order to meaningfully analyze these materials. (*See* Dkts. 215, 217.) Nonetheless, after a preliminary review, Plaintiffs have determined that certain of comScore's production and responses are lacking. As such, Dunstan seeks to compel comScore to provide full and adequate responses to his requests to avoid potentially delaying motion practice and trial preparation.

## BACKGROUND AND PROCEDURAL HISTORY

### A.    The Court Ordered the Parties to Proceed with Merits-Based Discovery.

After certifying a nationwide Class and Subclass, (Dkt. 186 at 19–20), Judge Holderman lifted the then-in-place stay of discovery, (Dkt. 207), and ordered that all fact discovery be noticed in time to be completed by December 20, 2013. (Dkt. 210.) This Court thereafter ordered the Parties to serve written discovery requests no later than August 9, 2013, and to provide responses by September 9, 2013. (Dkt. 211.)

### B.    Dunstan's Discovery Requests and comScore's Responses.

On July 31, 2013, comScore was served with Dunstan's First Set of Interrogatories and Requests for the Production of Documents and Plaintiff Harris's Second Set of Interrogatories. (*See* Declaration of Rafey S. Balabanian ["Balabanian Decl."] at ¶ 3, filed contemporaneously herewith.) Through those requests, Plaintiffs seek information about:

(1) the circumstances surrounding the design and development of OSSProxy;

(2) the process and manner in which comScore determined the types of information that it collects and transmits from Panelists' computers through OSSProxy;

(3) the value that comScore ascribes to the information that it collected, whether from the sale of the data or otherwise;

(4) the process, manner, and circumstances surrounding the drafting of, and subsequent modifications to, any applicable Terms of Service, User License Agreements, and Privacy Policies;

(5) the process by which comScore supposedly "fuzzifies" confidential information;

(6) the process by which comScore supposedly "purges" confidential information collected by OSSProxy;

(7) the types of data that comScore makes available to its clients and third party bundling partners, whether by sale or otherwise, including their identities, any contracts and other agreements in place between them, and the total top-line revenue and profit generated from the same;

(8) any and all complaints that comScore has received regarding OSSProxy; and

(9) the contact information that comScore has for Class and Subclass members.

(*See* Plaintiff Jeff Dunstan's First Set of Requests for Production of Documents to comScore, Inc. ("Dunstan's Requests"), Plaintiff Jeff Dunstan's First Set of Interrogatories to comScore, Inc. ("Dunstan's Interrogatories"), and Plaintiff Mike Harris's Second Set of Interrogatories to Defendant comScore, Inc. ("Harris's Interrogatories"), true and accurate copies of which are attached to the Balabanian Decl. as Exhibit Nos. 1, 2, and 3, respectively).

On August 30, 2013 comScore responded to Plaintiffs' discovery, primarily by offering boilerplate objections to each Interrogatory and Document Request. (Balabanian Decl. at ¶ 4.) More importantly, comScore also failed to answer certain of Dunstan's Interrogatories with sufficient detail (or even answer some Interrogatories at all) and didn't produce documents at the time. (*Id.*) Just over two weeks later, however, Plaintiffs received comScore's document

production via a hard drive containing files Bates-labeled "CS0016909-CS0096420."[1] (*Id.*) And after completing an initial survey of those files, Plaintiffs learned that comScore's production spans between 1.5 and 3.5 million pages of printed material. (*Id.*)

### C. The Parties Met and Conferred, But comScore Presently Refuses to Supplement Portions of Its Discovery Responses.

Pursuant to this Court's September 17th Order, the Parties met and conferred on September 26, 2013 about many of the issues above (the "meet and confer"). (Balabanian Decl. at ¶ 5.) Thereafter, the Parties exchanged several letters outlining their positions as to the contested discovery issues, wherein comScore agreed to supplement its responses regarding certain information and requests, but confirmed that it would not supplement in regards to others. (*Id.*)

In terms of anticipated supplementation, comScore has indicated that it will supplement its responses to Dunstan's Requests Numbers 74, 75, 76, 77, and 88, and its answers to Dunstan's Interrogatory Numbers 2, 3, and 4. (*See id.* at ¶ 6.) Of these, Plaintiffs specifically note that comScore has agreed to supplement its response to Dunstan's Request Number 88, which sought "[a]ny and all policies of liability insurance under which [comScore was] named or covered" during and before this litigation—information that should have been disclosed during comScore's Rule 26(a)(1) disclosures. And as previewed in their most recent motion submitted to this Court, (*see* Dkt. 217-1 ¶ 10), Plaintiffs presently take no position as to whether comScore willfully withheld information related to its insurance coverage for this matter, but to the extent it

---

[1]     As previewed in Plaintiffs' recent motion filed with this Court, (Dkt. 217), comScore says that it produced documents on September 9, 2013—and Plaintiffs have no reason to disbelieve comScore—but regardless, due to an apparent mix-up with FedEx's the delivery of the hard drive, Plaintiffs' counsel— despite thoroughly searching both their offices and the lobby of their building for the unencrypted hard drive at comScore's request—could not locate it, nor believe that it was actually delivered. comScore then promised to have a replacement hard drive delivered by September 16, 2013, but that too was delayed. As noted above, Plaintiffs received comScore's document production on September 17th. (Balabanian Decl. at ¶ 4 n.1.)

has any such coverage and failed to disclose it in accordance with the Federal Rules, Plaintiffs intend to address that failure with a separate motion. For now, Plaintiffs look forward to receiving the promised supplements to comScore's discovery responses—and will, of course, alert the Court to the extent the promised material is not provided.

As for comScore's refusal to answer certain discovery requests, Plaintiff Dunstan now seeks Court intervention. Namely, Plaintiff Dunstan seeks to compel responses regarding: (1) comScore's marketing or promotion of OSSProxy (Plaintiff Dunstan's Document Request Nos. 19, 21, 22 and 26); (2) comScore's practices and policies relating to the purging of certain Class and Subclass members' information (Plaintiff Dunstan's Document Request Nos. 34 and 36); (3) the revenue and monies generated from the sale and/or disclosure of the Class's and Subclass's information (Plaintiff Dunstan's Document Request Nos. 56, 57, 58, 59, 60, and 61 and Plaintiff Dunstan's Interrogatory Nos. 10, 11, and 12); and (4) comScore's relationship with Trees for the Future, NPO (Plaintiff Dunstan's Request Nos. 64, 65, 66, 67, and 68). To be clear, these deficiencies represent only those identified in Plaintiffs' present review of comScore's written discovery responses and massive document production—and if this Court extends its discovery deadlines, (*see* Dkt. 217), Plaintiff Dunstan anticipates amending and/or clarifying this Motion to Compel as appropriate.

## ARGUMENT

A party may "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Discoverable information is not limited to admissible evidence. *MSTG, Inc. v. AT & T Mobility LLC*, 08 C 7411, 2011 WL 221771, at *2 (N.D. Ill. Jan. 20, 2011). Instead, information is discoverable "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* (citation omitted).

Courts have extremely broad discretion in controlling discovery, *see Zimnicki v. Gen. Foam Plastics Corp.*, 09 C 2132, 2011 WL 833601, at *3 (N.D. Ill. Mar. 3, 2011) (citing *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331, 336 (N.D. Ill. 2005)), and may compel a party to respond to requests under Rule 37 of any matter that is relevant. *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006). In ruling on motions to compel discovery, "courts have consistently adopted a liberal interpretation of the discovery rules." *Wilstein v. San Tropai Condo Master Assoc.*, 189 F.R.D. 371, 375 (N.D. Ill. 1999). Courts, for example, have compelled discovery "where another party fails to respond to a discovery request or where the party's response is evasive or incomplete." *Kodish*, 235 F.R.D. at 450 (citing Fed. R. Civ. P. 37(a)(2)-(3)). The burden rests on the objecting party to show why a particular request is improper. *Rubin v. Islamic Republic of Iran*, 349 F.Supp.2d 1108, 1111 (N.D. Ill. 2004).

## I.  THE COURT SHOULD COMPEL COMSCORE TO PRODUCE DOCUMENTS RELATED TO MARKETING AND PROMOTING ITS PANELIST SOFTWARE.

To date, comScore has refused to answer Dunstan's Document Request Nos. 19, 21, and 22, which seek documents relating to comScore's marketing or promotion of its Panelist Software, and Dunstan's Document Request No. 26, which seeks communications between comScore and its bundling partners regarding the functionality of comScore's Panelist Software. Rather, comScore responded with a litany of non-specific, boilerplate objections, including repeated objections that the requests are overly broad, unduly burdensome, harassing and oppressive, and seek information not relevant to Plaintiffs' claims, without explaining the bases for any objections. (*See* Defendant comScore, Inc.'s Responses to Plaintiff Jeff Dunstan's First Set of Requests for Production of Documents to comScore, Inc., Resp. to Req. Nos. 19, 21, 22, and 26, a true and accurate copy of which is attached to the Balabanian Decl. as Exhibit No. 4.)

When asked during the meet and confer, comScore offered two explanations and one

compromise regarding its refusal to respond. (Balabanian Decl. at ¶ 8.) First, comScore explained that it believes information relating to its marketing or promotion of the Panelist Software is not relevant to this case. (*Id*.) Second, comScore asserted that the Requests were overly broad because the only possible relevant information would be communications with bundling partners about actually bundling OSSProxy (*i.e.*, with the partners' software), along with marketing materials designed to recruit new bundling partners. (*Id*.) For the compromise, Plaintiffs understood that comScore then-agreed to produce documents falling into the limited scope of what comScore took to be "possibly relevant" communications—but comScore later clarified that it viewed the "proposed 'narrowing' as an attempt to re-write [Dunstan's] Requests, which is improper [and that it would] not supplement."[2] (*Id*.)

comScore's underlying position is wrong—information about the marketing and promotion of its Panelist Software is relevant to Plaintiffs' claims. That is, Plaintiffs are required to prove that comScore acted intentionally for each of their counts. *See* 18 U.S.C. § 2701(a); 18 U.S.C. § 2511(1)(a); 18 U.S.C. § 1030(a)(2)(c). And, here, there are a number of ways that the requested materials may demonstrate comScore's intent.

To start, the requested communications may show that comScore willfully deceived Class members by, for example, incentivizing prospective or current bundling partners to develop or use misleading installation processes, so as to increase the number of installations of OSSProxy and, in turn, increase the collection of data through bundled versions of OSSProxy.

Likewise, the sought communications may demonstrate comScore's understanding about the nature and scope of its authorization to collect data from Class members' computers. *See*

---

[2]      It bears noting that Plaintiffs' offer isn't improper. In fact, offers of this nature are encouraged in this District. *See Bowden v. Kirkland & Ellis LLP*, 254 F.R.D. 542, 544 (N.D. Ill. 2009) ("compliance with the meet and confer requirements of Local Rule 37" contemplates the parties making "offers to narrow the range of the information sought by each document request or interrogatory . . . .").

*Cheng v. Romo*, CIV.A. 11-10007-DJC, 2012 WL 6021369, at *4 (D. Mass. Nov. 28, 2012) (holding that under the SCA, "it will be appropriate for a factfinder to consider evidence of whether [defendant] understood herself to be authorized or what she considered to be the scope of her authorization. This subjective inquiry is appropriate where 18 U.S.C. § 2707 imposes civil liability only where there is a violation of § 2701 committed 'with a knowing or intentional state of mind.'"). Namely, communications about the advertisement and/or promotion of its Panelist Software may reveal whether comScore understood the extent to which it was authorized to access Class members' computers—such as communications concerning the implementation of a new data collection technique, and whether or not such a technique was covered by the scope of existing agreements. Likewise, communications regarding the conspicuousness of comScore's Panelist Software as offered in bundled form may point to whether comScore intentionally created, or at least had a hand in contributing to a download and/or installation process where Class and Subclass members were purposefully kept "blind" to the installation of OSSProxy on their computers.

Finally, comScore's advertisement and promotion practices may also reveal that comScore utilized intentionally deceptive methods to drive-up OSSProxy installations. For example, documents may exist showing that comScore used "SEO" practices to suppress negative information about OSSProxy.[3] Such evidence would help demonstrate that it was comScore's conscious objective to avoid negative publicity about OSSProxy and ensure its mass distribution wasn't, or was minimally, affected. Similarly, communications between comScore and potential bundling partners could show patterned reputations of the companies comScore

---

[3]      SEO, or search engine optimization, is a technique used by internet marketers to, *inter alia*, manipulate the order in which search results (*i.e.*, those on Google.com) are presented to users. SEO can be used responsibly, such as by creating new original content, or irresponsibly, such as by spamming the Internet with fake, dubious, or duplicate material.

sought out to distribute OSSProxy—*i.e.*, comScore may have purposefully recruited partners with documented unscrupulous business practices in hopes of maximizing installations of OSSProxy.

In sum, while there are many ways the requested documents could be centrally relevant to this case, Plaintiffs only have one way to access them: through comScore. Accordingly, comScore should be compelled to provide responsive documents to Dunstan's Request Numbers 19, 21, 22, and 26.

## II. COMSCORE SHOULD BE COMPELLED TO PRODUCE DOCUMENTS RELATING TO THE PURGING OF PERSONAL INFORMATION COLLECTED THROUGH ITS PANELIST SOFTWARE.

Plaintiff Dunstan's Document Request Numbers 34 and 36 seek documents and communications relating to "any occurrence where [comScore] did not Purge Personal Information Collected through [its] Panelist Software." comScore responded to these Requests with the same boilerplate objections discussed in Section I, and, during the Parties' meet and confer, additionally explained that the Parties' definitions of "purge" were not in accord, but nonetheless agreed to consider producing documents that explain its purging procedures. (Balabanian Decl. at ¶ 9.) Most recently, however, comScore claims that is "has no documents to produce responsive to these requests" because it "does not have any documents, including written policies, regarding any such purging." (*Id.*)

comScore's position is untenable for at least two reasons. First, comScore has already produced documents responsive to—or at least showing that it has documents responsive to—these requests. (*Id.*) For instance, Plaintiffs have located communications between comScore employees discussing ███████████████████████████████████████████████ ███████████████████████████████████████████████████████. (*See* CS0075487_Confidential—Attorney's Eyes Only.htm, a true and accurate copy of which is

attached to the Balabanian Decl. as Exhibit No. 5.) This document shows that comScore's position (*i.e.*, that it has no responsive documents) is incorrect, and to the extent comScore has other documents like this one, they must be produced.

Second, and as has already been addressed in this case, comScore states outright in its Privacy Policy and User License Agreement that it "make[s] commercially viable efforts to purge [its] database of [inadvertently collected personal] information." (*See* Privacy Policy and User License Agreement, a true and accurate copy is attached as Exhibit A.) Assuming that comScore keeps, or attempts to keep, this promise, there's no way comScore possesses *no* documents or communications about such "commercially viable efforts to purge [its] databases]." Thus, if they do exist, they must be produced.

And, of course, comScore's collection and handling of "confidential personally identifiable information"—especially "unfuzzified" sensitive data collected from Class and Subclass members—is highly relevant and will inform whether comScore acted intentionally (*i.e.*, whether it did or did not attempt to purge inadvertently collected sensitive data) and allow Plaintiffs to calculate damages. *See United Labs., Inc. v. Rukin*, No. 98 C 602, 1999 WL 608712, at *6 (N.D. Ill. Aug. 4, 1999) (holding that the SCA allows for punitive damages where defendant's "conduct was constant and sustained over a lengthy period of time").

Therefore, comScore should be compelled to fully respond to Request Nos. 34 and 36.

## III. COMSCORE SHOULD BE COMPELLED TO IDENTIFY THE REVENUE, MONIES, AND OTHER BENEFITS GENERATED THROUGH ITS USE OF THE CLASS'S AND SUBCLASS'S INFORMATION.

Dunstan's Request Numbers 56, 57, 58, 59, 60, and 61 seek documents relating to the revenue and monies generated through comScore's "sharing, selling, transmitting, and/or disclosing" of the Class and Subclass's personal information. (*See* Dunstan's Request No. 56.)

Interrogatory Nos. 10–12 request similar information. For its part, comScore simply answered "None" to certain inquires (including Interrogatory Nos. 10 and 11). (Defendant comScore, Inc.'s Answers to Plaintiff Jeff Dunstan's First Set of Interrogatories to comScore, Inc., ("comScore's Answers"), a true and accurate copy of which is attached to the Balabanian Decl. as Exhibit No. 6.) And in others, comScore just responds with its boilerplate objections.[4] Both responses are insufficient—comScore has no basis for responding "none" or objecting on relevancy grounds.

Regarding its "none" response, comScore has clarified that it answered "None" to Interrogatory Nos. 10 and 11 because Plaintiffs' definition of "Personal Information" didn't include "aggregated" and/or "anonymized" data. (*See* September 30th Meet and Confer Follow Up Letter at 4, a true and accurate copy of which is attached to the Balabanian Decl. as Exhibit No. 7.) But that position doesn't hold up because the requests specifically seek information relating to the sharing, selling, transmitting, and/or disclosing of the *Class's* and *Subclass's* Personal Information—*i.e.*, in the aggregate rather than for this or that Class member.[5] What's

---

[4]     In one objection, comScore says that the term "top-line revenue" is vague and ambiguous. This is particularly disingenuous, as comScore repeatedly uses the term on its own webpages. *See, e.g.*, New Pharma Digital Marketing Benchmarks Reveal Significant Increase in Effectiveness in Recent Years, http://www.comscore.com/Insights/Press_Releases/2013/6/New_Pharma_Digital_Marketing_Benchmark s_Reveal_Significant_Increase_in_Effectiveness_in_Recent_Years (last visited October 7, 2013); *see also* comScore Reports Record Revenue and Profits in Third Quarter, http://ir.comscore.com/releasedetail.cfm?ReleaseID=344352 (last visited October 7, 2013).

[5]     comScore's curt Interrogatory answers frustrate the underlying purpose of discovery. Plaintiffs propounded Interrogatories and Document Requests on this topic specifically seeking answers and responses that would narrow the issues in contention in this case, potentially saving the Parties and Court time and resources, but have been rebuked by comScore. *See Fisher v. Baltimore Life Ins. Co.*, 235 F.R.D. 617, 628 (N.D.W. Va. 2006) (quoting *Life Music, Inc. v. Broadcast, Music, Inc.*, 41 F.R.D. 16, 26 (S.D. N.Y. 1966)) ("[T]he point of interrogatories is to obtain a party's admissions and contentions under oath and to narrow the issues in the case."). Plaintiffs cannot be expected to know the exact jargon comScore uses in describing the benefit it derives from its information collection practices. As long as comScore is playing cat-and-mouse with the definitions of words to avoid fully answering the Interrogatories and producing documents, Plaintiffs will be hamstrung in their efforts to efficiently prosecute this matter.

more, and even if Plaintiffs' definition of "Personal Information" excluded aggregated

information, evidence from comScore's document production shows that comScore *does* in fact

share or sell Personal Information that isn't "aggregated" or "anonymized" at all. For instance,

Plaintiffs have recently reviewed several communications from comScore's most recent

document production where comScore employees specifically discuss █████████████████

███████████████████. (*See* CS0049415_Confidential—Attorney's Eyes Only.htm, a true

and accurate copy is attached as Exhibit 8.) Likewise, comScore's Rule 30(b)(6) designee and

Chief Technology Officer, Mike Brown, recently testified ████████████████████████████

██████████████████████████████. (Balabanian Decl. at ¶ 10.)

And regardless of the above, comScore has indicated that even if Plaintiffs revised their

definition of "Personal Information" to include aggregated information, it would object to the

requests on relevance grounds. (*Id.*) That objection, however, is entirely without merit. The

information sought (*i.e.*, profits derived from the unlawful collection of Class members'

information) is directly and obviously relevant to this case, as two of the statutory claims

certified in this action (the ECPA and SCA) explicitly state that profits made in violation of the

laws are relevant in calculating damages. *See* 18 U.S.C. § 2520 ("[T]he court may assess as

damages whichever is the greater of: (A) the sum of the actual damages suffered by the plaintiff

and ***any profits made by the violator*** as a result of the violation . . . .) (emphasis added); 18

U.S.C. § 2707 ("(c) Damages. The court may assess as damages in a civil action under this

section the sum of the actual damages suffered by the plaintiff and ***any profits made by the***

***violator*** as a result of the violation") (emphasis added); *see also* (*Shefts v. Petrakis*, No. 10-CV-

1104, 2013 WL 1087695 (C.D. Ill. Mar. 14, 2013) (stating that in calculating damages under 18

U.S.C. § 2707(c), the Court can "assess the sum of the actual damages and *any profits*" made by the

violator.) And while comScore suggested that Plaintiffs examine its publicly available "Quarterly and Annual Financial Reports" for financial information, (Balabanian Decl. at ¶ 10), that is not a workable substitute for information within comScore's possession. Simply put, Plaintiffs cannot draw any conclusions from the publicly available reports because they do not break out or classify the revenue related to the collection and sharing of Class and Subclass members' information. (*See* comScore, Inc. Form 10-Q (Quarterly Report) for the Period Ending 06/30/13, a true and accurate copy is attached as Exhibit B.)

Accordingly, Plaintiff requests that the Court compel comScore to provide responsive documents to Plaintiff Dunstan's Request Nos. 56, 57, 58, 59, 60 and 61 and to meaningfully answer Plaintiff Dunstan's Interrogatory Nos. 10, 11, and 12.

## IV. COMSCORE CLAIMS THAT TREES FOR THE FUTURE WILL PLANT A TREE WHEN USERS INSTALL ITS PANELIST SOFTWARE, AND PLAINTIFFS ARE ENTITLED TO TEST THE VERACITY OF THAT STATEMENT.

Dunstan's Document Request Nos. 64, 65, 66, 67, and 68 all seek documents and communications related to Trees for the Future, NPO, including "contracts, amendments to contracts, agreements, and understandings." (*See* Plaintiff Dunstan's Request No. 65.) Amongst its repeated and unspecific objections addressed already, comScore also objected that the word "understandings" was vague and ambiguous and failed to produce any responsive documents. (Balabanian Decl. at ¶ 11.) In an attempt to clear up what Dunstan meant by "understandings," Plaintiffs explained that comScore's relationship with Trees for the Future is "relevant for the damages calculation in this case. If comScore's relationship with Trees for the Future was not as purported, and thus comScore's actions in this regard were willful or knowing, Plaintiffs may be entitled to additional damages." (*See* September 18th Meet and Confer Letter at 4, a true and accurate copy of which is attached to the Balabanian Decl. as Exhibit No. 9.) For its part,

13

comScore clarified that the real reason it did not produce any documents was because Trees for the Future is not a "Bundling Partner" and does not distribute the Panelist Software. (*See* October 3rd Meet and Confer Follow Up Letter at 2, a true and accurate copy of which is attached to the Balabanian Decl. as Exhibit No. 10.)

Regardless of which objection comScore chooses to assert, none have merit. comScore used, and continues to use, Trees for the Future as one method to convince consumers (and Class and Subclass members) to install OSSProxy. ███████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████. (*See*

CS0046036_Confidential—Attorney's Eyes Only.pdf at 20, a true and accurate copy of which is attached to the Balabanian Decl. as Exhibit No. 11.) And to date, comScore has produced nothing to show that it has actually planted any trees through the Trees For the Future program, apart from a single email (recently reviewed by Plaintiffs) referencing an "original donation" to the program. (Balabanian Decl. at ¶ 11.) As with other information sought by Plaintiffs, comScore's interactions with the Trees For the Future program is relevant to comScore's intent—especially if comScore does not follow through on its tree-planting promises made to incentivize eco-conscious consumers to install OSSProxy.

Accordingly, the Court should compel comScore to produce documents and communications responsive to Dunstan's Document Request Nos. 64, 65, 66, 67, and 68.

## CONCLUSION

For the foregoing reasons, Plaintiff Dunstan respectfully requests that the Court enter an order compelling comScore to produce all relevant information responsive to Dunstan's Document Request Nos. 19, 21, 22, 26, 34, 36, 56, 57, 58, 59, 60, 61, 64, 65, 66, 67, and 68 and

Interrogatory Nos. 10, 11, and 12, and providing such further relief that the Court deems

equitable and just.

Respectfully submitted,

**MIKE HARRIS** and **JEFF DUNSTAN,**
individually and on behalf of all others
similarly situated,

Dated: October 7, 2013

By: /s/ Rafey S. Balabanian
       One of Plaintiffs' Attorneys

Jay Edelson
Rafey S. Balabanian
Chandler R. Givens
Benjamin S. Thomassen
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
jedelson@edelson.com
rbalabanian@edelson.com
cgivens@edelson.com
bthomassen@edelson.com

**L.R. 37.2 CERTIFICATION**

Pursuant to Local Rule 37.2, the undersigned certifies that the Parties met and conferred telephonically at 2:00 P.M. (C.D.T.) on September 26, 2013, and despite their good faith efforts to resolve the discovery issues now in dispute, were unable to reach an accord.

/s/ Rafey S. Balabanian

**CERTIFICATE OF SERVICE**

I, Benjamin S. Thomassen, an attorney, hereby certify that on October 7, 2013, I served the above and foregoing ***Plaintiff Jeff Dunstan's Motion to Compel comScore, Inc. to Respond to Plaintiff's Written Discovery*** by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF system on this 7th day of October 2013.

/s/ Benjamin S. Thomassen