**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

MIKE HARRIS and JEFF DUNSTAN,
individually and on behalf of a class of
similarly situated individuals,

              Plaintiffs,

       v.

COMSCORE, INC., a Delaware corporation,

           Defendant.

Case No. 1:11-cv-5807

Hon. James F. Holderman

Magistrate Judge Young B. Kim

**PLAINTIFFS' MOTION FOR**
**PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION.................................................................................................................1

BACKGROUND .................................................................................................................2

I.     Nature of the Litigation ..........................................................................................2

       A.     The Parties and Events Preceding Litigation ................................2

       B.     Relevant Provisions of the SCA, ECPA, and CFAA...................4

       C.     Plaintiffs' Allegations and the Litigation History. ....................5

       D.     Settlement Discussions, Mediation, and Resolution...................9

       E.     comScore's Position ...................................................................10

II.    The Terms of the Settlement ................................................................................10

       A.     Class Definition .........................................................................11

       B.     Monetary Relief.........................................................................11

       C.     Additional Relief .......................................................................12

                1.     *Prospective Relief* ........................................................12

               2.     *Payment of Notice and Settlement Administration Expenses* ...................12

               3.     *Incentive Award for Class Representatives* ................13

               4.     *Payment of Attorneys' Fees and Expenses* ................13

       D.     Release of Liability....................................................................13

ARGUMENT ....................................................................................................................13

I.     The Proposed Settlement Warrants Preliminary Approval...................................13

       A.     Several uncertainties inherent to this litigation mean that the relief offered by the Settlement compares favorably to the strength of Plaintiffs' case.............................................................................15

       B.     The complexities and technicalities of any trial of Plaintiffs' claims, along with the length of trial and appeal, favor approval of the Settlement. ...............................................................................17

  **C.**  **The Settlement to date has no opposition among affected parties.** .................18

  **D.**  **Class Counsel have extensive experience in this type of litigation and believe that the Settlement offers exceptional relief for the Class and the Subclass.**...................................................................................................18

  **E.**  **Given that the Parties have completed non-expert discovery, they had access to all facts necessary to adequately value the case and negotiate its resolution.** .................................................................................................19

**II.**  **The Proposed Method of Notice Should be Approved**...................................................21

**CONCLUSION** ..........................................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**UNITED STATES SUPREME COURT CASES:**

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974).....................................................................21

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Armstrong v. Board of Sch. Dirs. Of City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980) ...13, 14, 15

*Harris v. comScore, Inc.*, No. 13-8007 (7th Cir. Apr. 16, 2013).....................................................7

*In re Pharmatrak, Inc.*, 329 F.3d 9 (1st Cir. 2003).........................................................................4

*Isby v. Bayh,* 75 F.3d 1191 (7th Cir. 1996)...........................................................................14, 19

*Lane v. Facebook, Inc.,* 696 F.3d 811 (9th Cir. 2012)...........................................................16, 20

*Parker v. Time Warner Entm't Co., L.P..,* 331 F.3d 13 (2d Cir. 2003) .........................................16

*Schorsch v. Hewlett-Packard Co.,* 417 F.3d 748 (7th Cir. 2005) ..................................................11

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir.2006)...........................14

*Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2003)..................................................................5

**UNITED STATES DISTRICT COURT CASES:**

*Am. Intern. Group, Inc. v. ACE INA Holdings, Inc.,* Nos. 07-cv-2898, 09-cv-2026,
    2011 WL 3290302 (N.D. Ill. July 26, 2011) ..............................................................19, 20

*Blanco v. CEC Entm't Concepts L.P.,* No. 07-cv-0559 GPS, 2008 WL 239658
    (C.D.Cal. Jan. 10, 2008) ......................................................................................................16

*Fraley v. Facebook, Inc.,* 966 F. Supp. 2d 939 (N.D. Cal.2013)............................................16, 20

*In re AT&T Mobility Wireless Data Servs. Sales Litig.,* MDL No. 2147, 270 F.R.D. 330
    (N.D. Ill. 2010)........................................................................................................14, 15, 18

*In re Facebook Privacy Litig.,* No. 10-cv-02389 (N.D. Cal.) .....................................................19

*In re Google Android Consumer Privacy Litig.,* No. 11-md-02264 JSW, 2014 WL 988889
    (N.D. Cal. Mar. 10, 2014)......................................................................................................5

*In re Google Buzz Privacy Litig.,* No. 10-cv-00672, 2011 WL 7460099
(N.D. Cal. June 2, 2011) ...........................................................................................16, 20

*In re Netflix Privacy Litig.,* No 11-cv-00379, Dkt. 59 (N.D. Cal. 2011) ..........................16, 19, 20

*Kessler v. Am. Resorts Int'l,* 05 C 5944, 2007 WL 4105204 (N.D. Ill. Nov. 14, 2007)...............15

*Redman v. RadioShack Corp.,* No. 11-cv-6741, 2014 WL 497438 (N.D. Ill. Feb. 7, 2014)........17

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)...................................14, 15, 17

**STATUTES:**

18 U.S.C. § 1030 .................................................................................................................4, 6

18 U.S.C. § 2701..................................................................................................................4, 5

18 U.S.C. § 2511..................................................................................................................4, 5

Fed. R. Civ. P. 23.................................................................................................................7, 21

**MISCELLANEOUS:**

Conte & Newberg, 4 *Newberg on Class Actions*, § 11-25 (4th Ed. 2002) .......................13, 14, 21

*Manual for Complex Litigation*, § 21.632 (4th Ed. 2004) ...........................................................14

## <u>INTRODUCTION</u>

After three years of intensive litigation, the class action settlement for which Plaintiffs Jeff Dunstan and Mike Harris ("Plaintiffs") now seek preliminary approval has been a long time coming. Indeed, over the course of the last three years, the Parties engaged in extensive written and oral discovery, briefed dozens of substantive motions, litigated and obtained a ruling on the issue of class certification, and participated in nearly one year of negotiations both in the context of private mediation and multiple settlement conferences with Magistrate Judge Young B. Kim.

The Settlement calls for comScore, Inc. ("comScore") to establish a $14 million non-reversionary settlement fund from which class member claims, attorneys' fees and incentive awards, costs, and administrative expenses would be paid. The Settlement also includes prospective relief requiring comScore to alter its privacy policy and implement certain protocols to ensure that its privacy practices remain consistent with its disclosures to consumers. Without question, the instant Settlement compares favorably to other consumer privacy class action settlements, which most often result in monies being directed to *cy pres* or *de minimus* payments to class members.[1] Here, however, Class Counsel secured a $14 million non-reversionary settlement fund that will be paid out to the Class, as well as significant prospective relief.

As shown below, the proposed Settlement goes well beyond the established privacy class action settlement paradigm. Given the years of hard-fought litigation, the substantial recovery available, and the significant risks that would accompany further litigation—including transfer, arbitration, summary judgment, decertification, trial, and appeal—the instant Settlement offers a more than adequate recovery for Class members. Accordingly, Plaintiffs respectfully move the Court for preliminary approval, and request that the Court amend the Class definition as

---

[1] This statement is not meant as a criticism of those settlements, which have been uniformly approved by the courts that have reviewed them.

1

provided herein, preliminarily approve the Settlement, and approve the proposed Notice Plan.

For convenience, proposed dates and deadlines leading to a final approval hearing are provided

in the Proposed Order separately submitted to the Court.

## BACKGROUND

### I.     Nature of the Litigation

#### A.     The Parties and Events Preceding Litigation

comScore is a global leader in measuring and analyzing consumers' Internet behavior.

(Dkt 169 ¶¶ 2 – 3.) By monitoring over a trillion online interactions per month, comScore

collects, measures, and analyzes computer and Internet usage data to offer its clients—including

"the largest Internet services companies and scores of Fortune 500 companies," (Dkt. 156-9 at

2)—"real-time predictive analytics . . . measuring consumers' behavior and attitudes . . . and

analyzing the implications."[2] comScore primarily collects its Internet usage data by distributing

its proprietary data-collection software (known as OSSProxy) to "panelists"—i.e., those

individuals who download OSSProxy and from whom comScore collects usage data.

Rather than delivering OSSProxy to panelists on its own, comScore enlists the assistance

of third-party Bundling Partners. These Bundling Partners offer free downloads to consumers

(generally termed "freeware," such as screensavers, music programs, games, etc.) that are then

"bundled" with OSSProxy. (Dkt. 329 at ¶¶ 15, 22 – 33.) That is, during the download and

installation of the freeware, a "branded" version of OSSProxy is installed as part of the same

download process, without initiating any new installation process or generally without presenting

new dialog windows. (*Id*.) A dialog box is presented during the download and installation of the

freeware, and if the user clicks "accept" to the terms presented in the dialog box, then the

---

[2]     Serge Matta, *Message from the CEO*, comScore – Careers,
http://www.comscore.com/Careers/Message_from_the_CEO (last accessed April 11, 2014).

software is distributed by a comScore subsidiary. (*Id.*) For instance, during the installation of MP3 Cut, one of the bundled programs, one of the installation windows states that "MP3Cut includes RelevantKnowledge," a version of OSSProxy distributed by comScore subsidiary TMRG, Inc. (Dkt. 154 at 15.)

Once installed, OSSProxy monitors essentially all online activity performed on a Panelist's computer, including websites viewed, items purchased, information entered on webpages—including credit card numbers, addresses, telephone numbers, bank account numbers, and full names—and more. (Dkt. 169 ¶ 7.) Once collected, and after obfuscating what OSSProxy deems personally identifiable information, the data is sent to comScore's servers, where it is used to create the data and market reports comScore's clients pay for. (*Id*. ¶ 5.)

Plaintiffs Mike Harris and Jeff Dunstan had OSSProxy installed on their computers while downloading software from comScore's Bundling Partners. Harris alleges that he unknowingly downloaded comScore's software in March 2010 when it was bundled with a free screensaver. After discovering that downloading the screensaver had also installed comScore's software, he uninstalled the screensaver, yet comScore's software remained on his computer. Dunstan similarly alleges that he unknowingly downloaded comScore's software in September 2010, when downloading free greeting card template software that was, unbeknownst to him, bundled with comScore's software. Dunstan spent considerable time researching how to remove comScore's software from his computer, and eventually had to pay forty dollars for third-party anti-virus software to remove the software from his computer (though comScore has always maintained that any Windows version of its software can be easily uninstalled using the Windows Add/Remove Programs function).

On August 23, 2011, Plaintiffs filed their first Class Action Complaint against comScore,

challenging its collection of data through OSSProxy and alleging that its collection occurred without consent, and therefore violated the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701, *et seq.*; the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510 – 22; the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"); the Illinois Consumer Fraud Act, 815 ILCS 505 ("ICFA"); and that its conduct constituted unjust enrichment. (Dkt. 1 ¶¶ 84 – 124.)

### B.    Relevant Provisions of the SCA, ECPA, and CFAA[3]

The SCA, the ECPA, and the CFAA were all enacted to offer protections to computers, electronic communications, and data. "The ECPA amended the Federal Wiretap Act by extending to data and electronic transmissions the same protection already afforded to oral and wire communications . . .  The paramount objective of the Wiretap Act is to protect effectively the privacy of communications." *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003). The ECPA prohibits, *inter alia*, the intentional interception of any wire, oral, or electronic communication, as well as the disclosure of any information knowingly obtained through the unlawful interception of a wire, oral, or electronic communication. 18 U.S.C. § 2511.

Like the ECPA, the SCA:

> protects individuals' privacy and proprietary interests. The Act reflects Congress's judgment that users have a legitimate interest in the confidentiality of communications in electronic storage at a communications facility. Just as trespass protects those who rent space from a commercial storage facility to hold sensitive documents, *cf. Prosser and Keeton on the Law of Torts* § 13, at 78 (W. Page Keeton ed., 5th ed. 1984), the Act protects users whose electronic communications are in electronic storage with an ISP or other electronic communications facility.

*Theofel v. Farey-Jones*, 359 F.3d 1066, 1072 – 73 (9th Cir. 2004). To prove their SCA claims,

---

[3]    As explained below, Plaintiffs voluntarily dismissed their ICFA claims and the Court denied certification as to the unjust enrichment claims. As such, only the statutes underlying the claims certified for class adjudication—the SCA, ECPA, and CFAA—are explained herein.

Plaintiffs would have to establish that comScore intentionally accessed, either without or in excess of any authority, a facility through which an electronic communications service was provided, and that comScore then obtained, altered, or prevented authorized access to a wire or electronic communication held in electronic storage. 18 U.S.C. § 2701.

Finally, "[t]he CFAA prohibits a number of different computer crimes, the majority of which involve accessing computers without authorization or in excess of authorization, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data." *In re Google Android Consumer Privacy Litig.*, No. 11-md-02264 JSW, 2014 WL 988889, at *4 (N.D. Cal. Mar. 10, 2014) (citing *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1131 (9th Cir. 2009)). In relevant part, the CFAA prohibits anyone from intentionally accessing a computer without authorization (or in excess of authorization), and obtaining information from protected computers, and from knowingly causing the transmission of a program or code that causes damage without authorization to a protected computer. 18 U.S.C. §§ 1030(a)(2)(c), 1030(a)(5).

### C.    Plaintiffs' Allegations and the Litigation History

Plaintiffs filed their Class Action Complaint against comScore on August 23, 2011, alleging that comScore's data collection occurred without consent, and therefore violated the SCA, the ECPA, the CFAA, and the ICFA, and that it constituted unjust enrichment. (Dkt. 1.)

On September 28, 2011, comScore filed a Motion to Dismiss or in the Alternative to Transfer to the United States District Court for the Eastern District of Virginia. (Dkt. 12.) In its motion, comScore asserted that in downloading its software, Plaintiffs had agreed to a forum selection clause compelling them to litigate in Virginia. (*Id.*) The Court denied comScore's motion on October 7, 2011. (Dkt. 31.) comScore then moved to dismiss pursuant to Federal

5

Rules 12(b)(1) and 12(b)(6), (Dkt. 39), and Plaintiffs responded by moving to strike the motion

to dismiss, asserting that Rule 12(g) prohibited comScore from filing successive pre-answer Rule

12 motions. (Dkt. 43.) By Minute Order dated November 15, 2011, the Court denied comScore's

Motion to Dismiss and granted Plaintiffs' Motion to Strike. (Dkt. 49.)

After comScore answered Plaintiffs' Complaint, (Dkt. 59), the parties engaged in

substantial discovery regarding class certification issues. (Declaration of Rafey S. Balabanian

("Balabanian Decl."), attached hereto as Exhibit 1, ¶ 2.) During that time, Plaintiffs and

comScore served and responded to seven sets of written discovery, filed and responded to

motions to compel, exchanged tens of thousands of documents, took nine depositions (including

those of the Plaintiffs and comScore's Rule 30(b)(6) designee), and exchanged expert discovery.

(Balabanian Decl. ¶ 2.) In January 2013, after the close of class discovery, Plaintiffs moved for

class certification,  (Dkts. 152 – 158), and filed their Second Amended Complaint, asserting

claims for violations of the SCA, ECPA, and CFAA, and for unjust enrichment. (Dkt. 169.)

After full briefing, the Court granted in part and denied in part Plaintiffs' Motion for

Class Certification, certifying a Class of all individuals since 2005 who had comScore's software

installed via one of comScore's third party bundling partners and a Subclass of all Class

members who were not presented with a functional hyperlink to the user license agreement

("ULA") when installing comScore's software, and appointing Plaintiffs as class representatives,

Harris as a representative of the Subclass, and Plaintiffs' counsel as class counsel. (Dkt. 186

("the Class Certification Order").)[4] The Court held that the numerosity requirement was easily

met by the multi-million-person class and that representation was adequate. (Dkt. 186 at 8, 13 –

14.) The Court also recognized "a variety of common questions that can be resolved on a

---

[4]     In the Certification Order, the Court found Plaintiffs' unjust enrichment claim unsuitable for
class-wide adjudication and denied certification as to that claim alone. (Dkt. 186.)

classwide basis." (*Id.* at 9.) "Most obviously, each class member agreed to a form contract (made up of the ULA and the Downloading Statement)." (*Id.*) Additionally, "the question of whether comScore is a party to the ULA and the Downloading Statement in light of the fact that it is not listed as a contracting party can be resolved consistently for the entire class." (*Id.*) "Similarly, the question of what rights comScore has under the ULA and the Downloading Statement as a third-party beneficiary to use the information OSSProxy collects is common to the entire class. Yet another common question is the scope of the consent the plaintiffs granted to comScore by agreeing to the ULA and the Downloading Statement." (*Id.*) Finally, "[a]nother common issue is whether OSSProxy's data collection violates the terms of the ULA and the Downloading Statement." (*Id.* at 10.)

The Court found that these common issues predominated over any individualized issues regarding consent, its scope, and comScore's actual collection of data; that individualized issues were unlikely to present "significant difficulties" in practice; and that a class action was a superior means of adjudicating the controversy. (*Id.* at 16 – 19.) The Court also held that Plaintiffs adequately represented the Class and Subclass, that Plaintiffs had "provide[d] ample evidence that their claims [were] typical," and that the only unique defenses to their claims were "based on speculation" and lacking in "actual evidence." (*Id.* at 12.) Finally, the Court found that the Class and Subclass would be ascertainable based on comScore's own records. (*Id.* at 14 – 15.)

Two weeks after the Court issued the Class Certification Order, comScore petitioned the Seventh Circuit Court of Appeals for leave to appeal, pursuant to Fed. R. Civ. P. 23(f). (*See Harris v. comScore, Inc.*, No. 13-8007, Dkt. 1 (7th Cir. Apr. 16, 2013) (hereinafter "App. Dkt.").) While comScore's petition was pending, the Direct Marketing Association, the

American Association of Advertising Agencies, the Association of National Advertisers, the Entertainment Software Association, the Interactive Advertising Bureau, and the Chamber of Commerce of the United States of America sought leave to (and ultimately did) file a brief of *amici curiae* in support of comScore's petition. (*See* App. Dkts. 4, 9, 10.) After Plaintiffs responded in opposition to both the petition and the motion for leave, the Seventh Circuit denied comScore's Rule 23(f) petition. (Dkt. 199.)

Following the denial of comScore's Rule 23(f) petition, the Parties proceeded with merits discovery. As with the class discovery, the Parties exchanged tens of thousands of documents and  took numerous depositions (in all, the Parties took twenty-three, including ten depositions of comScore's employees, six Rule 30(b)(6) depositions of comScore, two separate depositions of both Plaintiffs on class and merits issues, one third-party deposition, and three expert depositions), and filed, briefed, and argued several motions to compel. (Balabanian Decl. ¶ 4.) While merits discovery was occurring, the Parties filed a stipulated motion (which the Court later granted) to amend the Class definition, narrowing the Class (and with it, the Subclass) such that it only included United States residents. (Dkts. 252, 271.)

Near the end of merits discovery, comScore renewed its motion to dismiss Plaintiffs' claims under Rule 12(b)(3), contending that Plaintiffs and all Class members had manifested assent to a forum selection clause requiring them to litigate in Virginia. (*See* Dkts. 242, 243.) After Plaintiffs responded in opposition and comScore replied, (Dkts. 280, 291), comScore— citing intervening Supreme Court authority—sought (and received) leave to file a Motion to Transfer Under 28 U.S.C. § 1404(a), relying on the same forum clause as its motion under Rule 12(b)(3). (Dkt. 302.) Following full briefing on comScore's motion to transfer, and after the conclusion of non-expert merits discovery, Plaintiffs moved for partial summary judgment on the

authorization elements of, and consent defenses to, their claims under the CFAA, SCA, and ECPA. (Dkts. 321, 323.)

### D. Settlement Discussions, Mediation, and Resolution

Beginning in August 2013—shortly after the Seventh Circuit's denial of comScore's Rule 23(f) petition, and early in merits discovery—the Parties began to discuss the possibility of settlement. (Balabanian Decl. ¶ 5.) On August 22, 2013, the Parties engaged in a full-day mediation presided over by Rodney A. Max of the Upchurch Watson White and Max Mediation Group. (*Id.*) Despite the best efforts of the Parties and Mr. Max, the mediation did not result in a settlement, although the Parties did make progress in terms of closing the substantial gap in their opening positions. Following that initial session, over the course of the next few months, Mr. Max repeatedly followed up with both Parties, in order to keep the momentum moving towards settlement, but his efforts eventually gave way to the Parties' desire to continue litigating, given their vastly different views at that time regarding an appropriate settlement. (*Id.* ¶ 6.) Thus, the Parties pushed forward with engaging in merits discovery. (*Id.*)

Near the end of merits discovery, the Parties agreed to proceed with a settlement conference to be presided over by Magistrate Judge Kim, which took place on November 25, 2013. (*Id.* ¶ 7.) With Magistrate Judge Kim's knowledge of the case and guidance over the conference, the Parties made progress toward settlement, and agreed to engage in a second settlement conference, which took place on December 16, 2013. (*Id.*) That conference too, failed to result in settlement, although, once again, the Parties made progress toward a resolution. (*Id.*) After Magistrate Judge Kim adjourned the settlement conference but before he closed the referral, on January 9, 2014, he made a mediator's proposal providing for a $14 million non-reversionary settlement fund, and gave the Parties until 3:00 p.m. on January 13, 2014 to accept

or decline the offer. (*Id.* ¶ 8.) The Parties did not accept Magistrate Kim's proposal at that time. (*Id.*)

Following the lapse of Magistrate Judge Kim's proposal, the Parties continued to litigate, culminating with comScore moving to dismiss (Dkt. 242) (and later to transfer (Dkt. 302)), and Plaintiffs filing their Motion for Partial Summary Judgment on February 20, 2014. (Dkt. 321.) Over the course of the next month, the Parties continued their settlement negotiations, and eventually, on March 19, 2014, the Parties agreed to the terms proposed by Magistrate Judge Kim in his mediator's proposal—i.e., to a settlement that would create a non-reversionary $14 million fund. (Balabanian Decl. ¶ 10.) Over the course of the following two months, the Parties negotiated the remaining terms of the Settlement, including injunctive relief, Class notice, the claims process, and the particulars of the Settlement Agreement. Finally, on May 30, 2014, the Parties and their counsel agreed to execute the Settlement Agreement. (*Id.*)

### E.      comScore's Position

At all times, comScore has denied and continues to deny any wrongdoing whatsoever and has denied and continues to deny that it committed, or threatened or attempted to commit, any wrongful act or violation of law or duty alleged in the Action. (*See* Settlement Agreement, attached hereto as Exhibit 2 ("Ex. 2"), Recitals ¶ Q.) comScore also contends that it has acted properly in all regards in connection with its duties under the SCA, ECPA, and CFAA. Nonetheless, taking into account the uncertainty and risks inherent in any litigation, comScore has concluded that further defense of the Action would be protracted, burdensome, and expensive, and that it is desirable and beneficial that the Action be fully and finally settled and terminated in the manner and upon the terms and conditions set forth in the Settlement Agreement. (*Id.*)

## II. The Terms of the Settlement

The terms of the Settlement are set forth in the Settlement Agreement (*see* Ex. 2), and are briefly summarized as follows.

### A. Class Definition

The Settlement Agreement provides for a single Class, defined as follows:

> All persons who, at any time since 2005, had comScore's Data Collection Software downloaded and installed on their computers via a bundling partner, and used their computer in interstate commerce and/or communication.[5]

Excluded from the Settlement Class are: (a) all persons who file timely requests for exclusion, (b) all persons who had their claims discharged in bankruptcy, finally adjudicated on the merits or otherwise released, (c) any District Judge or Magistrate Judge presiding over this Action, (d) the Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, and employees, and (e) the legal representatives, successors or assigns of any such excluded persons. (Ex. 2 § 1.43.)

### B. Monetary Relief

comScore has agreed to establish a $14,000,000 non-reversionary Settlement Fund, from which each Class Member who submits a valid claim shall be entitled to a *pro rata* share of the money remaining in the Settlement Fund after payment of all Settlement Administration

---

[5] The definition of the Settlement Class is slightly different from the operative Class definition to account for the fact that comScore wanted to ensure that the Settlement Class included any foreign nationals who may be able to assert claims under the federal statutes at issue. Whereas the operative Class definition was limited to U.S. residents who downloaded and installed comScore's software since 2005, the proposed Settlement Class definition includes all individuals who downloaded and installed comScore's software since 2005 and used their computers in interstate commerce and/or communication. The modification does not materially change the size or composition of the Class but gives comScore finality, which was one of its goals in settling the case. Thus, the modification should be approved by the Court as "[l]itigants are free to modify a class via a court-approved settlement agreement," *In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011), and they do so regularly. *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005).

Expenses, incentive awards to the Class Representatives, and the Fee Award to Class Counsel. (*Id.* § 2.1 – 2.2(a).) The *pro rata* share shall not exceed the statutory damages available under the SCA ($1,000) and the ECPA ($10,000). (*Id.* § 2.2(a).) Plaintiffs estimate that, based on the expected rate of claims, each Class Member who submits a valid claim will receive approximately $200.

### C. Additional Relief

In addition to the individual relief to the Settlement Class provided above, comScore has also agreed to provide the following additional relief.

#### 1. Prospective Relief in Effect for Two Years after the Effective Date

comScore has agreed to modify the terms of its "Disclosure Statement" and "User License Agreement" such that they are consistent with its data collection practices and accurately disclose and identify (a) the categories of information collected by OSSProxy and (b) each company collecting such information. (Ex. 2, § 2.3(a).) comScore has also agreed to implement procedures to further ensure that its requirement for third-party bundling partners to include in the Disclosure Statement a functional and conspicuous hyperlink to the ULA is met. (*Id.* § 2.3(b).) comScore has agreed to implement reasonable systems and controls to comply with this requirement, and shall take reasonable steps to remedy any violations. (*Id.*) comScore has also agreed to establish a mechanism for individuals to receive easily understood instructions for removing OSSProxy from their computers. (*Id.* § 2.3(c).) Finally, comScore has agreed to continue its practice of engaging an independent third party to perform semi-annual audits, but with the scope of the audits expanded to ensure that the auditors check for compliance with the prospective relief provided by the Settlement, and correct any violations identified by the auditors. (*Id.* § 2.3(d).) The costs of the audits, up to a total of $100,000.00, are to be paid out of

the Settlement Fund. (*Id.*)

### 2. Payment of Notice and Settlement Administration Expenses

comScore has agreed to pay, from the Settlement Fund, the cost of sending the Notice set forth in the Agreement and any other notice as required by the Court, as well as all costs of administration of the Settlement. (*Id.* § 2.1, 4.1.)

### 3. Incentive Award for Class Representatives

In addition to the relief received as Class Members under the settlement, and in recognition of their efforts on behalf of the Settlement Class, comScore has agreed to pay each of the Plaintiffs, subject to Court approval, an incentive award of $11,000 per Plaintiff from the Settlement Fund as appropriate compensation for their time and effort serving as class representatives and parties to the Action. comScore will not oppose any request limited to this amount. (*Id.* § 8.3.)

### 4. Payment of Attorneys' Fees and Expenses

Under the Agreement, comScore has agreed to pay Class Counsel reasonable attorneys' fees and to reimburse expenses in this Action, in an amount to be approved by the Court. comScore has agreed to pay Class Counsel $4,662,000 from the Settlement Fund, as well as Class Counsel's unreimbursed expenses incurred in the action, as a Fee Award. (*Id.* § 8.1.)

### D. Release of Liability

In exchange for the relief described above, comScore, and each of its affiliated and/or related entities, will receive a full release of all claims related to the alleged monitoring of and collection of data from Class Members' computers using OSSProxy. (*Id.* § 3.)

## ARGUMENT

### I. The Proposed Settlement Warrants Preliminary Approval

Once a certified class exists, the Court next determines whether to preliminarily approve a settlement. Conte & Newberg, 4 *Newberg on Class Actions*, §11.25, at 38 – 39 (4th Ed. 2002); *see also Armstrong v. Board of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). First, courts conduct a pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval." *Newberg*, §11.25, at 38 – 39; *Armstrong*, 616 F.2d at 314. The purpose of this preliminary approval hearing is not to conduct a "fairness hearing," but rather "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Armstrong*, 616 F.2d at 314; *Newberg*, §11.25, at 38 – 39. This stage serves as an "initial evaluation" of the proposed settlement, taking into consideration the written submissions as well as the informal presentations provided by the settling parties. *Manual for Complex Litigation,* § 21.632 (4th ed. 2004). Upon determining that the settlement proposal is "within the range of possible approval," the court then proceeds to the second step, a final approval hearing. *Newberg*, §11.25, at 38 – 39; *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, MDL No. 2147, 270 F.R.D. 330, 346 (N.D. Ill. 2010).

"Federal courts naturally favor the settlement of class action litigation." *In re AT&T*, 270 F.R.D. at 345 (quoting *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)). Upon a finding that a proposed settlement is "fair, reasonable, and adequate," strong judicial and public policy favors the approval of such a settlement. *Isby*, 75 F.3d at 1198. In determining whether the proposed settlement is fair, reasonable and adequate, courts look to the following factors: (1) the strength of the plaintiff's case compared to the amount of the settlement offer; (2) an assessment of the likely complexity of a trial; (3) the length and expense of the litigation; (4) the amount of opposition to settlement among affected parties; (5) the opinion of competent counsel; and

14

(6) the stage of the proceedings and amount of discovery completed at the time of settlement. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 578 (N.D. Ill. 2011) (citing *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir.2006)). Though these factors are ultimately assessed at the fairness hearing that follows preliminary approval of the proposed settlement, a summary version of the same inquiry also takes place at this phase of the approval process. *Kessler v. Am. Resorts Int'l*, 05 C 5944, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) (citing *Armstrong*, 616 F.2d at 314)). At this preliminary phase, applying the six-factor test demonstrates that the proposed settlement is "fair, reasonable and adequate" and thus well within the range of approval.

### A. Several uncertainties inherent to this litigation mean that the relief offered by the Settlement compares favorably to the strength of Plaintiffs' case.

The first factor, the strength of Plaintiffs' case compared to the settlement offer, is the most heavily weighted and also strongly favors approval. *See Schulte*, 805 F. Supp. 2d at 578. Courts should be mindful not to reject a settlement solely because it does not provide a complete victory, given that parties to a settlement "benefit by immediately resolving the litigation and receiving some measure of vindication for [their] position[s] while foregoing the opportunity to achieve an unmitigated victory." *In re AT&T*, 270 F.R.D. at 347.

Here, while Plaintiffs are confident in their claims, they are cognizant of the substantial risks that would accompany further litigation. Indeed, comScore is represented by highly experienced attorneys from one of the most preeminent law firms in the world, and they have made clear that absent a settlement, they were prepared to continue their vigorous defense of this case, including moving to decertify the class and for summary judgment. (Balabanian Decl. ¶ 11.) And, of course, without a settlement, there would be the uncertainty and expense of trial, and the risks and delay of inevitable appeals. More specifically, Plaintiffs are aware that

15

comScore would continue to assert a number of defenses on the merits, including traditional defenses such as consent, which comScore has always maintained they've validly obtained from each and every class member, as well as more complicated ones including whether Plaintiffs can satisfy the "facility" and "electronic communication service" elements of their SCA claims, the "interception" and "electronic communication" elements of their ECPA claims, and the minimum damages requirement of their CFAA claims. (*Id.*) Additionally, while some of these defenses could be resolved on a motion for summary judgment, many (if not most) would only be resolved after a complex, expensive, and risky trial. (*See* Dkt. 323 (seeking summary judgment solely on issues of authorization and consent); Balabanian Decl. ¶ 12.) Looking beyond trial, Plaintiffs were also keenly aware of the fact that comScore would appeal the merits of any adverse decision, and that in light of the massive aggregate statutory damages in play, comScore would attempt to argue—in both the trial and appellate courts—for a reduction of damages based on due process concerns. *See Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003) (citing *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)); *Blanco v. CEC Entm't Concepts L.P.*, No. 07-cv-0559 GPS, 2008 WL 239658, at *2 (C.D. Cal. Jan. 10, 2008). (*See also* Balabanian Decl. ¶ 12.)

Given these concerns, Plaintiffs view the creation of the $14 million non-reversionary fund—with its, in Class Counsel's view, estimated $200 per claimant payment—as well as the required injunctive relief, to be an extraordinary result for the Class. The Settlement's merit becomes even more apparent, however, when it is compared to the results obtained in other privacy class action settlements, which typically result in *cy pres* donations or, at most, a *de minimis* recovery for claimants. *See, e.g., In re Netflix Privacy Litig.*, No 11-cv-00379, Dkt. 59 (N.D. Cal. 2011) ($9 million, *cy pres* only settlement); *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th

Cir. 2012) ($9.5 million, *cy pres* only settlement); *In re Google Buzz Privacy Litig.*, No. 10-cv-00672, 2011 WL 7460099 (N.D. Cal. June 2, 2011) ($8.5 million, *cy pres* only settlement); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939 (N.D. Cal. 2013) ($20 million settlement providing for $15 per claimant).

      In light of the substantial risks, expense, and delay that would accompany further litigation, and in comparison to other privacy class action settlements, the Settlement offers substantial value relative to the strength of Plaintiffs' case and preliminary approval should be granted as a result.

      **B.**    **The complexities and technicalities of any trial of Plaintiffs' claims, along with the length of trial and appeal, favor approval of the Settlement.**

      The Court should approve the Settlement because it "allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011). Here, settlement is especially favorable due to the complex facts and novel legal issues involved. As far as complexity is concerned, liability in this case will turn on facts regarding the installation and operation of several of comScore's proprietary software programs, and how those facts interact with a body of case law that is, admittedly, sparse. The Parties have already exchanged hundreds of thousands of documents as part of their extensive discovery efforts, and the presentation at trial of the facts obtained will be highly complex. Beyond trial, those same complex issues would likely lead to protracted and complex appeals, regardless of which side wins. Thus, "[i]f the Court approves the Agreement, the present lawsuit will come to an end and Class Members will realize both immediate and future benefits as a result. If the Court denies approval, however, protracted litigation [will] likely ensue[.]" *Schulte*, 805 F. Supp. 2d at 586; *see also Redman v. RadioShack Corp.*, No. 11-cv-6741, 2014 WL 497438, at *4 (N.D. Ill. Feb. 7, 2014).

Thus, the immediate and substantial relief provided by the Settlement weighs highly in favor of approval, and avoids the inherent risks associated with this complex and novel litigation. (Balabanian Decl. ¶ 12.)

C.    **The Settlement to date has no opposition among affected parties.**

As would be expected at the preliminary approval stage, none of the parties affected by the Settlement—including the Parties and their counsel, as well as the absent Class members— have voiced opposition to the Settlement.[6] More relevant to this factor, however, is the process by which the Parties arrived at the Settlement. After the close of the Parties' second settlement conference, Magistrate Judge Kim—with an intimate knowledge of the facts as a result of his presiding over the discovery disputes to date, and with knowledge of the Parties' respective positions and subjective assessments of their own positions—proposed that the Parties agree in principle to a settlement built around a $14 million non-reversionary fund. (Balabanian Decl. ¶ 7 – 8.) At the time, the Parties did not accept Magistrate Judge Kim's proposal, and continued to litigate. But after the Parties filed additional briefing that clarified their respective positions, they engaged in further negotiations and eventually agreed upon Magistrate Judge Kim's original proposal. (*Id.* ¶¶ 8, 10.)

Thus, not only does this Settlement represent an agreement as to the value of the case by the Parties and their experienced counsel, it also aligns with Magistrate Judge Kim's well-informed evaluation of the case's value. As such, the fourth factor in evaluating a proposed settlement—the opposition (or lack thereof) from concerned parties—favors approval.

D.    **Class Counsel have extensive experience in this type of litigation and believe that the Settlement offers exceptional relief for the Class.**

---

[6]       While this factor is traditionally not considered at the preliminary approval stage, *see In re AT&T*, 270 F.R.D. at 346, it warrants discussion in this case given that the settlement ultimately reached was proposed by Magistrate Judge Kim.

The Court should also grant preliminary approval because Class Counsel, who are among the leaders in the plaintiff's privacy class action bar, believe it represents an exceptional recovery. When evaluating a proposed settlement, it is appropriate for Courts to "give consideration to the opinion of competent counsel that the settlement was fair, reasonable and adequate." *Isby v. Bayh*, 75 F.3d at 1200. When weighing Class Counsel's opinion, the Court may consider affidavits, as well as general observations made by Class Counsel. *Id.*

Here, Class Counsel are recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *In re Facebook Privacy Litig.*, No. 10-cv-02389, Dkt. 69 at 5 (N.D. Cal.); *see also In re Netflix Privacy Litig.*, No. 11-cv-00379, Dkt. 59 at 5 (N.D. Cal. 2011) (appointing firm as sole lead counsel due, in part, to its "significant and particularly specialized expertise in electronic privacy litigation and class actions[.]").) Based on their substantial and particularized experience in consumer privacy class actions, Plaintiffs' counsel are fully able to accurately weigh the risks and rewards of further litigation as compared to settlement. As a result, Class Counsel believes that this Settlement offers a substantial and landmark recovery to Plaintiffs and the Class.

As such, the opinion of Class Counsel strongly favors preliminary approval.

### E.    Given that the Parties have completed non-expert discovery, they had access to all facts necessary to adequately value the case and negotiate its resolution.

The Court should also grant preliminary approval because the Parties have, through extensive discovery, obtained and exchanged all the information necessary to make informed settlement decisions. In assessing this factor, the Court seeks to determine whether "sufficient discovery has been undertaken to provide the parties with information about their respective litigation positions." *Am. Intern. Group, Inc. v. ACE INA Holdings, Inc.*, Nos. 07-cv-2898, 09-cv-2026, 2011 WL 3290302, at *8 (N.D. Ill. July 26, 2011).

19

> [T]he standard under this factor is not whether it is conceivable
> that more discovery could possibly be conducted. Rather, courts
> have preliminarily approved settlements where there was merely,
> for example, 'a significant amount of informal discovery,' *AT & T
> Mobility*, 270 F.R.D. at 350, or where no discovery at all was
> conducted before the settlement agreement was reached, *Kaufman*
> [*v. Am. Exp. Travel Related Servs. Co., Inc.*, 264 F.R.D. 438, 447
> (N.D. Ill. 2009)]. *See also Butler* [*v. Am. Cable & Telephone,
> LLC*,] No. 09 CV 5336, 2011 WL 2708399, at *8 (N.D. Ill. July
> 12, 2011).

*Am. Intern. Group, Inc.*, 2011 WL 3290302, at *8 (collecting cases). Here, the only remaining discovery to take place was expert discovery on the merits. (*See* Dkt. 215.) The Parties had completed discovery (both fact and expert) regarding class issues, and extensive non-expert merits discovery. (*See* Balabanian Decl. ¶¶ 2, 4.) Put simply, there was no more information to obtain; the Parties would simply offer expert interpretations of existing information. Therefore, "extensive discovery has undisputedly been completed, and the court has been presented with volumes of argument, declarations, and exhibits." *Am. Intern. Group, Inc.*, 2011 WL 3290302 at *8. (*See also* Dkt. 104, 104-1 – 104-9; Dkt. 156, 156-1 – 156-20; Dkt. 178, 178-1 – 178-23; Dkts. 245, 246, 246-1 – 246-23; Dkt. 323, 325, 325-1 – 325-32.) "Thus, it is impossible to say that the court and the parties are unable to evaluate the merits of this case," *Am. Intern. Group, Inc.*, 2011 WL 3290302, at *8, and the "extent of discovery" factor favors approval.

———————————————————————

As established above, each of the six factors considered at this stage strongly supports preliminary approval. Beyond that though, the Court should not hesitate to approve this Settlement because it offers relief far beyond that available in other privacy class action settlements. *See, e.g.*, *In re Netflix Privacy Litig.*, No 11-cv-00379, Dkt. 59 (N.D. Cal. 2011) ($9 million, *cy pres* only settlement); *Lane v. Facebook, Inc.*, 696 F.3d 811 ($9.5 million, *cy pres* only settlement); *In re Google Buzz Privacy Litig.*, 2011 WL 7460099 (N.D. Cal. June 2, 2011)

($8.5 million *cy pres* only settlement); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939 ($20 million settlement providing for $15 per claimant).

As such, Plaintiffs respectfully request that the Court grant preliminary approval to the Settlement, and, as detailed below, order notice to be effectuated.

## II.     The Proposed Method of Notice Should be Approved

Rule 23 and Due Process require that "[f]or any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). Rule 23(e)(1) similarly provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." Fed. R. Civ. P. 23(e)(1). Notice is "adequate if it may be understood by the average class member." Newberg, § 11:53 at 167. The substance of the notice to the settlement class must describe in plain language the nature of the action, the definition of the class to be certified, the class claims and defenses at issue, that settlement class members may enter an appearance through counsel if so desired, that class members may request to be excluded from the settlement class, and that the effect of a class judgment shall be binding on all class members. *See* Fed. R. Civ. P. 23 (c)(2)(B).

To ensure that notice of the Settlement Agreement reaches as many affected Class members as possible and satisfies the requirements of Rule 23 and of due process, the Parties engaged experienced class action administrator Kurtzman Carson Consultants, LLC ("KCC") to develop and implement a multi-part notice plan. First, comScore will, to the greatest extent possible, provide KCC a list identifying all people likely to be class members. (Ex. 2 § 4.2(a).) Second, KCC will provide direct mail or email notice, in the form attached as Exhibits B and C

(subject to Court approval). (Ex. 2 § 4.2(b).) Third, using OSSProxy, comScore will "push" or "pop" a summary notice of the Settlement, containing an active hyperlink to the Settlement Website, to the computer screens of Class Members currently running OSSProxy on their computers. (*Id.* § 4.2(c).) Fourth, KCC will design and implement an online media campaign that will include internet banner ads appearing on 24/7's Global Alliance Network. (*Id.* at § 4.2(d).) Fifth, KCC will provide publication notice by purchasing a half-page advertisement in *People* magazine, to be published within 45 days of Preliminary Approval. (*Id.* § 4.2(e).) Sixth, KCC will establish and administer a Settlement Website that shall provide Notice, important Court documents, and the ability to file Claim Forms online. (*Id.* § 4.2(f).) Seventh, and finally, KCC will provide notice to the requisite state Attorneys General as required by the Class Action Fairness Act, 28 U.S.C. § 1715. (Ex. 2 at § 4.2(h).)

The proposed notices and claim form are attached as Exhibits A through G to the Settlement Agreement and should be approved by the Court. In sum, this Court should find that the proposed methods for providing Notice to the Settlement Class comport with Rule 23 and Due Process.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) modify the Class definition as set forth herein and in the Settlement Agreement, (2) preliminarily approve the Settlement Agreement, (3) approve the form and methods of notice, and (4) grant such further relief as the Court deems reasonable and just. A proposed preliminary schedule leading to final approval is contained in the Proposed Order separately submitted to the Court.

Dated: May 30, 2014

Respectfully submitted,

**MIKE HARRIS** and **JEFF DUNSTAN**, individually and on behalf of a class of similarly situated individuals,

By: s/ Rafey S. Balabanian
    One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Chandler R. Givens
cgivens@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiffs and the Class*

23

## CERTIFICATE OF SERVICE

I, Rafey S. Balabanian, an attorney, hereby certify that on May 30, 2014, I served the above and foregoing *Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Approval of Class Action Settlement*, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

s/ Rafey S. Balabanian