**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MIKE HARRIS and JEFF DUNSTAN, individually and on behalf of a class of similarly situated individuals, | Case No. 1:11-cv-5807 |
| Plaintiffs, | Hon. James F. Holderman |
| v. | Magistrate Judge Young B. Kim |
| COMSCORE, INC., a Delaware corporation, | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
APPROVAL OF ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.    THE FACTS AND UNDERLYING LAW ........................................................ 2

    A.    Nature of the Case.................................................................................. 3

    B.    The Litigation and Work Performed for the Class's Benefit ................................. 4

    C.    Private Mediation and Settlement Conferences with Magistrate Judge Kim ......... 7

    D.    The Settlement ....................................................................................... 8

III.    THE COURT SHOULD APPROVE THE ATTORNEYS' FEES AND EXPENSES..... 10

    A.    Awarding Attorneys' Fees in Class Actions ........................................ 10

        1.    Attorneys' fees should be calculated by the percentage-of-the-fund method.................................................. 11

        2.    The market rate is between 33% and 40% of the settlement fund................ 12

        3.    Class Counsel's lodestar confirms the reasonableness of the requested fees................................................................................ 14

        4.    The risk associated with the litigation justifies the 33% of the fund or the 1.38 multiplier sought ........................................................... 16

    B.    The Incentive Awards are Reasonable and Warrant Approval............................ 18

IV.    CONCLUSION ...................................................................................... 20

<u>**TABLE OF AUTHORITIES**</u>

**UNITED STATES COURT OF APPEALS CASES**

*Americana Art China, Co., Inc. v. Foxfire Printing and Packaging, Inc.*,
743 F.3d 243 (7th Cir. 2014) ...............................................................11

*Assess Tech. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 464 (7th Cir. 2004) .................................11

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998) ........................................................14 n.5, 16, 18

*Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1994) .........................................16

*Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998).........................................................13

*Gastineau v. Wright*, 592 F.3d 747 (7th Cir. 2010) ................................................14, 16

*Harman v. Lyphomed, Inc.*, 945 F.2d 969 (7th Cir. 1991).......................................15, 16

*In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 159 F.3d 1016 (7th Cir. 1998) ............13

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001). .........................................18

*In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011) .................................. 15-16

*Jeffboat LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487
(7th Cir. 2009).........................................................14

*Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 2006) ..........................................................11

*Meyenburg v. Exxon Mobil Corp.*, No. 05-cv-15, 2006 WL 2191422,
(S.D. Ill. July 31, 2006)..........................................................13

*Montanez v. Simon*, 755 F.3d 547 (7th Cir. 2014).........................................................14

*Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399 (7th Cir. 2000).............................................11

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) ...................................................10, 11

*Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005) .............................................10

*Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629 (7th Cir. 2011) .......................10, 14 n.5

**UNITED STATES DISTRICT COURT CASES**

*Barel v. Bank of Am.*, 255 F.R.D. 393 (E.D. Pa. 2009) .............................................19

*Beesley v. Int'l Paper Co.*, 3:06-CV-703-DRH-CJP, 2014 WL 375432,
   (S.D. Ill. Jan. 31, 2014) .........................................................................................12

*Hinman v. M & M Rental Center, Inc.,* No. 1:06-cv-01156, Dkt. 335
   (N.D. Ill. Oct. 06, 2009) .......................................................................................12

*In re Linerboard Antitrust Litig.*, No. 98-cv-5055, 2004 WL 1221350,
   (E.D. Pa. Jun. 2, 2004) ..........................................................................................16

*In re Aftermarket Filters Antitrust Litigation*, No. 1:08-cv-4883 Dkt. 1025,
   (N.D. Ill. Oct. 9, 2012) .........................................................................................12

*In re Plasma Derivative Protein Therapies Antitrust Litigation*, No. 09-cv-07666,
   (N.D. Ill. Apr. 16, 2014) .......................................................................................12

*Kaplan v. Houlihan Smith & Co.,* No. 12-cv-5134, 2014 WL 2808801,
   (N.D. Ill. June 20, 2014) .......................................................................................10

*McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806 (E.D. Wis. 2009).....................11

*Razilov v. Nationwide Mut. Ins. Co.*, No. 01-cv-1466, 2006 WL 3312024,
   (D. Or. Nov. 13, 2006) ..........................................................................................19

*Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, No. 97 C 7694,
   (N.D. Ill. Dec. 10, 2001) ......................................................................................12

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)....................................... 13-14

*Stumpf v. Pyod LLC*, No. 12-cv-4688, 2013 WL 5753829 (N.D. Ill. Oct. 23, 2013)..............11 n.4

*Will v. Gen. Dynamics Corp.,* CIV. 06-698-GPM, 2010 WL 4818174,
   (S.D. Ill. Nov. 22, 2010) .................................................................................12, 13

*Williams v. Gen. Elec. Capital Auto Lease*, No. 94-cv-7410, 1995 WL 765266,
   (N.D. Ill. Dec. 26, 1995) ......................................................................................11

## RULES AND REGULATIONS

Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701, *et seq* ................................3-4, 17, 19

Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510 – 22...............3-4, 17, 19

Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030...........................................3-4, 17

**MISCELLANEOUS**

William B. Rubenstein, Newberg on Class Actions § 14:6 (4th ed.) ...........................................13

Richard Posner, Economic Analysis of Law § 21.9, at 534 – 35 (3d ed. 1986)...........................16

# I.  INTRODUCTION

This Court should not have any hesitation in awarding the requested attorneys' fees, case expenses, and incentive awards. The settlement that forms the basis for Plaintiffs' requested fees, expenses and an incentive award is the result of more than three years of contentious litigation that included extensive written and oral discovery (which the parties completed), the briefing of dozens of substantive motions (including class certification, a petition for interlocutory appeal to the Seventh Circuit, and partial summary judgment), and nearly one year of negotiations both in the context of private mediation and multiple settlement conferences with Magistrate Judge Kim. The settlement brings an end to Plaintiffs Jeff Dunstan's and Mike Harris's (collectively, "Plaintiffs" or the "Class Representatives") claims that Defendant comScore, Inc. ("Defendant" or "comScore") (together, the "Parties") violated federal electronic privacy laws by collecting certain information from Plaintiffs' and the Class members' computers without consent. As explained in their papers in support of preliminary approval, the settlement is an exceptional result for the Class, going well beyond the established privacy class action settlement paradigm, where monies are most often directed to *cy pres* or result in *de minimus* payments to class members.

Quite unlike those types of settlement structures, however, here comScore has agreed to establish a $14 million non-reversionary common fund that will be used to pay claiming Class members on a *pro rata* basis (which, based on the current rate of claims, Class Counsel continues to believe will be at least $200 per claimant), as well as the costs of notice, reasonable attorneys' fees and expenses, and incentive awards.[1] And in addition to the substantial monetary payments

---

[1]     The fund will also be used to pay for some of the audit costs that comScore will incur as a result of the prospective relief under the settlement, up to a maximum of $100,000.

made available to Class members, comScore has also agreed to prospective relief requiring that it alter its privacy policy and implement certain protocols to ensure that its privacy practices remain consistent with its disclosures to consumers.

With the relief secured for the class as a backdrop, Plaintiffs now move the Court to approve the requested amount of attorneys' fees and expenses to Class Counsel, and an incentive award to them for their service as Class Representatives. The requested attorneys' fees are entirely reasonable, as they fall right in line with the market rate. Using the percentage of the fund approach—the preferred method for calculating attorneys' fees in common fund cases in this Circuit—the requested fees amount to 33% of the fund, a percentage that is commonly awarded in cases like this. Further, given the risk assumed by Class Counsel, the amount and quality of the work performed, and the result achieved, the requested fees become ever more reasonable under the common fund approach. And if the Court were to use the lodestar analysis, it would just further confirm the fairness of the requested fees, especially considering that the risk multiplier would amount to just 1.38, which is on the low end of the range that the Seventh Circuit has said is reasonable.

Accordingly, pursuant to Federal Rule of Civil Procedure 23(e), Plaintiffs Harris and Dunstan request that the Court approve Class Counsel's request for an award of attorneys' fees and an incentive award for the Class Representatives in connection with the class action settlement reached with comScore.

## II.  THE FACTS AND UNDERLYING LAW

Although Plaintiffs' motion focuses on the Court's approval of the requested fee award, a brief summary of the underlying facts and law involved in the litigation is helpful to understand the reasonableness of the fees sought.

### A.      Nature of the Case.

comScore is a leading internet analytics company, monitoring over a trillion online interactions per month to offer its clients analysis and data regarding consumer behavior and purchasing habits. (Dkt. 345 at 7.) comScore collects its data primarily by distributing proprietary software known as OSSProxy to individual consumers (known as "panelists"), typically by "bundling" OSSProxy with free software such as screensavers, music programs, games, and more. (Dkt. 329 at ¶¶ 15, 22 – 33.) Thus, during the download and installation process for bundled software, consumers install OSSProxy as well. (*Id.*) Once installed on a computer, OSSProxy monitors essentially all online activity performed on a panelist's computer, including websites viewed, items purchased, and information entered on webpages (such as credit card numbers, addresses, telephone numbers, bank account numbers, and full names). Once that information is collected, OSSProxy obfuscates personally identifiable information and sends the data to comScore's servers, where it is used as a basis for comScore's research and analysis. (Dkt. 169 ¶¶ 5, 7.)

Plaintiffs Mike Harris and Jeff Dunstan had OSSProxy installed on their computers after downloading and installing software from comScore's "bundling partners." (Dkt. 345 at 8.) Both Plaintiffs allege that OSSProxy was installed on their computers without their knowledge, and both Plaintiffs maintain that they made efforts to uninstall OSSProxy once they realized it had been installed. (*Id.*) Subsequently, on August 23, 2011, Plaintiffs filed their class action complaint against comScore, asserting claims for violation of the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701, *et seq.*; the Electronic Communications Privacy Act ("ECPA", 18 U.S.C. §§ 2510 – 22; the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"); the

Illinois Consumer Fraud Act, 815 ICLS 505 ("ICFA"); and for unjust enrichment. (Dkt. 1.)[2]

The SCA, ECPA, and CFAA were all enacted to protect the privacy of computers, electronic communications, and data. In relevant parts, the SCA prohibits any person or entity from intentionally accessing, without or in excess of authority, a facility through which an electronic communications service is provided and thereby obtaining, altering, or preventing authorized access to a wire or electronic communication held in electronic storage. 18 U.S.C. § 2701. Likewise, the ECPA prohibits the intentional interception of any wire, oral, or electronic communication. 18 U.S.C. § 2511. And the CFAA, in relevant parts, prohibits anyone from intentionally accessing a computer without (or in excess of) authorization and obtaining information from protected computers, and from knowingly causing the transmission of a program or code that causes damage without authorization to a protected computer. 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(5).

**B.      The Litigation and Work Performed for the Class's Benefit.**

The attorneys' fees here were earned through more than three years of contentious litigation, involving highly technical issues of first impression, and against one of the nation's premier law firms.

Plaintiffs filed their Class Action Complaint against comScore on August 23, 2011, alleging that comScore's data collection occurred without consent, and therefore violated the SCA, the ECPA, the CFAA, and the ICFA, and that it constituted unjust enrichment. (Dkt. 1.) On September 28, 2011, comScore filed a Motion to Dismiss or in the Alternative to Transfer to the United States District Court for the Eastern District of Virginia. (Dkt. 12.) In its motion,

---

[2]      Later in the case, Plaintiffs voluntarily dismissed their ICFA claims and the Court denied class certification as to the unjust enrichment claim. As such, only the statutes underlying the class claims—the SCA, ECPA, and CFAA—are explained herein.

comScore asserted that in downloading its software, Plaintiffs had agreed to a forum selection clause compelling them to litigate in Virginia. (*Id.*) The Court denied comScore's motion on October 7, 2011. (Dkt. 31.) comScore then moved to dismiss pursuant to Federal Rules 12(b)(1) and 12(b)(6), (Dkt. 39), and Plaintiffs responded by moving to strike the motion to dismiss, asserting that Rule 12(g) prohibited comScore from filing successive pre-answer Rule 12 motions. (Dkt. 43.) By Minute Order dated November 15, 2011, the Court denied comScore's Motion to Dismiss and granted Plaintiffs' Motion to Strike. (Dkt. 49.)

After comScore answered Plaintiffs' Complaint, (Dkt. 59), the Parties engaged in substantial discovery regarding class certification issues. (Declaration of Rafey S. Balabanian ["Balabanian Decl."], attached hereto as Exhibit 1, ¶ 6.) During that time, Plaintiffs and comScore served and responded to seven sets of written discovery, filed and responded to motions to compel, exchanged tens of thousands of documents, took nine depositions (including those of the Plaintiffs and comScore's Rule 30(b)(6) designee), and exchanged expert discovery. (*Id.*) In January 2013, after the close of class discovery, Plaintiffs moved for class certification, (Dkts. 152 – 158), and filed their Second Amended Complaint, asserting claims for violations of the SCA, ECPA, and CFAA, and for unjust enrichment. (Dkt. 169.)

After full briefing, the Court granted in part and denied in part Plaintiffs' Motion for Class Certification, certifying a Class of all individuals since 2005 who had comScore's software installed via one of comScore's third party bundling partners and a Subclass of all Class members who were not presented with a functional hyperlink to the user license agreement ("ULA") when installing comScore's software, and appointing Plaintiffs as class representatives, Harris as a representative of the Subclass, and Plaintiffs' counsel as Class Counsel. (Dkt. 186

("the Certification Order").).[3]

Two weeks after the Court issued the Class Certification Order, comScore petitioned the Seventh Circuit Court of Appeals for leave to appeal pursuant to Fed. R. Civ. P. 23(f). (*See Harris v. comScore, Inc.*, No. 13-8007, Dkt. 1 (7th Cir. Apr. 16, 2013) (hereinafter "App. Dkt.").) While comScore's petition was pending, the Direct Marketing Association, the American Association of Advertising Agencies, the Association of National Advertisers, the Entertainment Software Association, the Interactive Advertising Bureau, and the Chamber of Commerce of the United States of America sought leave to (and ultimately did) file a brief of *amici curiae* in support of comScore's petition. (*See* App. Dkts. 4, 9, 10.) After Plaintiffs responded in opposition to both the petition and the motion for leave, the Seventh Circuit denied comScore's Rule 23(f) petition. (Dkt. 199.)

Following the denial of comScore's Rule 23(f) petition, the Parties proceeded with merits discovery. (Balabanian Decl. ¶ 6.) As with class discovery, the Parties exchanged tens of thousands of documents and took numerous depositions (in all, the Parties took twenty-four, including ten depositions of comScore's employees, six Rule 30(b)(6) depositions of comScore, two separate depositions of both Plaintiffs on class and merits issues, one third-party deposition, and three expert depositions), and filed, briefed, and argued several motions to compel. (*Id.*)

Near the end of merits discovery, comScore renewed its motion to dismiss Plaintiffs' claims under Rule 12(b)(3), contending that Plaintiffs and all Class members had manifested assent to a forum selection clause requiring them to litigate in Virginia. (*See* Dkts. 242, 243.) After Plaintiffs responded in opposition and comScore replied, (Dkts. 280, 291), comScore— citing intervening Supreme Court authority—sought (and received) leave to file a Motion to

---

[3]     In the Certification Order, the Court found Plaintiffs' unjust enrichment claim unsuitable for class-wide adjudication and denied certification as to that claim alone. (Dkt. 186.)

Transfer Under 28 U.S.C. § 1404(a), relying on the same forum clause as its motion under Rule 12(b)(3). (Dkt. 302.) Following full briefing on comScore's motion to transfer, and after the conclusion of non-expert merits discovery, Plaintiffs moved for partial summary judgment on the authorization elements of, and consent defenses to, their claims under the CFAA, SCA, and ECPA. (Dkts. 321, 323.)

> ### C. Private Mediation and Settlement Conferences with Magistrate Judge Kim.

Beginning in August 2013—shortly after the Seventh Circuit's denial of comScore's Rule 23(f) petition, and early in merits discovery—the Parties began to discuss the possibility of settlement. (Balabanian Decl. ¶ 7.) On August 22, 2013, the Parties engaged in a full-day mediation presided over by Rodney A. Max of the Upchurch Watson White and Max Mediation Group. (*Id.* ¶ 8.) Despite the best efforts of the Parties and Mr. Max, the mediation did not result in a settlement, although the Parties did make progress in terms of closing the substantial gap in their opening positions. (*Id.*)Following that initial session, over the course of the next few months, Mr. Max repeatedly followed up with both Parties in order to keep the momentum moving towards settlement, but his efforts eventually gave way to the Parties' desire to continue litigating, given their vastly different views at that time regarding an appropriate settlement. (*Id.* ¶ 6.) Thus, the Parties pushed forward with engaging in merits discovery. (*Id.*)

Near the end of merits discovery, the Parties agreed to proceed with a settlement conference to be presided over by Magistrate Judge Kim, which took place on November 25, 2013. (*Id.* ¶ 9.) While the Parties could not reach agreement on settlement terms during that initial settlement conference, with Magistrate Judge Kim guiding the process, the Parties made progress toward settlement, and agreed to engage in a second settlement conference, which took place on December 16, 2013. (*Id.*) But that second conference also failed to result in settlement,

although, once again, the Parties made some progress toward a resolution. (*Id.* ¶ 10) After Magistrate Judge Kim adjourned the settlement conference but before he closed the referral, on January 9, 2014, he made a mediator's proposal providing for a $14 million non-reversionary settlement fund, and gave the Parties until 3:00 p.m. on January 13, 2014 to accept or decline the proposal. (*Id.* ¶ 11.) The Parties did not accept Magistrate Kim's proposal at that time. (*Id.*)

Following the lapse of Magistrate Judge Kim's proposal, the Parties continued to litigate, culminating with comScore moving to dismiss (Dkt. 242) (and later to transfer (Dkt. 302)), and Plaintiffs filing their Motion for Partial Summary Judgment on February 20, 2014. (Dkt. 321.) Over the course of the next month, the Parties continued their settlement negotiations, and eventually, on March 19, 2014, the Parties agreed to the terms proposed by Magistrate Judge Kim in his mediator's proposal—i.e., to a settlement that would create a non-reversionary $14 million fund. (Balabanian Decl. ¶ 13.) Over the course of the following two months, the Parties negotiated the remaining terms of the Settlement, including prospective relief, class notice, the claims process, and the particulars of the Settlement Agreement. Finally, on May 30, 2014, the Parties and their counsel agreed to execute the Settlement Agreement. (*Id.*)

### D. The Settlement.

The fruit of Class Counsel's effort is a settlement that goes well beyond the established privacy class action settlement paradigm. The settlement creates a non-reversionary $14,000,000 common fund, from which all costs associated with the settlement will be paid, including *pro rata* payments to all potential class members who file valid claims (which, based on the current claims rate, Class Counsel continues to estimate will be at least $200 per claimant), as well as the costs of notice, administrative expenses, audit costs (up to $100,000), incentive awards, and attorneys' fees. (Dkt. 345 at 16 – 17; Dkt. 345-2 at §§ 2.1 – 2.2(a).). In addition, the settlement

contemplates prospective relief requiring comScore to alter its privacy policy and implement certain protocols to ensure that its privacy practices remain consistent with its disclosures to consumers. (Dkt. 345-2 at § 2.3.) In short, the terms of the Parties' class action settlement are exceptional, and go above and beyond the relief afforded in similar privacy class action settlements that have been approved by federal courts throughout the country.

In the end, in order to realize the settlement for the benefit of the Class, Class Counsel were required to spend over 9302 hours litigating this case without compensation, including:

- briefing dozens of substantive motions, including a motion to transfer, a motion to dismiss, a motion for class certification, a Rule 23(f) petition to the Seventh Circuit for leave to file an interlocutory appeal, a renewed motion to dismiss for improper venue, a motion to transfer, a motion for partial summary judgment, a motion for preliminary approval of the settlement, and the instant motion for attorneys' fees and an incentive award;

- conducting substantial party and third-party discovery, including review and analysis of comScore's source code, review of tens of thousands of documents (consisting of millions of electronic pages); conducting twenty-four depositions (including ten of comScore employees, six Rule 30(b)(6) depositions, two separate depositions of each Plaintiff, one third-party deposition, and three expert depositions); and briefing and arguing six motions to compel;

- drafting two mediation statements, and appearing for three mediations (one with third-party neutral Rodney Max, as well as two with Magistrate Judge Kim); and

- drafting a comprehensive settlement agreement, including the class notices and several declarations.

(*See* Balabanian Decl. ¶¶ 5-10, 25.)

After the settlement was reached, Class Counsel worked to ensure that the Class Notice was as effective as possible, setting up phone lines to personally handle class member inquiries directly. (*Id*. ¶ 15.) To date, Class Counsel has received dozens of inquiries from class members, and has assisted in filing a number of claims. (*Id*.) This support is in addition to the phone lines that have been set up by the Settlement Administrator, which to date, have received 1,471

9

inquiries from class members. (*Id.* ¶ 14.) Given that thousands of claims have already been filed, it's clear that the terms of the settlement and notice plan were successfully implemented, and Class Counsel is deserving of the credit for that.

## III.    THE COURT SHOULD APPROVE THE ATTORNEYS' FEES AND EXPENSES

### A.    Awarding Attorneys' Fees in Class Actions.

In common fund settlements like this one, the Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007); *see also Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) ("When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys."). In order to determine the applicable market and corresponding market rate for attorneys' fees, courts in this Circuit look at three factors: "[1] actual fee contracts that were privately negotiated for similar litigation, [2] information from other cases, and [3] data from class-counsel auctions." *Williams*, 658 F.3d at 635 – 36 (quoting *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005)); *see also Kaplan v. Houlihan Smith & Co.*, No. 12-cv-5134, 2014 WL 2808801 (N.D. Ill. June 20, 2014) ("This Court's task is to consider whether [the amount of attorneys' fees sought] is consistent with a hypothetical *ex ante* bargain for the attorneys' work on this case".).

Here, all the relevant factors justify a percentage fee award of 33.33% of the $14,000,000 common fund. Such a percentage award is reasonable because it's in line with market rates in that it's consistent with percentage awards in similar cases, is commonly awarded by courts in this Circuit in common fund cases, and fairly compensates Class Counsel for the risk they

assumed in taking and litigating this case.

### 1. *Attorneys' fees should be calculated by the percentage-of-the-fund method.*

Although applicable law in the Seventh Circuit affords district courts the discretion to apply either the "percentage of the fund" or the "lodestar" method in awarding fees in a class action where a common fund is created, *Americana Art China, Co., Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014),[4] "[t]he approach favored in the Seventh Circuit is to compute attorneys' fees as a percentage of the benefit conferred upon the class" especially where the percentage accurately reflects the market. *Williams v. Gen. Elec. Capital Auto Lease*, No. 94-cv-7410, 1995 WL 765266, *9 (N.D. Ill. Dec. 26, 1995); *see also Sutton*, 504 F.3d at 693 (directing district court on remand to consult the market for legal services to arrive at a reasonable percentage). To determine whether fee awards in complex federal statutory cases, like the instant matter, should be calculated based on the "lodestar" method or a percentage of the common settlement fund afforded to the class members, the court must look to the prevailing method for compensating counsel in similar cases. *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 814 – 15 (E.D. Wis. 2009); *Assess Tech. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 464, 438 (7th Cir. 2004) ("The best evidence of the value of the lawyer's services is what the client agreed to pay him."); *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 308 (7th Cir. 2000) ("the measure of what is reasonable [as an attorney fee] is what an attorney would receive from paying a client in a similar case."). And, "[w]hen the prevailing method of compensating lawyers for similar services is the contingent fee, then the contingent fee *is* the 'market rate.'"

---

[4]     Because the *Americana* settlement involved a reversionary fund, the Seventh Circuit noted that the rate of claims could be taken into account in determining the appropriate percentage award. *Americana Art China*, 743 F.3d at 245. In this case, the percentage award does not depend on the rate of claims, since the settlement fund is *non-reversionary*, with the entirety of the $14 million to be paid to Class members.  Thus, the final rate of claims should have no bearing on the ultimate percentage awarded.

*Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 2006).

In this case, awarding fees based on a percentage of the Settlement Fund is supported both by the market, as shown by fee awards in similar class actions, and by the Plaintiffs' fee agreements with Class Counsel. Not only do the fee agreements between Class Counsel, Dunstan, and Harris contain a contingency fee arrangement whereby Class Counsel would receive up to one third of any common fund created for the benefit of the class (plus the costs of the suit), but fee awards in complex federal statutory cases are almost exclusively awarded as a percentage of the common fund created by the litigation. *See In re Plasma Derivative Protein Therapies Antitrust Litigation*, No. 09-cv-07666, (N.D. Ill. Apr. 16, 2014) (awarding 33.3% of the $64 million settlement fund in Sherman Act case); *Beesley v. Int'l Paper Co.*, *Beesley v. Int'l Paper Co.*, 3:06-CV-703-DRH-CJP, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014) (awarding 33.3% of a $30 million settlement fund, plus costs in ERISA class action); *In re Aftermarket Filters Antitrust Litigation*, No. 1:08-cv-4883, Dkt. 1025 (N.D. Ill. Oct. 9, 2012) (awarding 33.3% of $6 million settlement fund in class action brought under the Sherman Act case); *Will v. Gen. Dynamics Corp.,* 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010) (awarding 33.3% of a $15.5 million settlement fund (plus costs) in ERISA class action); *Hinman v. M & M Rental Center, Inc.,* No. 1:06-cv-01156, Dkt. 335 (N.D. Ill. Oct. 06, 2009) (awarding 33.3% of $5.8 million settlement fund in class action brought under the Telephone Consumer Protection Act); *Retsky Family Ltd. Partnership v. Price Waterhouse LLP*, No. 97 C 7694, (N.D. Ill. Dec. 10, 2001) (awarding 33.3% of $14 million settlement fund in federal securities class action). As such, fees in this case are properly determined as a percentage of the fund created by the Settlement Agreement.

### 2. *The market rate is between 33% and 40% of the settlement fund.*

Class Counsel's $4.662 million fee request is comfortably within the going market rate,

whether within the market for class actions generally, or complex federal statutory cases specifically. This is supported by contingent legal fee arrangements in the Chicago legal market and the amount of fees awarded in similar litigation. In this District, the market for fee awards in class actions of any type mirror that of the market for contingency fees in general litigation: 33 to 40 percent of the total benefit made available to the Class. *Gaskill v. Gordon*, 160 F.3d 361, 362 – 63 (7th Cir. 1998) (noting that typical contingency fees are between 33% and 40%, and affirming award of 38%); *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 159 F.3d 1016, 1018 (7th Cir. 1998) ("Contingent-fee contracts generally entitle the lawyer to 33 to 40 percent of any judgment or settlement."); *Meyenburg v. Exxon Mobil Corp.*, No. 05-cv-15, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentage in the legal marketplace for comparable commercial litigation."); *see also Will v. Gen. Dynamics Corp.*, 2010 WL 4818174 (S.D. Ill.) (noting that "[w]here the market for legal services in a class action is only for contingency fee agreements, and there is substantial risk of nonpayment for the attorneys, 'the normal rate of compensation in the market' is '33.33% of the common fund recovered.'"); William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 14:6 (4th ed.) ("Empirical studies show that, regardless of whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.").

Thus, the law is clear that the award of attorneys' fees in complex federal statutory cases is consistently near the range of 33 – 40% of the total fund available to the class. Hence, the attorneys' fees requested here, amounting to 33.33% of the $14,000,000 common fund made available for the benefit of the class, fall on the low end of percentage awards in similar cases. Accordingly, the requested fees are well in line with the market rate and should be readily

approved on that basis.

### 3. Class Counsel's lodestar confirms the reasonableness of the requested fees.

While most courts in this Circuit have questioned the use of the lodestar analysis either

for determining the proper amount of fees or as a "cross-check," the requested attorneys' fees are

also reasonable under that analysis. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 (N.D.

Ill. 2011).[5] To determine the reasonableness of a fee request under the lodestar method, the first

step is to "multiply[] a reasonable hourly rate by the number of hours reasonably expanded."

*Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010). "A reasonable hourly rate is based on

the local market rate for the attorney's services[,] which is best evidenced by "the amount the

attorney actually bills for similar work" or "rates set for the attorney in similar cases." *Montanez

v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014); *see also Jeffboat LLC v. Director, Office of

Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009) (finding a reasonable hourly rate

should be in line with the prevailing rate in the "community for similar services by lawyers of

reasonably comparable skill, experience and reputation.")

As summarized in Section II above, Class Counsel have logged over 9302 hours in

uncompensated time in order to realize the instant Settlement, and as of the time of filing, had a

base lodestar of $3,357,538.00, as is represented in the following chart:

| ATTORNEY (Position) | YEARS OF EXPERIENCE | HOURS | HOURLY RATE | TOTAL |
|---|---|---|---|---|
| Jay Edelson (Managing Partner) | 18 | 397.5 | $685 | $272,287.50 |
| Rafey S. Balabanian (Partner) | 9 | 971.5 | $570 | $553,755.00 |

---

[5] In the Seventh Circuit, the use of a lodestar cross-check is not required. *Williams*, 658 F.3d at 636; *see also Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach.").

| | | | | |
|---|---|---|---|---|
| Ben Thomassen (Associate) | 3 | 1,565.4 | $350 | $547,890.00 |
| Chandler Givens (Associate) | 3 | 1,525.7 | $350 | $533,995.00 |
| Nick Larry (Associate) | 2 | 571.9 | $335 | $191,587.00 |
| David Mindell (Associate) | 2 | 402.9 | $335 | $134,972.00 |
| Amir Missaghi (Associate) | 1 | 1,424.7 | $295 | $420,287.00 |
| Jack Yamin (Associate) | 1 | 1,180.1 | $295 | $348,130.00 |
| Ari Scharg (Partner) | 6 | 251.5 | $450 | $113,175.00 |
| Steven Teppler (Former Partner) | 32 | 132.5 | $600 | $79,500.00 |
| Law Clerks | n/a | 753.3 | $215 | $161,959.50 |
| Estimated Time Remaining | n/a | 125.0 | $400 | $50,000.00 |
| **TOTAL** | | **9302** | | **$3,357,538.00** |

Class counsel have also fronted $101,069.13 in unreimbursed litigation costs.[6]

(Balabanian Decl. ¶¶ 25, 28.) The attorney rates listed are the same as those that Class Counsel

charges to their hourly clients and are comparable to (or less than) those charged for attorneys

with similar background or experience. (*Id*. ¶¶ 21-22.) These rates have been approved as

reasonable by federal courts throughout the country in the context of both privacy class actions

specifically, and other consumer class action litigation more generally. (*Id*. ¶ 21.) The base

lodestar, however, is not the end of the inquiry. As when determining the proper percentage to

award, an award of fees rooted in lodestar must consider the risk of non-payment that Class

Counsel assumed when bringing the case. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 – 76

---

[6]    "It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses, which includes such things as expert witness costs; computerized research; court reports; travel expense; copy, phone and facsimile expenses and mediation." *Beesley v. Int'l Paper Co.*, *Beesley v. Int'l Paper Co.*, 3:06-CV-703-DRH-CJP, 2014 WL 375432, *3 (S.D. Ill. Jan. 31, 2014) (citing Fed.R.Civ.P. 23; *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980).

(7th Cir. 1991) (remanding case for recalculation of attorneys' fees because trial court failed to award a risk multiplier).

### 4. The risk associated with the litigation justifies the 33% of the fund or the 1.38 multiplier sought.

Whether the fee award is based on lodestar or on a percentage of the settlement fund, the final factor weighed in determining the reasonableness of a class action fee award is the risk of loss that Class Counsel faced when embarking on the action. *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 746 (7th Cir. 2011); *see also* Richard Posner, Economic Analysis of Law § 21.9, at 534 – 35 (3d ed. 1986) (explaining the established practice of rewarding attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases). In deciding an appropriate multiplier in the lodestar context, in addition to risk, courts consider "the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation." *Gastineau*, 592 F.3d at 748.

In this case, the requested award would represent a multiplier of less than 1.38, a risk multiplier regularly found reasonable in the Seventh Circuit. *See Cook*, 142 F.3d at 1015 (finding multiplier of 1.5 reasonable given contingent fee arrangement); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) (vacating and remanding fee award for district court's failure to apply a risk multiplier, and noting that "[b]ecause class counsel have requested a multiplier of 1.53, the district court need not worry about exceeding what we have suggested is a sensible ceiling of double the lodestar."). In fact, numerous federal courts across the country have approved fee applications by Class Counsel in similar litigation where comparable multipliers were applied. (Balabanian Decl. ¶ 21.) These multipliers are also below typical multipliers awarded in similar class actions, which average around 4 or higher. *See In re Linerboard Antitrust Litig.*, No. 98-cv-5055, 2004 WL 1221350, at *14 (E.D. Pa. Jun. 2, 2004)

16

(recognizing that from 2001 to 2003, the average multiplier approved in common fund cases was 4.35); *Harman*, 945 F.2d at 974 (noting a risk multiplier is appropriate when counsel assume a risk of non-payment in taking the suit and "multipliers anywhere between one and four . . . have been approved.").

Succeeding in this litigation was by no means a certainty. While there is a risk of losing any case filed, the risks here show that the 33% of the fund figure is both reasonable and fully justified. To start, comScore is a sophisticated litigant, represented at different points in this case by two of the world's pre-eminent law firms (first, by Cooley LLP, and later by Quinn Emanuel Urquhardt & Sullivan, LLP). Thus, at all times Defendant was prepared to, and did, mount a vigorous defense of the case. Beyond that, however, the outcome of the case was anything but certain given the highly technical nature of the facts, as well as the innumerable novel legal issues raised in the case. For instance, Plaintiffs' claims turned on several contentious and undeveloped legal issues, including whether: Plaintiffs' computers constituted "facilit[ies] through which an electronic communications service [was] provided,"[7] the files accessed by comScore on Plaintiffs' computers were "in electronic storage,"[8] Plaintiffs consented to comScore's conduct,[9] whether Plaintiffs suffered any damages,[10] and whether class certification was appropriate, among others. Not only was there a lack of on-point legal authority for most of these questions, but if *any* element of Plaintiffs' claims (or of the certification analysis) had been decided in comScore's favor, Plaintiffs claims would have failed and the Class (and Class Counsel) would have gone home empty handed. Given that Plaintiffs had to defeat two motions to dismiss, comScore's opposition to Plaintiffs' certification motion and comScore's petition for

---

[7]     *See* 18 U.S.C. § 2701(a).

[8]     *Id.*

[9]     *Id.*; 18 U.S.C. § 2511(2)(d); 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(5).

[10]     *See* 18 U.S.C. § 2707(c).

interlocutory review, and would have had to defeat comScore's motion to transfer (and perhaps compel arbitration) and a motion for summary judgment before even getting to trial, the risk of non-payment when Class Counsel took on this case was real and substantial.

Despite these obstacles and risks, Class Counsel was able to obtain adversarial certification of what is believed to be the largest privacy class in history (excluding certification for settlement purposes), and was able to negotiate a settlement that goes far beyond the established privacy class action settlement paradigm, by allowing claimants to obtain significant monetary relief on account of their claims. (Dkt. 345 at 17.) Additionally, Class Counsel negotiated injunctive relief that seeks to prevent harms like those suffered by the Class from occurring going forward. (Dkt. 345-2 at § 2.3.) Accordingly, the risk assumed by Class Counsel confirms that an award of $4.662 million to Class Counsel—1/3 of the common fund, and a 1.38 risk multiplier—is both reasonable and justified.

## B.     The Incentive Awards are Reasonable and Warrant Approval

Because plaintiffs are essential to any class action, "[i]ncentive awards are justified when necessary to induce individuals to become named representatives." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 – 23 (7th Cir. 2001). In deciding whether an incentive award is warranted, courts look to: (1) "the actions the plaintiff has taken to protect the interests of the class"; (2) "the degree to which the class has benefitted from those actions"; and (3) "the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d 1016. These factors are readily satisfied in this case by the substantial effort put forth by Plaintiffs, and by the stellar results their efforts achieved. These efforts included:

- Devoting substantial time participating in the pre-suit investigation of their claims;

- Providing information for, and reviewing, the pleadings;

- Responding to comScore's discovery requests (two sets of interrogatories, two sets of document requests, and two sets of requests to admit);

- Imaging their computer hard drives and producing copies for detailed inspection by Defendant's counsel and experts;

- Preparing for, traveling to, and sitting for two depositions each;

- Reviewing their deposition transcripts for accuracy;

- Engaging in the settlement process; and

- Actively engaging in the management of the case through regular correspondence with counsel by telephone, email, and in-person meeting.

(*See generally* Declarations of Mike Harris and Jeff Dunstan collectively attached hereto as Exhibit 2.) Were it not for these substantial efforts by Plaintiffs, the class would not have obtained the substantial benefit conferred by the Settlement. (Balabanian Decl. ¶ 35.) Moreover, both Plaintiffs agreed to be part of this case, despite knowing full well that that the case was likely to receive significant coverage from the national media—including on the Plaintiffs' personal participation as representatives of the class and that comScore was likely to make public statements—through court filings and otherwise—attacking the character and credibility of Plaintiffs and the merits of the case. (Balabanian Decl. ¶¶ 31-33); (Harris Decl. ¶ 3); (Dunstan Decl. ¶ 3.) As Courts in other privacy class actions have approved similar or larger incentive awards than those sought by Plaintiffs here, *see Barel v. Bank of Am.*, 255 F.R.D. 393, 402 – 03 (E.D. Pa. 2009) (approving $10,000 incentive award in Fair Credit Reporting Act class action); *Razilov v. Nationwide Mut. Ins. Co.*, No. 01-cv-1466, 2006 WL 3312024, at **3 – 4 (D. Or. Nov. 13, 2006), and the incentive awards are no greater than the result Plaintiffs could hope to obtain at trial, *see* 18 U.S.C. §§ 2520, 2707, they should be viewed as reasonable as well. Accordingly, the Court should also approve the requested incentive award to both Plaintiffs Harris and Dunstan.

19

IV.        CONCLUSION

For the reasons stated above, Plaintiffs Mike Harris and Jeff Dunstan respectfully request that the Court approve the $4,662,000 in attorneys' fees and expenses, which comScore has agreed not to oppose following mediations overseen by Magistrate Judge Kim; grant the incentive award of $11,000 each to Harris and Dunstan; and award such other and further relief the Court deems equitable and just. Pursuant to the Court's Preliminary Approval Order (Dkt. 353), a copy of this memorandum shall be posted on the Settlement Website, www.DataCollectionSettlement.net.

Dated: August 20, 2014                    Respectfully submitted,

                                          **MIKE HARRIS** and **JEFF DUNSTAN**,
                                          individually and on behalf of a class of
                                          similarly situated individuals,

                                          By: /s/ Rafey S. Balabanian
                                                  One of Plaintiffs' Attorneys

                                          Jay Edelson
                                          jedelson@edelson.com
                                          Rafey S. Balabanian
                                          rbalabanian@edelson.com
                                          Chandler R. Givens
                                          cgivens@edelson.com
                                          Benjamin S. Thomassen
                                          bthomassen@edelson.com
                                          EDELSON PC
                                          350 North LaSalle Street, Suite 1300
                                          Chicago, Illinois 60654
                                          Tel: 312.589.6370
                                          Fax: 312.589.6378

                                          *Attorneys for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Rafey S. Balabanian, an attorney, hereby certify that on August 20, 2014, I served the above and foregoing ***Plaintiffs' Memorandum of Law in Support of Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

/s/  Rafey S. Balabanian