**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

|  |  |
|---|---|
| MIKE HARRIS and JEFF DUNSTAN, individually and on behalf of a class of similarly situated individuals, | Case No. 1:11-cv-5807 |
| Plaintiffs, | Hon. James F. Holderman |
| v. | Magistrate Judge Young B. Kim |
| COMSCORE, INC., a Delaware corporation, | |
| Defendant. | |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

**TABLE OF CONTENTS**

I.  **NATURE OF THE LITIGATION** ................................................................2

    A.    **The Facts, the Law, and the Litigation History** ...................................2

    B.    **The Mediations and the Settlement Agreement** ..................................5

II.  **TERMS OF THE SETTLEMENT** ...........................................................7

    A.    *Class Definition.* ......................................................................7

    B.    *Class Member Payments.* ..........................................................7

    C.    *Prospective Relief.* ...................................................................7

    D.    *Additional Relief.* ...................................................................8

        1.    **Payment of Notice and Settlement Administration Expenses** ...............8

        2.    **Incentive Award For Class Representatives** ...........................8

        3.    **Payment of Attorneys' Fees and Expenses** ..........................8

    E.    *The Release.* ..........................................................................8

III.  **THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS** .......9

IV.  **THE SETTLEMENT WARRANTS FINAL APPROVAL** ........................10

    A.    **The Strength of the Plaintiffs' Case Compared to Settlement Weighs in Favor of Granting Approval.** ......................................................11

    B.    **The Likelihood of an Increase in the Complexity, Length, and Expense of Continued Litigation Validates Final Approval of the Settlement.** ...........15

    C.    **There Has Been No Opposition to the Settlement.** ..............................15

    D.    **The Opinion of Competent Counsel Favors Approval.** .........................16

    E.    **The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Final Approval.** ...............................................17

    F.    **The Settlement Is Not a Product of Collusion and There Are No "Red Flags" Present in the Settlement.** ...............................................18

## <u>TABLE OF AUTHORITIES</u>

**UNITED STATES SUPREME COURT CASES:**

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) .......................................................13

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974).......................................................9

*State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)...........................13

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305 (7th Cir.1980).....................17

*Burns v. Elrod*, 757 F.2d 151 (7th Cir. 1985) ...............................................................9

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014).......................................12, 19, 20

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)..........................................................17

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996)............................................................11, 18

*Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012)...................................................14

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ......................................9

*Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13 (2d Cir. 2003) ..........................13

*Safeco Ins. Co. of Am. v. Am. Int'l Group*, 710 F.3d 754 (7th Cir. 2013) ...................11

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006)...................11, 12

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002)...........11

**UNITED STATES DISTRICT COURT CASES:**

*Am. Int'l. Group, Inc. v. ACE INA Holdings, Inc.*,
    No. 07-cv-2898, 2011 WL 3290302 (N.D. Ill. July 26, 2011) .........................................18

*Am. Int'l Group, Inc. v. ACE INA Holdings, Inc.*,
    No. 07-cv-2898, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012).........................11, 12, 15, 18

*Blanco v. CEC Entm't Concepts L.P.*,
    No. 07-cv-0559, 2008 WL 239658 (C.D. Cal. Jan. 10, 2008)...........................................14

*Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939 (N.D. Cal. 2013)..............................14, 20

*Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130 (N.D. Ill. 1997) ......................16, 17, 18

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011) .............................................11, 12, 15, 16

*In re Facebook Privacy Litig.*, No. 10-cv-2389, Dkt. 69 (N.D. Cal. Dec. 10, 2010) ..................17

*In re Google Buzz Privacy Litig.*,
    No. 10-cv-672, 2011 WL 7460099 (N.D. Cal. June 2, 2011)....................................14, 20

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ........................15, 16

*In re Netflix Privacy Litig.*,
    No. 11-cv-379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) .................................14, 20

*In re Netflix Privacy Litig.*, No. 11-cv-379, Dkt. 59 at 5 (N.D. Cal. Aug. 12, 2011) ...................17

*In re Sw. Airlines Voucher Litig.*,
    No. 11-cv-8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) ........................................12

*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) ......................................................9

*Redman v. RadioShack Corp.*,
    No. 11-cv-06741, 2014 WL 497438 (N.D. Ill. Feb 7, 2014).................................9, 11, 17

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)..........................................11, 16

**RULES AND STATUTES:**

815 ILCS 505 ...................................................................................................................3

18 U.S.C. § 2701 .........................................................................................................3, 4

18 U.S.C. § 2511 .........................................................................................................3, 4

18 U.S.C. § 1030 .........................................................................................................3, 4

28 U.S.C. § 1404 ...............................................................................................................5

Fed. R. Civ. P. 12 .........................................................................................................4, 5

Fed. R. Civ. P. 23 ...................................................................................................... *passim*

**MISCELLANEOUS:**

*comScore, Inc. (SCOR)*, Wall Street Journal, http://quotes.wsj.com/SCOR .......................14 n. 11

*Federal Judicial Center, Judges' Class Action Notice and Claims Process*
*Checklist and Plain Language Guide* (2010)..........................................................................9, 10

R. LeCours, Note, *Steering Clear of the "Road to Nowhere": Why the BMW Guideposts Should*
*Not be Used to Review Statutory Penalty Awards*, 63 Rutgers L. Rev. 327 (2010) .............13 n. 10

In accordance with the Court's June 6, 2014 Order granting preliminary approval to the Settlement[1] reached in this case, (Dkt. 353), the Settlement Administrator and comScore have effectuated the broad multi-part Notice Plan[2] set forth in the Settlement Agreement, and the deadline for opt-outs and objections has now passed. The reaction of the Settlement Class can only be characterized as overwhelmingly positive: nearly ten thousand claims have been filed, not a single Class Member objected to the Settlement, and only one has opted-out. Likewise, in response to the Parties' CAFA notice, no state Attorney General voiced an objection to the Settlement.[3]

The Class's favorable reaction is of little surprise given the strength of the Settlement. To recap the relief, comScore agreed to establish a $14 million non-reversionary Settlement Fund, from which Class Members' claims, notice and administrative expenses, Court-awarded attorneys' fees, and an incentive award to the named Class Representatives will be paid. With respect to the individual relief to claiming Class Members, it couldn't be more simple and straightforward to obtain, and the amount is meaningful. Indeed, by completing and submitting a one-page claim form (either online or in hard-copy form), each Class Member will receive a cash payment expected to be between $500 and $700—a remarkable result that far surpasses the settlements reached in other consumer privacy class actions. Further, comScore has agreed to modify its privacy policy and implement certain protocols to ensure that its privacy practices

---

[1]     All capitalized terms not defined herein shall have the meaning ascribed them in the Class Action Settlement Agreement.

[2]     Consisting of direct notice by mail, email, and "web pop" notice to Class members still running comScore's software on their computers, the creation of a Settlement Website (which allowed Class Members to view, complete, and file claim forms and review all relevant court documents), publication notice in *People*, *Parade*, and *Rolling Stones* magazines, an online media campaign designed to deliver 152,500,000 Adult 18+ impressions, and CAFA notice to the relevant governmental agencies.

[3]     To be clear, by pointing out that no Attorneys General, state or federal, have filed objections to the Settlement, Plaintiffs do not mean to imply that that is an endorsement of the Settlement in any way. All that is meant by the statement is that no objections have been filed by the relevant governmental agencies either.

remain consistent with its disclosures to consumers.

Given the exceptional results achieved, coupled with the overwhelmingly positive response from the Class, there is no question that the settlement should be viewed as fair, reasonable, and adequate, and that the Court's decision to grant preliminary approval was the right one. Ultimately, if the Court grants final approval, thousands of claiming class members will receive between $500 and $700, comScore will change its practices, and the Parties will be able to call an end to more than three years of hard-fought, expensive, and risky litigation. For these reasons, and as discussed further below, Plaintiffs respectfully request that the Court grant final approval of the Parties' Settlement and dismiss all Released Claims with prejudice.[4]

## I.     NATURE OF THE LITIGATION[5]

### A.     The Facts, the Law, and the Litigation History

comScore is a leading online analytics company that monitors over a trillion online interactions per month to offer its clients analysis and data regarding consumer behavior and purchasing habits. (Dkt. 345 at 7.) comScore primarily collects that data by distributing proprietary software known as OSSProxy to individual consumers (known as "panelists"), typically by "bundling" OSSProxy with free software—such as screensavers, music programs, games, and more—such that during the download and installation process for the bundled software, consumers install OSSProxy as well. (Dkt. 329 at ¶¶ 15, 22 – 33.) Once installed, OSSProxy monitors essentially all online activity performed on a panelist's computer, including websites viewed, items purchased, and information entered on webpages (including credit card numbers, addresses, telephone numbers, bank account numbers, and full names). After collecting

---

[4]     Pursuant to the Court's standing order, Plaintiffs will submit a proposed Final Judgment Order to the Court. The proposed order also accounts for the relief requested in Plaintiffs' previously filed Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award. (Dkt. 358.)

[5]     A more detailed analysis of the nature of the litigation is available in Plaintiffs' Motion for Preliminary Approval. (*See* Dkt. 345 at 2 – 10.)

that information, OSSProxy then obfuscates personally identifiable information and sends the data to comScore's servers, where comScore uses it as a basis for its research and analysis. (Dkt. 169 at ¶¶ 5, 7.)

Plaintiffs Harris and Dunstan had OSSProxy installed on their computers after downloading and installing software from comScore's bundling partners. (Dkt. 345 at 8.) Each alleges that OSSProxy was installed on their computers without their informed consent, and each maintains that upon discovering OSSProxy on their computers, they made efforts to uninstall it. (*Id.*) Consequently, on August 23, 2011, Plaintiffs filed their class action complaint against comScore, asserting claims for violation of the SCA; the ECPA; the CFAA; the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505; and for unjust enrichment.[6]

The SCA, ECPA, and CFAA were all enacted to protect the privacy of computers, electronic communications, and data. In relevant parts, the SCA prohibits any person or entity from intentionally accessing, without or in excess of authority, a facility through which an electronic communications service is provided, and thereby obtaining, altering, or preventing authorized access to a wire or electronic communication held in electronic storage. 18 U.S.C. § 2701. Likewise, the ECPA prohibits the intentional interception of any wire, oral, or electronic communication. 18 U.S.C. § 2511. And the relevant provisions of the CFAA prohibit anyone from intentionally accessing a protected computer without (or in excess of) authorization and obtaining information from it, and from knowingly causing the transmission of a program or code to a protected computer without authorization and thereby causing damage.

After Plaintiffs filed their complaint, protracted and highly contentious litigation followed. Initially, comScore filed a Motion to Dismiss or in the Alternative to Transfer, (Dkt.

---

[6]     After further litigation, Plaintiffs voluntarily dismissed their ICFA claims and the Court denied class certification as to the unjust enrichment claim. As such, only the statutes underlying the class claims—the SCA, ECPA, and CFAA—are explained herein.

12), arguing that while downloading OSSProxy, Plaintiffs had agreed to a forum selection clause compelling them to litigate in Virginia. (*Id.*) After the Court denied that motion on October 7, 2011, comScore moved to dismiss pursuant to Federal Rules 12(b)(1) and 12(b)(6). (Dkt. 39.) In response, Plaintiffs moved to strike that motion, asserting that Rule 12(g) prohibited comScore from filing successive pre-answer Rule 12 motions, (Dkt. 43), and on November 15, 2011, the Court denied comScore's Motion to Dismiss and granted Plaintiffs' Motion to Strike. (Dkt. 49.)

From there, comScore answered the Complaint and the Parties engaged in substantial discovery regarding class certification issues, including numerous sets of written discovery, motions to compel, extensive document production and review, and numerous depositions. (Dkt. 358-1 at ¶ 6.) In January 2013, at the close of the class discovery period, Plaintiffs moved for class certification, (Dkts. 152 – 158), and filed their Second Amended Complaint, asserting claims for violations of the SCA, ECPA, and CFAA, and for unjust enrichment. (Dkt. 169.)

After full briefing, the Court granted Plaintiffs' motion in part and denied it in part, certifying a Class of all individuals since 2005 who had comScore's software installed via one of comScore's bundling partners, and a Subclass of all Class members who were not presented with a functional hyperlink to the user license agreement ("ULA") when installing comScore's software. (Dkt. 186 ("the Certification Order").)[7] The Certification Order also appointed Plaintiffs as class representatives, Harris as a representative of the Subclass, and Plaintiffs' counsel as Class Counsel. (*Id.*) Following the Certification Order, comScore petitioned the Seventh Circuit Court of Appeals for leave to appeal pursuant to Fed. R. Civ. P. 23(f), and was joined in its efforts by six *amici curiae*. *See Harris v. comScore, Inc.*, No. 13-8007, Dkts. 1, 4, 9,

---

[7]     In the Certification Order, the Court also denied certification as to Plaintiffs' unjust enrichment claims. (Dkt. 186.)

10 (7th Cir.) (hereinafter "App. Dkt.").[8] Following full briefing, the Seventh Circuit denied comScore's Rule 23(f) petition. (Dkt. 199.)

Thereafter, the Parties proceeded with substantial and voluminous merits discovery. (Dkt. 358-1 at ¶ 6.) As with class discovery, the Parties exchanged tens of thousands of documents, took numerous depositions, and briefed several motions to compel. (*Id.*) Near the end of merits discovery, comScore renewed its motion to dismiss for improper venue, contending that Plaintiffs and the Class had assented to a forum clause compelling them to litigate in Virginia. (Dkts. 242, 243.) After briefing on that motion was complete, comScore—citing intervening Supreme Court authority—sought and received leave to file a Motion to Transfer Under 28 U.S.C. § 1404(a), relying on the same forum clause from its Rule 12(b)(3) motion. (Dkt. 302.) Following full briefing on that motion, Plaintiffs moved for partial summary judgment on the authorization elements of, and consent defenses to, their claims under the SCA, ECPA, and CFAA. (Dkts. 321, 323.)

## B. The Mediations and the Settlement Agreement

Settlement discussions in this case began in earnest in August 2013—shortly after the Seventh Circuit denied comScore's Rule 23(f) petition. (Dkt. 358-1 at ¶ 7.) On August 22, 2013, the Parties engaged in a full-day mediation presided over by Rodney A. Max of the Upchurch Watson White and Max Mediation Group. (*Id.* ¶ 8.) Despite the best efforts of the Parties and Mr. Max—both during the in-person mediation and over several months of follow-up discussions—the Parties were unable to reach a settlement and instead continued with merits discovery. (*Id.* ¶ 6.)

Near the end of merits discovery, the Parties agreed to proceed with a settlement

---

[8] Those *amici* were the Direct Marketing Association, the American Association of Advertising Agencies, the Association of National Advertisers, the Entertainment Software Association, the Interactive Advertising Bureau, and the Chamber of Commerce of the United States of America.

conference before Magistrate Judge Kim, which took place on November 25, 2013. (*Id.* ¶ 9.) Though that conference did not lead to settlement, the Parties did feel they had made significant progress, and therefore agreed to a second settlement conference with Magistrate Judge Kim, which took place on December 16, 2013. (*Id.* ¶ 10) While that settlement conference did not result in a settlement either, after additional discussions in the months following, Magistrate Judge Kim made a mediator's proposal providing for a $14 million non-reversionary common fund. (*Id.* ¶ 11.) However, the Parties did not accept Magistrate Judge Kim's proposal before its expiration date, and the Magistrate terminated the referral on January 13, 2014. (Dkt. 308.)

After Magistrate Judge Kim exhausted his settlement efforts, the Parties continued to litigate, culminating with the aforementioned motions to dismiss, to transfer, and for summary judgment. (Dkts. 242, 302, 321.) Notwithstanding, throughout this time, the Parties continued their settlement negotiations, and on March 19, 2014, they agreed to the terms of Magistrate Judge Kim's original mediator's proposal—a settlement creating a non-reversionary $14 million common fund. (Dkt. 358-1 at ¶ 13.) Over the following two months, the Parties negotiated the remaining settlement terms, including prospective relief, class notice, the claims process, and various other issues, and on May 30, 2014, the Parties and their counsel agreed to execute the Settlement Agreement. (*Id.*)

On June 6, 2014, this Court granted preliminary approval to the Settlement, (Dkt. 353), holding that the Settlement appeared to be fair, reasonable, and adequate, that it was negotiated in good faith at arms-length, and that the proposed Notice Plan to the Class was appropriate and provided due process of law to absent Class Members. (*Id.*) Pursuant to the Court's Order granting preliminary approval, notice was effectuated shortly thereafter. (*See* Declaration of Stefanie C. Gardella Re: Notice Procedures ("Gardella Dec."), Ex. A; Declaration of Thomas S.

Cushing ("Cushing Dec."), Ex. B.)[9]

## II.     TERMS OF THE SETTLEMENT

The terms of the Settlement preliminarily approved by the Court are set forth in the

Settlement Agreement (Ex. C), and briefly summarized as follows:

      A.     ***Class Definition.*** "All individuals who, at any time since 2005, had comScore's

Data Collection Software downloaded and installed on their computers via a bundling partner,

and used their computer in interstate commerce and/or communication." (Dkt. 353 at 2; Ex. C at

¶ 1.43.)

      B.     ***Class Member Payments.*** The Settlement provides for the establishment of a

$14,000,000.00 Settlement Fund, from which each Class Member who submits a valid Claim

Form shall be entitled to a *pro rata* share of the money remaining in the Settlement Fund after

payment of all Settlement Administration Expenses, incentive awards to the Class

Representatives, and the Fee Award to Class Counsel. (Ex. C at §§ 2.1 – 2.2(a).) The *pro rata*

share shall not exceed the statutory damages available under the SCA ($1,000) and the ECPA

($10,000). (*Id.* § 2.2(a).) Based on the current claims rate and that which is to be expected before

expiration of the Claims Deadline, Plaintiffs estimate that each Class Member who submits a

valid Claim Form will receive between $500 and $700 (assuming full attorneys' fees are

awarded by the Court). (Balabanian Decl. at ¶ 4.)

      C.     ***Prospective Relief.*** comScore has also agreed to modify the terms of its

"Disclosure Statement" and "User License Agreement" to make them consistent with its data

collection practices, and to accurately disclose and identify (a) the categories of information

collected by OSSProxy and (b) each company collecting such information. (Ex. C at § 2.3(a).)

---

[9]      Throughout this motion, all references to exhibits (i.e., "Ex. A") refer to the exhibits attached to the Declaration of Rafey S. Balabanian, filed contemporaneously herewith.

Further, comScore has agreed to implement systems and procedures to ensure that its third-party bundling partners include a functional and conspicuous hyperlink to the ULA in each Disclosure Statement, and to establish a mechanism for individuals to receive easily understood instructions for removing OSSProxy from their computers. (*Id.* §§ 2.3(b), (c).) Finally, comScore has agreed to continue its practice of engaging an independent third party to perform semi-annual privacy audits, and to expand the scope of those audits to ensure compliance with the Settlement's prospective relief provisions. (*Id.* § 2.3(d).) The costs of those audits, up to a total of $100,000.00, are to be paid from the Settlement Fund. (*Id.*)

  **D.** ***Additional Relief.*** In addition to the individual monetary payments and the prospective relief discussed above, comScore has also agreed to provide the following relief:

   **1.** **Payment of Notice and Settlement Administration Expenses:** comScore has agreed to pay from the Settlement Fund the costs of effectuating the Court-approved Notice Plan, as well as all expenses incurred by the Settlement Administrator in processing and paying valid claims and otherwise administering the Settlement. (*See id.* at § 1.41.)

   **2.** **Incentive Award for Class Representatives:** comScore has agreed, subject to Court approval, to pay Plaintiffs Harris and Dunstan an incentive award of $11,000 each, in addition to any money they will receive as claiming Class Members through the Settlement Agreement. (*Id.* at § 8.3.)

   **3.** **Payment of Attorneys' Fees and Expenses:** comScore has agreed, subject to Court approval, to pay Class Counsel reasonable attorneys' fees and to reimburse expenses in this Action. On August 20, 2014, Plaintiffs submitted their Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award, requesting attorneys' fees in the amount of

$4,662,000 and reimbursement of expenses in the amount of $101,069.13. (Dkt. 358.)

      **E.**     ***The Release.*** Should the Court grant final approval to the Settlement Agreement, comScore and each of its affiliated and/or related entities will receive a full release of all claims related to the alleged monitoring and collection of data from Class Members' computers using OSSProxy. (Ex. C at § 3.)

## III.    THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS

      Prior to granting final approval to this Settlement, the Court must first consider whether the Notice to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Redman v. RadioShack Corp.*, No. 11-cv-06741, 2014 WL 497438, *2 (N.D. Ill. Feb 7, 2014). The "best notice practicable" does not require receipt of actual notice by all class members in order to comport with both Rule 23 and the requirements of due process however. Rather, "notice should be mailed to the last known addresses of those who can be identified and publication used to notify [the] others." *Mangone v. First USA Bank*, 206 F.R.D. 222, 231 – 32 (S.D. Ill. 2001) (internal citations omitted); *see also Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification"). Publication notice is also not limited to print media—the "World Wide Web is an increasingly important method of communication, and . . . an increasingly important substitute for newspapers." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004). The Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable. *Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), at 3.

The multipart Notice Plan approved by the Court has been fully carried out by professional settlement administrator Kurtzman Carson Consultants, LLC ("KCC") and comScore, and consisted of direct mail and email notice; the use of direct "web pop" notifications to provide some 510,737 Class Members currently running OSSProxy on their computers with summary notice of the Settlement (including an active hyperlink to the Settlement Website); an online media campaign including internet banner ads designed to deliver 152,500,000 Adult 18+ impressions; publication of half-page advertisements in *People* and *Rolling Stone* magazines, and two-fifths page advertisements in *Parade* magazine; the establishment of a Settlement Website that provided the Notice, important Court documents, and the ability to download and file Claim Forms online; as well as notice to the U.S. and state Attorneys General as required by the Class Action Fairness Act, 28 U.S.C. § 1715. (*See* Gardella Dec. at ¶¶ 5 – 20; Cushing Dec. at ¶¶ 3 – 5.) Through the individual notices (i.e., mail, email, and "web pop" notices) together with the online and print media campaigns, notice was disseminated to more than 74.1% of the Class. (Gardella Dec. at ¶ 21; Cushing Dec. at ¶ 5.)

All of the notices directed Class Members to the Court-approved "long form" notice that was posted on www.DataCollectionSettlement.net. (Gardella Dec. at ¶ 11.) Through this website, Class Members were able to file claims online, print claim forms to be mailed to KCC, and review documents filed with the Court in this case. (*Id.*) Since going "live," there have been 487,295 visitors to the website. (*Id.*) As the Notice Plan reached over 74.1% of the Class, it fully satisfies Rule 23 and due process. *See Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), at 3.

## IV.      THE SETTLEMENT WARRANTS FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) mandates that "claims, issues, or defenses of a

certified class may be settled . . . only with the court's approval . . . after a hearing and finding

that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); *Am. Int'l Group, Inc. v. ACE INA

Holdings, Inc.*, 07 CV 2898, 2012 WL 651727, *1 (N.D. Ill. Feb. 28, 2012), appeal dismissed

*Safeco Ins. Co. of Am. v. Am. Int'l Group*, 710 F.3d 754 (7th Cir. 2013). Even still, "[f]ederal

courts naturally favor the settlement of class action litigation." *Schulte v. Fifth Third Bank*, 805

F. Supp. 2d 560, 578 (N.D. Ill. 2011) (citing *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)).

Given this predisposition towards favoring settlements, the Court's inquiry as to whether to grant

approval "is limited to [the consideration of] whether the proposed settlement is lawful, fair,

reasonable and adequate," *Uhl v. Thoroughbred Tech. & Telecomms., Inc.,* 309 F.3d 978, 986

(7th Cir. 2002), and the "court should not substitute its own judgment as to the best outcomes for

the litigants and their counsel." *Redman*, 2014 WL 497438, *3.

There is a five-factor analysis that must be employed by the district court to consider the

overall fairness of the settlement:

> [1] the strength of plaintiffs' case compared to the amount of defendants'
> settlement offer, [2] an assessment of the likely complexity, length and expense of
> the litigation, [3] an evaluation of the amount of opposition to settlement among
> affected parties, [4] the opinion of competent counsel, and [5] the stage of the
> proceedings and amount of discovery completed at the time of settlement.

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal

citations omitted); *accord In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F.

Supp. 2d 935, 958 (N.D. Ill. 2011). Each factor here militates in favor of final approval.

### A.    The Strength of Plaintiffs' Case Compared to Settlement Weighs in Favor of Granting Approval.

"The most important factor relevant to the fairness of a class action settlement is the first

one listed: the strength of plaintiffs' case on the merits balanced against the amount offered in

the settlement." *Synfuel*, 463 F.3d at 653; *Redman*, 2014 WL 497438, *3. The strength of a

plaintiff's case can be quantified by examining "the net expected value of continued litigation to the class" and then estimating "the range of possible outcomes and ascrib[ing] a probability to each point on the range." *Am. Int'l Group, Inc.*, 2012 WL 651727, *2 (quoting *Synfuel*, 463 F.3d at 653); *see also Eubank v. Pella Corp.*, 753 F.3d 718, 727 (7th Cir. 2014) (finding district court should "estimate the likely outcome of a trial "in order to evaluate the adequacy of the settlement"). However, "the Seventh Circuit recognizes that a high degree of precision cannot be expected in these calculations" and "[i]nstead, courts are to provide a ballpark valuation of the class's claims." *Am. Int'l Group, Inc*., 2012 WL 651727, *2. (internal quotations omitted). "In considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval." *In re Sw. Airlines Voucher Litig*., No. 11-cv-8176, 2013 WL 4510197, *7 (N.D. Ill. Aug. 26, 2013). Finally, "[b]ecause the essence of settlement is compromise courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility*, 270 F.R.D. at 347 (internal quotations omitted).

While Plaintiffs here are confident in their claims, they recognized that further litigation would carry substantial risks. Not only is comScore represented by highly experienced attorneys from one of the world's pre-eminent law firms, it has made clear that in the absence of a settlement, it would assert vigorous defenses on summary judgment and at trial, and would move to de-certify the class. (Dkt. 345-1 at ¶ 11.) Among the defenses comScore would assert are traditional merits defenses such as consent (which comScore has always maintained that each Class Member provided), as well as more complex defenses such as whether Plaintiffs can satisfy the "facility" and "electronic communication service" elements of their SCA claims, the "interception" and "electronic communication" elements of their ECPA claims, and the minimum damages requirement of their CFAA claims. (*Id.*). While some of these defenses could

12

be resolved on summary judgment, many (if not most) could only be resolved through a complex, risky, and expensive trial. (*See* Dkt. 323 (seeking summary judgment solely on issues of authorization and consent); Dkt. 345-1 at ¶ 12.) Although Plaintiffs are confident that they would ultimately prevail at trial, these are issues of first impression, making the chances of doing so something like a coin flip. (Balabanian Decl. at ¶¶ 5 – 6.) And assuming they prevailed at trial, Plaintiffs recognize that comScore would certainly appeal the merits of any adverse decision, and that in light of the massive aggregated statutory damages available to the Class, any such recovery, *beyond the impossibility of collection*, would likely be reduced judicially.[10]

(*Id.*) The Supreme Court has yet to rule on the constitutionality of disproportionate federal statutory damage awards, but appellate courts have observed that "the potential for a devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class, may raise due process issues." *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003). The Second Circuit explained that such issues arise:

> from the effects of combining a statutory scheme that imposes minimum statutory damages awards on a per-consumer basis … with the class action mechanism that aggregates many claims-often because there would otherwise be no incentive to bring an individual claim. Such a combination may expand the potential statutory damages so far beyond the actual damages suffered that … the due process clause might be invoked, not to prevent certification, but to nullify that effect and reduce the aggregate damage award.

*Id.* (*citing State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003); BMW, 517 U.S. at 580)). Even more, concerns about disproportionately large statutory damage awards are

---

[10]     Though Plaintiffs maintain that the sheer size of a statutory damages award cannot render it unconstitutional—see generally R. LeCours, Note, *Steering Clear of the "Road to Nowhere": Why the BMW Guideposts Should Not be Used to Review Statutory Penalty Awards*, 63 Rutgers L. Rev. 327 (2010); *see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 443 (2001) ("I continue to believe that the Constitution does not constrain the size of punitive damages awards") (Thomas, J., concurring) (*citing BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 599 (1996) (Scalia, J., joined by Thomas, J., dissenting))—they acknowledge the likelihood that if they obtained a judgment on the merits and the maximum statutory damage award of approximately $110 billion, in all reality, the Court could reduce the award using remittitur or find the award unconstitutionally excessive.

heightened where a statutory award would be annihilative to the defendant. In *Blanco v. CEC Entm't Concepts L.P.*, No. 07-cv-0559 GPS, 2008 WL 239658 (C.D. Cal. Jan. 10, 2008), for example, the court pointed out that statutory damages ranging from $200 million to $2 billion "would completely swallow [defendant's] net income last year of $68,257,000 [and] would be grossly disproportionate to the harm [alleged]." *Id.* at *2.

Here, in comparison, a theoretical $110 *billion* statutory damage award is more than fifty times the highest potential award in *Blanco*, and is even further out of proportion relative to comScore's 2014 net loss of $2.3 million. (See comScore, Inc., Annual Report (Form 10-K) (Feb. 18, 2014). Facing a massive statutory award of approximately $110 billion—more than eighty times comScore's current market capitalization[11]—the Court would, in all likelihood, reduce the award to a more manageable number.

In light of these many issues still facing them, Plaintiffs view the $14 million non-reversionary Settlement Fund—with the $500 to $700 per claimant payment—as well as the prospective relief offered by the Settlement, to be an extraordinary result for the Class, especially when compared to other privacy class action settlements, which have typically resulted in *cy pres* donations or, at most, *de minimis* recoveries for claimants. *See*, *e.g.*, *In re Netflix Privacy Litig.*, No. 11-cv-379, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) (granting final approval to $9 million, *cy pres*-only settlement); *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) (affirming final approval of $9.5 million, *cy pres*-only settlement); *In re Google Buzz Privacy Litig.*, No. 10-cv-672, 2011 WL 7460099 (N.D. Cal. June 2, 2011) (granting final approval to $8.5 million, *cy pres*-only settlement); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939 (N.D. Cal. 2013) (granting final approval of $20 million settlement providing recovery of $15 per claimant).

---

[11] *See comScore, Inc. (SCOR)*, Wall Street Journal, http://quotes.wsj.com/SCOR (last accessed Sept. 16, 2014).

Thus, given the substantial risks, expense, and delay that would accompany further litigation, and in comparison to other privacy class action settlements, the Settlement offers substantial value relative to the strength of Plaintiffs' case. The first—and most important— *Synfuel* factor strongly supports final approval.

### B. The Likelihood of an Increase in the Complexity, Length, and Expense of Continued Litigation Validates Final Approval of the Settlement.

Final approval of a settlement is favored in cases like this one, where "continued litigation would require resolution of complex issues at considerable expense and would absorb many days of trial time." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000). There can be no doubt that continued litigation in this case would result in the Parties incurring further, substantial expenses, including the costs of further expert discovery and testimony, and further briefing. And should the case proceed to trial, evidence and witnesses from across the country would have to be convened, adding additional expense to the litigation. *See In re AT&T,* 789 F. Supp. 2d at 964 (recognizing that where a complex class action survives the summary judgment stage, it leads to "lengthy and expensive" trial); (Balabanian Decl. at ¶ 5.) Given the amount of potential statutory damages at issue and the lack of Seventh Circuit guidance on several of the relevant issues in dispute, the defeated party would certainly appeal an unfavorable judgment, resulting in greater expenses and a further delay of the final resolution of this case. Therefore, this factor weighs in favor of finally approving the Settlement also.

### C. There Has Been No Opposition to the Settlement.

Where a settlement has garnered few or no objectors, courts should view this as further proof that the settlement is fair and reasonable and that class members consider the settlement to be in their best interest. *Am. Int'l Group*, 2012 WL 651727, at *1. In those cases where there have been no objectors, or very few in comparison to the total number of class members, courts

15

have considered this to be "strong circumstantial evidence favoring settlement." *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020 – 21 (finding that a settlement where "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlements"); *In re AT&T Mobility*, 789 F. Supp. 2d at 964 – 65 ("[I]t is illuminative that only a tiny fraction of the Class Members saw fit to opt out or to object.").

Here, not a single one of the roughly 10 million Class Members objected, and only one Class Member opted out of the Settlement. (Gardella Dec. at ¶¶ 23, 24.) Further, since the Court granted preliminary approval to the Settlement, and in furtherance of their obligations to the Class, attorneys and staff at Edelson PC spoke with hundreds of Class Members about the Settlement in exercise of their obligation to the Class. (Balabanian Decl. at ¶ 8.) These Class Members expressed nearly uniform approval of the Settlement, and not a single one (nor any of the other 10 million Class Members) saw fit to object. (*Id.*) This complete absence of objections, coupled with the positive responses to the Settlement and the presence of only a single exclusion request demonstrates the soundness of the Court's preliminary approval of the Settlement, and that final approval should be granted as well.

### D. The Opinion of Competent Counsel Favors Approval.

"The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23." *Schulte*, 805 F. Supp. 2d at 586. This is especially true where Class Counsel are qualified, where discovery and settlement negotiations are extensive and thorough, and where there is no indication of collusion. *Id.*; *see also Hispanics United v. Vill. of Addison*, 988 F. Supp. 1130, 1150 n. 6 (N.D. Ill. 1997) (noting that a "strong initial presumption of fairness attaches" where the settlement is "the result of arm's length negotiations," and where plaintiff's counsel are "experienced and have engaged in adequate discovery"). Further, "the absence of collusion, as evidenced by the time spent in arms-length

negotiations under the supervision of this Court . . . weighs in favor of final approval." *Redman*, 2014 WL 497438, *6; *Hispanics United.*, 988 F. Supp. at 1169 (finding Court's participation in settlement conferences demonstrated an absence of collusion).

Here, Class Counsel are recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on the issue." *In re Facebook Privacy Litig.*, No. 10-cv-2389, Dkt. 69 at 5 (N.D. Cal. Dec. 10, 2010); *see also In re Netflix Privacy Litig.*, No. 11-cv-379, Dkt. 59 at 5 (N.D. Cal. Aug. 12, 2011) (appointing firm as sole lead counsel due, in part, to its "significant and particularly specialized expertise in electronic privacy litigation and class actions[.]").) That substantial and particularized experience has allowed Class Counsel to accurately weigh the merits of the Class's claims along with the risks and potential rewards of further litigation as compared to settlement. Further, as this settlement was reached only after multiple settlement conferences, including through private mediation and then with Magistrate Judge Kim, and the Parties' eventual acceptance of Magistrate Judge Kim's mediator's proposal, there isn't even a hint of collusion that could attach to the process. In the end, Class Counsel believes that this substantial and landmark recovery for the Class is preferable to further protracted litigation and the risk of obtaining nothing for the Class should any one of comScore's defenses succeed. Thus, the opinion of Class Counsel favors final approval.

### E. The Stage of the Proceedings and the Amount of Discovery Completed Weigh in Favor of Final Approval.

The fifth factor concerning the stage of the proceedings is relevant because it determines "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir.1980), overruled on other grounds by *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). This factor is satisfied

where "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough," *Isby*, 75 F.3d at 1200, and is clearly satisfied in cases such as this where there has been "massive discovery, various legal and evidentiary pretrial rulings . . . briefing on a motion for partial summary judgment," certification of an adversarial class, and the case was headed for trial. *See Hispanics United*, 988 F. Supp. at 1171.

Here, the fact that discovery was substantially complete strongly supports final approval of the Settlement. In fact, the *only* discovery left to complete prior to settlement was expert discovery on the merits. (*See* Dkt. 215.) The Parties had completed fact and expert discovery regarding class issues, as well as extensive fact discovery regarding the merits. (Dkt. 345-1 at Decl. ¶¶ 2, 4.) Frankly, there was no more information for either Party to obtain; the Parties simply were going to offer expert interpretations of existing information. As such, Plaintiffs were fully informed of the relevant facts prior to the Settlement, and were able to negotiate a Settlement that not only offered landmark relief for a privacy class action settlement, but also compared favorably to the expected recovery going forward.

Ultimately, "extensive discovery has undisputedly been completed, and the court has been presented with volumes of argument, declarations, and exhibits." *Am. Int'l. Group, Inc. v. ACE INA Holdings, Inc.*, No. 07-cv-2898, 2011 WL 3290302, *8 (N.D. Ill. July 26, 2011). (*See also* Dkt. 104, 104-1 – 104-9; Dkt. 156, 156-1 – 156-20; Dkt. 178, 178-1 – 178-23; Dkts. 245, 246, 246-1 – 246-23; Dkt. 323, 325, 325-1 – 325-32.) "Thus, it is impossible to say that the court and the parties are unable to evaluate the merits of this case," *Am. Int'l. Group., Inc.*, 2011 WL 3290302, at *8, and the "extent of discovery" factor thus favors final approval. With this final *Synfuel* factor satisfied, the result supports a finding that the Settlement is fair, reasonable, and adequate, and deserving of this Court's final approval.

**F.      The Settlement Is Not a Product of Collusion and There Are No "Red Flags" Present in the Settlement.**

Finally, the Court should not hesitate to grant the Settlement final approval to the Settlement because it raises none of the "red flags" identified by the Seventh Circuit and other Courts in analyzing class settlements. In *Eubank*, the Seventh Circuit identified five potential indicators of a flawed settlement, none of which are present here. These included (i) the failure to properly establish the size of the fund and the total class recovery, (ii) the reversion of unawarded attorneys' fees to the defendant, (iii) substantial alterations to existing class definitions, (iv) the use of coupons, rather than cash payments, for class compensation, and (v) overly complicated claim forms. *See Eubank*, 753 F.3d at 723 – 29. Simply put, this Settlement does not raise those red flags, demonstrating that final approval is entirely appropriate.

Unlike the *Eubank* settlement, the Court here knows exactly how much money will be available to the Class under the Settlement: $14,000,000 minus payment of all Settlement Administration Expenses, incentive awards to the Class Representatives, and the Fee Award to Class Counsel. (Ex. C at § 1.45.) And while the exact *pro rata* recovery available to claiming class members is not yet finally determined, based on the claims rates to date, Class Counsel estimates that each claimant will recover between $500 and $700. (Balabanian Decl. at ¶ 4.) Thus, unlike *Eubank*, the Court knows how much the Class will recover in the aggregate ($7,725,800), and approximately how much individual claimants will recover ($500 – $700).

The same goes for the remaining red flags identified in *Eubank*. Should the Court decide not to award the full attorneys' fees sought by Class Counsel, the remainder will not revert to defendant (as it did in *Eubank*), but rather will remain in the Settlement Fund to be disbursed among claiming Class Members. (Ex. C at § 1.45.) Nor does the change in class definition call into question the propriety of certification as it did in *Eubank*. There, the Seventh Circuit

19

recognized adversity among the certified subclasses, thus rendering the settlement's provision of a single, unified class improper. *Eubank*, 753 F.3d at 821. Here, however, the Class Members' claims are materially indistinguishable from each other. As a result, there are no competing groups within the class, and none of the diametrically opposed interests that rendered the certification of a single, undivided class inappropriate in *Eubank*. *Id.*

And finally, unlike the *Eubank* settlement, which sought to provide only coupon payments to some class members through exceedingly long and difficult claim forms, *Eubank*, 753 F.3d at 725, the instant Settlement will provide each claiming Class Member with a substantial recovery—between $500 and $700 cash—through submission of a simple, one-page Claim Form either by mail or online through the Settlement Website. (Dkt. 345-2 at 41.) Therefore, given the absence of any red flags or opposition to the Settlement, the Court should grant final approval to the Settlement, and effectuate the relief to the Class Members.

———————————————

As established above, each of the factors considered at this stage strongly supports final approval, and the Settlement raises no "red flags" or evidence of collusion or self-dealing. And beyond that, the Settlement offers relief far beyond that traditionally provided by privacy class action settlements. *See, e.g.*, *In re Netflix Privacy Litig.*, 2013 WL 1120801 ($9 million, *cy pres*-only settlement); *Lane*, 696 F.3d 811 ($9.5 million, *cy pres*-only settlement); *In re Google Buzz Privacy Litig.*, 2011 WL 7460099 ($8.5 million, *cy pres*-only settlement); *Fraley*, 966 F. Supp. 2d 939 ($20 million settlement providing recovery of $15 per claimant).

Accordingly, Plaintiffs respectfully request that the Court grant final approval to the Settlement and dismiss all Released Claims with prejudice.

Dated: September 17, 2014

Respectfully submitted,

**MIKE HARRIS** and **JEFF DUNSTAN**, individually and on behalf of a class of similarly situated individuals,

By: s/  Rafey S. Balabanian
          One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Chandler R. Givens
cgivens@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

  I, J. Dominick Larry, an attorney, hereby certify that on September 17, 2014, I served the above and foregoing ***Plaintiffs' Motion for Final Approval of Class Action Settlement***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

s/ J. Dominick Larry    